MOLO LAMKEN LLP
JEFFREY A. LAMKEN (CA Bar # 154217)
The Watergate, Suite 660
600 New Hampshire Ave.
Washington, D.C.  20037
Telephone: (202) 556-2000
Facsimile: (202) 556-2001

*Counsel for Third-Party Defendant*
BANK MELLI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL BENNETT, *et al.*, | Case No. CV 11-5807 (CRB) (NJV) |
| Plaintiffs, | **MOTION TO VACATE DEFAULT** |
| v. | **Before the Honorable Charles R. Breyer and Nandor J. Vadas** |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | **Noticed Hearing:** |
| Defendants. | **August 3, 2012, 10:00 a.m.** |
| | |
| VISA INC. and FRANKLIN RESOURCES, INC., | |
| Third-Party Plaintiffs, | |
| v. | |
| BANK MELLI, *et al.*, | |
| Third-Party Defendants. | |

**MOTION TO VACATE DEFAULT**

# TABLE OF CONTENTS

Page

NOTICE OF MOTION.............................................................................................. 1

INTRODUCTION ..................................................................................................... 2

BACKGROUND ....................................................................................................... 3

ARGUMENT............................................................................................................. 5

I.      Bank Melli Did Not Engage in Culpable Conduct Leading to the
        Default ........................................................................................................... 6

II.     Bank Melli Has Several Meritorious Defenses............................................. 7

        A.      Bank Melli Was Never Properly Served.............................................. 8

        B.      Under the Supreme Court's Decision in *Bancec*, Bank Melli
                Cannot Be Held Liable for the Debts of Iran..................................... 11

        C.      The TRIA and Section 1610(g) Do Not Apply
                Retroactively ...................................................................................... 19

        D.      The Assets in this Court's Registry Are Not "Assets of" or
                "Property of" Bank Melli for Purposes of the TRIA or Section
                1610(g) ............................................................................................... 23

III.    Vacating the Default Will Not Prejudice Plaintiffs...................................... 24

CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acree v. Snow*, 276 F. Supp. 2d 31 (D.D.C. 2003) ................................................. 21

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277 (11th Cir. 1999) ................................................ 15

*Allied Mar., Inc. v. Descatrade SA*, 620 F.3d 70 (2d Cir. 2010) ............................. 8

*Bateman v. U.S. Postal Serv.*, 231 F.3d 1220 (9th Cir. 2000) ................................ 24

*Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188 (2011) ............................................... 23

*Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152 (D.D.C. 2009), *aff'd*, 618 F.3d 19 (D.C. Cir. 2010) ..................................... 18

*Calderon-Cardona v. JP Morgan Chase Bank, N.A.*, — F. Supp. 2d —, No. 11 Civ. 3283, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011) ..................... 23

*Ctr. for Biological Diversity v. U.S. Dep't of Agric.*, 626 F.3d 1113 (9th Cir. 2010) ............................................ 19, 21

*de la Mata v. Am. Life Ins. Co.*, 771 F. Supp. 1375 (D. Del. 1991), *aff'd mem.*, 961 F.2d 208 (3d Cir. 1992) ................................... 10

*Dobrota v. INS*, 311 F.3d 1206 (9th Cir. 2002) ..................................................... 10

*Ellis v. United States*, 206 U.S. 246 (1907) .......................................................... 23

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009) ........................................... 22

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) .................... 14

*Falk v. Allen*, 739 F.2d 461 (9th Cir. 1984) ........................................................ 2, 5

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835 (D.C. Cir. 2006) ................................................ 5, 10, 24

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*") ................................................ *passim*

ii

*Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002)........................13

*Franchise Holding II, LLC. v. Huntington Rests. Grp., Inc.*,
   375 F.3d 922 (9th Cir. 2004) ...................................................6

*Friedman v. Israel Labour Party*, No. 96-cv-4702, 1997 WL 379181
   (E.D. Pa. Jul. 2, 1997) ........................................................9

*G & G Closed Circuit Event, LLC v. Nguyen*, No. 5:10-CV-05722,
   2012 WL 900750 (N.D. Cal. Mar. 15, 2012) .......................................7

*Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989) ..............................7

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ..........................................16

*Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989) .........5

*Icho v. Hammer*, 434 F. App'x 588 (9th Cir. May 23, 2011) ..........................7

*In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31
   (D.D.C. 2009) .................................................................22

*In re Schwinn Bicycle Co.*, 190 B.R. 599 (Bankr. N.D. Ill. 1995) ...................9

*J & J Sports Prods., Inc. v. Gidha*, No. CIV-S-10-2509, 2011 WL
   3439205 (E.D. Cal. Aug. 4, 2011)..............................................21

*J & J Sports Prods., Inc. v. Tolentino*, No. 1:10-cv-02089, 2011 WL
   1899804 (E.D. Cal. May 19, 2011) ..............................................8

*Johnson v. United States*, 529 U.S. 694 (2000).....................................20

*Keegal v. Key West & Carribean Trading Co.*, 627 F.2d 372
   (D.C. Cir. 1980)...............................................................8

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ..............................19, 22

*Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097 (9th Cir. 2006) ..............5

*Limonium Mar., S.A. v. Mizushima Marinera, S.A.*, 961 F. Supp. 600
   (S.D.N.Y. 1997).................................................................8

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804).....................14

*Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010)...................11

MOTION TO VACATE DEFAULT

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) ............................................... 22

*Poe v. Seaborn*, 282 U.S. 101 (1930) ...................................................................... 23

*Practical Concepts Inc. v. Republic of Bolivia*, 811 F.2d 1543
   (D.C. Cir. 1987) ............................................................................................... 3, 5

*Robinson v. Hanrahan*, 409 U.S. 38 (1972) (per curiam) ...................................... 10

*Scott v. Boos*, 215 F.3d 940 (9th Cir. 2000) ........................................................... 20

*Straub v. AP Green, Inc.*, 38 F.3d 448 (9th Cir. 1994) ........................................... 10

*Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176 (1982) ................................ 12

*TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691 (9th Cir. 2001) ............ *passim*

*Thompson v. Am. Home Assurance Co.* 95 F.3d 429 (6th Cir. 1996) ..................... 24

*Vartelas v. Holder*, 132 S. Ct. 1479 (2012) ............................................................ 20

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), *petition
   for cert. filed*, 80 U.S.L.W. 3240 (U.S. Oct 6, 2011) (No. 11-431) ............ 15, 16

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .......................................... 15

### TREATIES, STATUTES, REGULATIONS, AND RULES

Treaty of Amity, Economic Relations, and Consular Rights,
   U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899 ...................................... 12, 13, 17, 18, 19

28 U.S.C. § 1602 *et seq.* ............................................................................................ 5

28 U.S.C. § 1605(a)(7) ............................................................................................. 14

28 U.S.C. § 1605A ............................................................................................. 17, 22

28 U.S.C. § 1608(b) ................................................................................................... 9

28 U.S.C. § 1608(b)(2) .............................................................................................. 9

28 U.S.C. § 1608(b)(3) .......................................................................................... 9, 10

28 U.S.C. § 1608(b)(3)(B) ..................................................................................... 9, 10

28 U.S.C. § 1610(f)(1)(A) ........................................................................................ 15

28 U.S.C. § 1610(g) ........................................................................................ *passim*

28 U.S.C. § 1610(g)(1) .................................................................................. 17

28 U.S.C. § 1610(g)(3) .................................................................................. 18

28 U.S.C. § 1610 note .................................................................................... 14

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a),
116 Stat. 2322 ...................................................................................... *passim*

Pub. L. No. 110-181, 122 Stat. 3, 341 (2008) ....................................... 21

31 C.F.R. § 544.507 ......................................................................................... 5

Fed. R. Civ. P. 55(c) ........................................................... 1, 2, 3, 5, 16

### LEGISLATIVE MATERIALS

H.R. 3485, 106th Cong. § 1(c) (Nov. 18, 1999) .................................... 13

148 Cong. Rec. 22,392 (Nov. 14, 2002) .................................................. 16

148 Cong. Rec. 23,122 (Nov. 19, 2002) .................................................. 16

*Justice for Victims of Terrorism Act:  Hearing on H.R. 3485 Before the
Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*,
106th Cong. (Apr. 13, 2000) ............................................................. 13

### OTHER AUTHORITIES

Brief for the United States as *Amicus Curiae*, *Rubin v. Islamic
Republic of Iran* (1st Cir. filed June 7, 2012) (No. 11-2144) ............. 23

*C-SPAN Video Library: Senate Session Nov. 19, 2002*,
http://www.c-spanvideo.org/program/SenateSession3032 ............... 16

Jennifer K. Elsea, Congressional Research Service, *Suits Against Terrorist
States by Victims of Terrorism* (Aug. 8, 2008) ........................... 18, 22

*Hague Conference on Private International Law: Status Table on the
Service Abroad of Judicial and Extrajudicial Documents in Civil
or Commercial Matters*, http://www.hcch.net/index_en.php?act=
conventions.status&cid=17 .................................................................... 9

MOTION TO VACATE DEFAULT

U.S. Dep't of Treasury, *Recent OFAC Actions* (Oct. 25, 2007),
    http://www.treasury.gov/resource-center/sanctions/OFAC-
    Enforcement/Pages/20071025.aspx ...................................................................... 20

Herman Walker, Jr., *Provisions on Companies in United States Commercial
    Treaties*, 50 Am. J. Int'l L. 373 (1956) ............................................................... 12

10A C. Wright *et al.*, *Federal Practice and Procedure* § 2696 (3d ed. 2012) ......... 2

**MOTION TO VACATE DEFAULT**

# NOTICE OF MOTION

To the Court, all parties, and counsel of record:

Please take notice that on Friday, August 3, 2012, at 10:00 a.m., before the Honorable Charles R. Breyer, at the U.S. District Court for the Northern District of California, San Francisco Courthouse, Courtroom 6 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Third-Party Defendant Bank Melli will and hereby does move the Court to vacate the default entered against it on April 26, 2012. *See* Doc. No. 79.

Bank Melli respectfully moves the Court to vacate the default pursuant to Federal Rule of Civil Procedure 55(c) and to allow this action to proceed to consideration of Bank Melli's jurisdictional and other defenses on the merits, for the reasons set forth more fully herein.

1

1

## **INTRODUCTION**

2    Plaintiffs and certain third-party defendants (collectively "Plaintiffs") hold

3    judgments against the Islamic Republic of Iran.  In this action, they seek to execute

4    those judgments against assets held by Visa Inc. and Franklin Resources, Inc.

5    ("Visa" and "Franklin") for the benefit of Bank Melli, an Iranian bank.  Bank Melli

6    is a separate legal entity from the government of Iran.  It is not named as a defen-

7    dant in the judgments and had no involvement in the events underlying them.

8    Bank Melli is headquartered in Iran, and the funds at issue relate to services

9    performed there.  Nonetheless, when Visa and Franklin added Bank Melli to this

10   suit, they never tried to serve Bank Melli's head office in Tehran.  Instead, they

11   mailed the complaint to a defunct branch in Paris, which had ceased banking op-

12   erations nearly four years before the complaint was mailed, after having been taken

13   over by the French government.  Unaware of the pending attempt to seize its as-

14   sets, Bank Melli failed to answer, and on April 26, the Clerk of Court entered a de-

15   fault against it.  Doc. No. 79.

16   Bank Melli now respectfully moves to vacate that default pursuant to Fed-

17   eral Rule of Civil Procedure 55(c) and defend this action on the merits.[1]  Rule

18   55(c) allows the Court to set aside a default for "good cause."  Fed. R. Civ. P.

19   55(c).  "Rule 55(c) motions are frequently granted," 10A C. Wright *et al.*, *Federal*

20   *Practice and Procedure* § 2696 (3d ed. 2012), because a "judgment by default is a

21   drastic step appropriate only in extreme circumstances," *Falk v. Allen*, 739 F.2d

22   461, 463 (9th Cir. 1984).  Those principles carry special weight when the defen-

23   dant is a sovereign:  "Intolerant adherence to default judgments against foreign

24   states could adversely affect this nation's relations with other nations and under-

25   mine the State Department's continuing efforts to encourage foreign sovereigns

26

27   ─────────────
[1] Bank Melli is appearing and moving to vacate the default solely to assert immu-

28   nity and protect its interest in the assets at issue.  Bank Melli disputes the Court's
jurisdiction over it and those assets and reserves all jurisdictional arguments.

**MOTION TO VACATE DEFAULT**

1   generally to resolve disputes within the United States' legal framework." *Practical*

2   *Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551 n.19 (D.C. Cir. 1987)

3   (R.B. Ginsburg, J.) (quotation marks and alterations omitted).

4       Bank Melli easily satisfies Rule 55(c)'s requirements. Each of the relevant

5   factors—whether the default was caused by the defendant's culpable conduct,

6   whether the defendant has a potentially meritorious defense, and whether re-

7   opening will prejudice the plaintiff—favors lifting the default here.  The default

8   was not any fault of Bank Melli's.  To the contrary, Bank Melli failed to answer

9   the complaint only because Visa and Franklin sent the papers to a long-since de-

10  funct branch in Paris rather than Bank Melli's head office in Tehran.  Bank Melli

11  also has multiple defenses to Plaintiffs' effort to hold it liable for another entity's

12  debts—defenses that should be resolved on the merits.  Finally, vacating the de-

13  fault will not prejudice Plaintiffs at all.  The motion should accordingly be granted.

## BACKGROUND

15      Founded in 1928, Bank Melli is Iran's largest financial institution.  Ahangari

16  Decl. ¶ 2.  With more than 43,000 employees at 3,300 branches, the bank handles a

17  larger share of project and trade financing than any other Iranian bank, as well as a

18  considerable share of private sector deposits.  *Id.*  Although Bank Melli's stock is

19  currently wholly owned by the Iranian government, the bank is separately incorpo-

20  rated, with its own share capital and board of directors.  *Id.*  Bank Melli maintains

21  its head office in Tehran, and has also maintained separate branches in other coun-

22  tries.  *Id.* ¶ 3.

23      This case concerns certain assets held by Visa Inc. and Franklin Resources,

24  Inc. in which Bank Melli has an interest.  Ahangari Decl. ¶ 6.  Those assets stem

25  from a 1991 agreement between Visa and Bank Melli under which Bank Melli

26  agreed to accept Visa cards in Iran through its branches in that country.  *Id.*

27      On December 2, 2011, some of the Plaintiffs in this case filed a complaint

28  against Visa and Franklin seeking to execute against the assets in order to satisfy a

**MOTION TO VACATE DEFAULT**

judgment previously obtained against the government of Iran stemming from a 2002 bombing in Jerusalem.  Doc. No. 1 ¶ 3.  On February 3, 2012, Visa and Franklin filed a third-party complaint in the nature of an interpleader, naming as defendants Bank Melli and other third-party defendants with potential claims against the assets.  Doc. No. 16.  Visa and Franklin later deposited the assets into this Court's registry.  Doc. Nos. 88-89.

Visa and Franklin did not serve the third-party complaint on Bank Melli's head office in Iran.  Instead, their counsel mailed a copy to Bank Melli's former Paris branch, to the attention of Mr. Mohammad Shadkami, General Manager.  Doc. No. 45-1.  The complaints do not allege that the assets at issue have any connection to Bank Melli's Paris branch, as opposed to its head office in Iran, where the Visa program operated.  *See* Doc. Nos. 1, 16.

Due to European Union sanctions, the operations of Bank Melli's Paris branch have been suspended since June 2008.  Ahangari Decl. ¶ 4 & Exs. A-C.  At that time, all Iranian staff at the branch, including Mr. Shadkami, were removed from office by the French Banking Commission.  *Id.* ¶ 4 & Ex. C.  The Paris branch currently carries on only very limited administrative affairs, all conducted by persons appointed by the French government.  *Id.* ¶ 4.  The complaint was thus mailed to the attention of a long-since removed manager at a branch with no connection to the dispute that had long since stopped operating.  As a result, Bank Melli did not learn of the complaint until months after it was filed.  *Id.* ¶¶ 7-10.

On April 26, 2012, the Clerk entered a default against Bank Melli.  Doc. No. 79.  On June 11, Plaintiffs filed a stipulation and proposed order seeking to disburse the assets from the Court's registry.  Doc. No. 95.  The next day, Bank Melli's current counsel entered an appearance, opposed the stipulation, and moved to stay distribution.  Doc. Nos. 96, 98.[2]  Bank Melli now moves to vacate the de-

---

[2] As undersigned counsel advised the Court in earlier correspondence, Bank Melli is seeking to retain San Francisco counsel, Mr. John D. Cline, to represent it in this

**MOTION TO VACATE DEFAULT**

1   fault entered against it, so that it may defend this matter.

2   <u>**ARGUMENT**</u>

3   Rule 55(c) provides that a "court may set aside an entry of default for good

4   cause." Fed. R. Civ. P. 55(c). "[D]efault is a drastic step appropriate only in ex-

5   treme circumstances," and "a case should, whenever possible, be decided on the

6   merits." *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984); *see also Latshaw v.*

7   *Trainer Wortham & Co.*, 452 F.3d 1097, 1103 (9th Cir. 2006). "[W]here there has

8   been no merits decision, appropriate exercise of district court discretion . . . ***re-***

9   ***quires*** that the finality interest should give way fairly readily, to further the com-

10  peting interest in reaching the merits of a dispute." *TCI Group Life Ins. Plan v.*

11  *Knoebber*, 244 F.3d 691, 696 (9th Cir. 2001) (emphasis added).

12  Bank Melli, moreover, is a foreign instrumentality entitled to the protections

13  of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*

14  "The involvement of a foreign sovereign is an unusual interest which must be

15  taken into account." *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170,

16  175 (5th Cir. 1989). "[I]t is important that [the sovereign's] defenses be consid-

17  ered carefully and, if possible, that the dispute be resolved on the basis of . . . all

18  relevant legal arguments." *FG Hemisphere Assocs., LLC v. Democratic Republic*

19  *of Congo*, 447 F.3d 835, 839 (D.C. Cir. 2006) (quotation marks omitted). As then-

20  Judge Ruth Bader Ginsburg observed, sovereign status weighs heavily in favor of

21  vacating a default: "Intolerant adherence to default judgments against foreign

22  states could adversely affect this nation's relations with other nations and under-

23  mine the State Department's continuing efforts to encourage foreign sovereigns

24  generally to resolve disputes within the United States' legal framework." *Practical*

25  *Concepts*, 811 F.2d at 1551 n.19 (quotation marks and alterations omitted). Bank

26

27  matter. *See* Doc. Nos. 99, 102. Mr. Cline will enter an appearance once he has re-

28  ceived the necessary license from the U.S. Treasury Department's Office of Foreign
    Assets Control. *See* 31 C.F.R. § 544.507.

Melli's sovereign status thus underscores the importance of vacating the default and resolving this case on the merits.

To determine whether "good cause" to vacate a default exists, a court must consider three factors: "(1) whether [the defendant] engaged in culpable conduct that led to the default; (2) whether [the defendant] ha[s] a meritorious defense; or (3) whether reopening the default judgment would prejudice [the plaintiff]." *Franchise Holding II, LLC v. Huntington Rests. Grp., Inc.*, 375 F.3d 922, 926 (9th Cir. 2004). All three factors favor vacating the default here, and overwhelmingly so.

First, the default was not the result of any "culpable conduct" by Bank Melli. To the contrary, Bank Melli failed to respond only because Visa and Franklin improperly mailed the summons and complaint to a defunct Paris branch that had ceased banking operations nearly four years earlier—a branch with no apparent connection to this dispute—and addressed the documents to a former manager who had been removed from the branch along with all the rest of its Iranian staff.

Second, Bank Melli has multiple meritorious defenses. Even apart from the defects in service, Plaintiffs are improperly seeking to collect judgments entered against the government of Iran from a juridically separate Iranian bank that is not a party to the judgments and played no role in the underlying events. Supreme Court precedent is clear: Except in narrow circumstances not applicable here, plaintiffs may not execute against assets of a juridically distinct instrumentality to satisfy a judgment against the sovereign. The statutes plaintiffs rely on do not provide otherwise, and even if they did, they would not apply retroactively to this case.

Finally, vacating the default will not prejudice Plaintiffs. It will simply give Bank Melli a fair opportunity to defend itself in this matter.

## I. Bank Melli Did Not Engage in Culpable Conduct Leading to the Default

With respect to the first factor, Bank Melli did not "engage[] in culpable conduct that led to the default." *Franchise Holding*, 375 F.3d at 926. "Culpable conduct" means something more than simply "receiv[ing] a pleading, read[ing] and

understand[ing] it, and tak[ing] no steps to meet the deadline for filing a responsive pleading." *TCI Group*, 244 F.3d at 697. "Culpability involves 'not simply nonappearance following receipt of notice of the action, but rather conduct which hindered judicial proceedings.'" *Icho v. Hammer*, 434 F. App'x 588, 590 (9th Cir. May 23, 2011) (quoting *Gregorian v. Izvestia*, 871 F.2d 1515, 1525 (9th Cir. 1989)); *see also G & G Closed Circuit Event, LLC v. Nguyen*, No. 5:10-CV-05722, 2012 WL 900750, at *2 (N.D. Cal. Mar. 15, 2012). There must be "no explanation of the default inconsistent with a ***devious, deliberate, willful, or bad faith failure to respond***." *TCI Group*, 244 F.3d at 698 (emphasis added).

Here, the reasons for Bank Melli's brief delay in responding to the third-party complaint are obvious. Visa and Franklin purported to serve Bank Melli by mailing a copy of the papers to Bank Melli's Paris branch rather than the head office in Tehran. *See* Doc. No. 45-1. That branch, however, had ceased banking operations long before the complaint was mailed. Ahangari Decl. ¶ 4. As a result, the complaint was not delivered to Bank Melli's headquarters, and Bank Melli did not have notice of this action. *Id.* ¶¶ 7-8, 10.

As explained below, Visa and Franklin's attempted service was legally ineffective and thus affords Bank Melli a procedural defense on the merits. *See* pp. 8-11, *infra*. At a minimum, however, Visa and Franklin's attempted service on a defunct Paris branch and the resulting lack of notice refute any notion that Bank Melli acted in bad faith in failing to respond. Even setting aside its lack of notice, Bank Melli's brief delay in appearing simply does not rise to the level of culpability the Ninth Circuit requires to justify a default. Bank Melli did not engage in any "devious, deliberate, willful, or bad faith" conduct. *TCI Group*, 244 F.3d at 698.

## II.   Bank Melli Has Several Meritorious Defenses

The second requirement for vacating a default is satisfied because Bank Melli has strong defenses on the merits. The burden of demonstrating a meritorious defense "is not extraordinarily heavy." *TCI Group*, 244 F.3d at 700. "Likeli-

7

1   hood of success is not the measure.  Defendants' allegations are meritorious if they

2   contain *even a hint of a suggestion* which, proven at trial, would constitute a com-

3   plete defense."  *J & J Sports Prods., Inc. v. Tolentino*, No. 1:10-cv-02089, 2011

4   WL 1899804, at *4 (E.D. Cal. May 19, 2011) (quoting *Keegal v. Key West & Car-*

5   *ribean Trading Co.*, 627 F.2d 372, 374 (D.C. Cir. 1980)) (quotation marks omitted)

6   (emphasis added).  Bank Melli readily satisfies that standard.

### A.    Bank Melli Was Never Properly Served

8        Bank Melli has strong arguments for dismissal of this action as originally

9   filed because it was never properly served with the summons and third-party com-

10   plaint.  Visa and Franklin purported to serve Bank Melli by mailing an untranslated

11   copy of those documents to Bank Melli's defunct Paris branch.  *See* Doc. No. 45-1.

12   That attempted service failed to comply with applicable requirements.

13        The traditional rule is that a bank's branches, whether or not separately in-

14   corporated, are considered separate entities for purposes of service of process:

15   " 'Service on one branch should not be permitted to accomplish a restraint on ac-

16   counts and funds in other branches . . . .' "  *Limonium Mar., S.A. v. Mizushima*

17   *Marinera, S.A.*, 961 F. Supp. 600, 607-08 (S.D.N.Y. 1997); *see also Allied Mar.,*

18   *Inc. v. Descatrade SA*, 620 F.3d 70, 74 (2d Cir. 2010).  The assets in dispute in this

19   case have nothing whatsoever to do with Bank Melli's now-defunct Paris branch.

20   Rather, they relate to Bank Melli's provision of Visa card services *in Iran*.  Ahan-

21   gari Decl. ¶ 6.  Thus, if any branch of Bank Melli has a connection to those assets,

22   it is the bank's head office in Tehran, not its former branch in Paris.  But Visa and

23   Franklin never delivered a copy of the summons and complaint to Bank Melli's

24   head office in Tehran.  *See* Doc. No. 45-1.  And their mailing of a copy to the

25   bank's Paris branch failed to effect service on the head office.

26

27

28

**MOTION TO VACATE DEFAULT**

Service of process on an agency or instrumentality of a foreign state is governed by 28 U.S.C. § 1608(b)—in this case, Section 1608(b)(3).[3]  That provision permits a plaintiff to serve a summons and complaint "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court," provided that (1) the service is "reasonably calculated to give actual notice"; and (2) the summons and complaint are accompanied by "a translation of each into the official language of the foreign state."   28 U.S.C. § 1608(b)(3)(B).   Visa and Franklin's service failed to comply with Section 1608(b)(3) for three reasons.

First and most fundamentally, Visa and Franklin's service by mail to the Paris branch was not "reasonably calculated to give actual notice" to Bank Melli itself.  28 U.S.C. § 1608(b)(3)(B).  As explained above, due to European Union sanctions, the operations of Bank Melli's Paris branch have been suspended since June 2008.  Ahangari Decl. ¶ 4 & Exs. A-C.  The service copy, moreover, was addressed to Mr. Mohammad Shadkami, who had been removed from the branch by the French Banking Commission when it suspended the branch's operations.  *Id.* ¶ 4 & Ex. C.  The Paris branch currently carries on only very limited administrative affairs, all conducted by persons appointed by the French government.  *Id.* ¶ 4.

---

[3]  Visa and Franklin purported to effect service pursuant to Section 1608(b)(2), which allows service to be made "in accordance with an applicable international convention on service of judicial documents."  28 U.S.C. § 1608(b)(2).  They identified The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters as an "applicable international convention" permitting the method of service chosen.  *See* Doc. 45-1.  Iran, however, is not a party to that Convention.  *See Hague Conference on Private International Law: Status Table on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, http://www.hcch.net/index_en.php?act=conventions.status&cid=17.   Service on Iran's instrumentalities thus may not be effected under that treaty.  *See In re Schwinn Bicycle Co.*, 190 B.R. 599, 612 (Bankr. N.D. Ill. 1995) ("Taiwan is not a signatory to the Hague Service Convention.  As a result, the Hague Service Convention does not apply to service of process on citizens of Taiwan.");  *Friedman v. Israel Labour Party*, No. 96-cv-4702, 1997 WL 379181, at *2-3 (E.D. Pa. Jul. 2, 1997) (holding that Israel's Labour Party and various Israeli citizens could not be served by a method authorized by the Hague Convention that Israel had rejected).  Because Iran is not a signatory to the Hague Convention, this case is governed by Section 1608(b)(3), not 1608(b)(2).

**MOTION TO VACATE DEFAULT**

Mailing a summons and complaint to a defunct branch that had been effectively closed for business for nearly four years, addressed to a manager who had long since been removed, plainly is not "reasonably calculated to give actual notice" to Bank Melli. *See Dobrota v. INS*, 311 F.3d 1206, 1211 (9th Cir. 2002) (notice of deportation hearing sent to alien's last known address instead of that address and address of the alien's attorney not "reasonably calculated" to provide actual notice); *see also Robinson v. Hanrahan*, 409 U.S. 38, 40 (1972) (per curiam); *de la Mata v. Am. Life Ins. Co.*, 771 F. Supp. 1375, 1387 (D. Del. 1991), *aff'd mem.*, 961 F.2d 208 (3d Cir. 1992).[4]

Visa and Franklin's service was also ineffective because, so far as the certificate of service shows, they sent the summons and complaint in English, without including "a translation of each into the official language of the foreign state" as required by 28 U.S.C. § 1608(b)(3)(B).  *See* Doc. No. 45-1.  The Ninth Circuit has expressly held that failure to meet that translation requirement is fatal:  "Failure to deliver a complaint in the correct language is such a fundamental defect that it fails both a 'strict compliance' test and a 'substantial compliance' test" under Section 1608(b)(3).  *Straub v. AP Green, Inc.*, 38 F.3d 448, 453 (9th Cir. 1994); *see also FG Hemisphere Assocs.*, 447 F.3d at 841 (failure to translate "virtually guaranteed [the defendant's] inability to file a timely response").

Finally, service was improper because the summons and third-party complaint were not "dispatched ***by the clerk of the court*** to the agency or instrumentality to be served," as the statute expressly requires.  28 U.S.C. § 1608(b)(3)(B) (emphasis added).  Instead, Visa and Franklin's counsel mailed the papers themselves.  Doc. No. 45-1.  Although the Ninth Circuit has held violations of that particular

---

[4] Although someone apparently signed the return address card acknowledging receipt of the papers, the signature is illegible.  *See* Doc. No. 45-3.  The signature is not, however, Mr. Shadkami's.  *See id.*  And it is singularly unlikely to be the signature of any Bank Melli officer, as the French government removed them all from office years earlier.  *See* Ahangari Decl. ¶ 4 & Ex. C.

requirement harmless where the plaintiff otherwise substantially complied with the FSIA's service requirements and the defendant had actual notice, *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1129 (9th Cir. 2010), neither was the case here:  Visa and Franklin's deficient service not only failed to substantially comply with the FSIA but also deprived Bank Melli of actual notice of the suit.

### B.   Under the Supreme Court's Decision in *Bancec*, Bank Melli Cannot Be Held Liable for the Debts of Iran

Even if Bank Melli were properly served, it has compelling arguments on the merits.  Plaintiffs hold judgments against the government of Iran, its Ministry of Information and Security, and/or its Revolutionary Guard Corps—not Bank Melli.  Doc No. 1 ¶ 3; Doc. No. 95 at 2-3, 5-6, 8.  Although Bank Melli's stock is currently wholly owned by the Iranian government, the bank is separately incorporated, with its own share capital and board of directors.  Ahangari Decl. ¶ 2.  Plaintiffs are thus seeking to collect their judgments from assets that, according to them, belong to an entirely distinct entity that had nothing to do with any of the events underlying their judgments.  That effort to hold a juridically distinct instrumentality liable for the sovereign's debts is foreclosed by Supreme Court precedent.

#### 1.   *Bancec Prohibits Execution Against Instrumentality Assets To Satisfy a Sovereign's Debts*

The Supreme Court set forth the governing rule almost 30 years ago in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*").  There, the Court held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626-27.  As the Court explained, that presumption of separate juridical status derives from "international law," "[d]ue respect for the actions taken by foreign sovereigns," and "comity between nations."  *Id.* at 623, 626-27.  The Court repeatedly emphasized the importance of the principle:

**MOTION TO VACATE DEFAULT**

1   "Freely ignoring the separate status of government instrumentalities would result
2   in substantial uncertainty over whether an instrumentality's assets would be di-
3   verted to satisfy a claim against the sovereign," which could cause others to "hesi-
4   tate before extending credit."  *Id.* at 626.  "As a result, the efforts of sovereign na-
5   tions to structure their governmental activities in a manner deemed necessary to
6   promote economic development and efficient administration would surely be frus-
7   trated."  *Id.  Bancec* recognized only two narrow exceptions—where the sovereign
8   and instrumentality are alter egos or where the corporate form is abused to work a
9   fraud or injustice.  *See id.* at 628-34.  Neither exception applies here.

10   *Bancec*'s rule is also reflected in longstanding U.S. treaty obligations.
11   Scores of treaties between the United States and foreign nations obligate the
12   United States to recognize the juridical status of corporate entities.  *See Sumitomo*
13   *Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180-82 & nn.6-7, 185-86 & n.13
14   (1982); Herman Walker, Jr., *Provisions on Companies in United States Commer-*
15   *cial Treaties*, 50 Am. J. Int'l L. 373, 379-81 (1956).  The Treaty of Amity between
16   the United States and Iran is clear on that issue:  It requires that "[c]ompanies con-
17   stituted under the applicable laws" of each country must "have their juridical status
18   recognized within the territories of the other."  Treaty of Amity, Economic Rela-
19   tions, and Consular Rights, U.S.-Iran, art. III.1, Aug. 15, 1955, 8 U.S.T. 899, 902.
20   It also requires each country to "refrain from applying unreasonable or discrimina-
21   tory measures that would impair" those entities' rights, *id.* art. IV.1, 8 U.S.T. at
22   903, and to grant judicial protections "upon terms no less favorable than those ap-
23   plicable to nationals and companies of [the other country] or of any third country,"
24   *id.* art. III.2, 8 U.S.T. at 902-03.  Finally, it requires each country to grant "most
25   constant protection and security" to property of the other country's entities, "in no
26   case less than that required by international law."  *Id.* art. IV.2, 8 U.S.T. at 903.

27   Since *Bancec* was decided, Congress and the Executive Branch have re-
28   pelled efforts to abrogate it.  In 1999, for example, certain Members of Congress

proposed to amend the FSIA to provide that "all [blocked] assets of any agency or instrumentality of a foreign state shall be treated as assets of that foreign state." H.R. 3485, 106th Cong. § 1(c) (Nov. 18, 1999).  The State, Treasury, and Defense Departments took the unusual step of submitting a joint statement warning of dire consequences if Congress enacted the amendment.  *See Justice for Victims of Terrorism Act: Hearing on H.R. 3485 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. 48-54 (Apr. 13, 2000).  The proposal, they stated, was "fundamentally flawed" and would "seriously damag[e] . . . important U.S. interests."  *Id.* at 48.  Even though the bill was "limited . . . to terrorism-list states and their majority owned entities," refusing to respect separate juridical status would set a "dangerous precedent" and "create the perception that the United States is unreliable as a location for banking or investment."  *Id.* at 49, 53.  It would encourage foreign countries to take "similar actions" against assets of U.S. instrumentalities.  *Id.* at 53.  And it would threaten "substantial U.S. taxpayer liability for takings claims . . . before international [tribunals]."  *Id.* at 54.  Congress did not enact the proposal.

Courts have likewise rejected efforts to bypass *Bancec* in terrorism cases.  In *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002), for example, the plaintiff obtained a wrongful death judgment against Iran and sought to enforce it against an Iranian bank.  *Id.* at 1067.  He urged that the terrorism provisions of the FSIA altered *Bancec*'s presumption of separate juridical status.  *Id.* at 1071 n.10.  The Ninth Circuit rejected that argument, holding that the provisions "did not alter the *Bancec* presumption."  *Id.*

Those principles foreclose Plaintiffs' attempts to execute against Bank Melli's assets here.  Bank Melli is a juridically separate instrumentality from Iran: It is separately incorporated, with its own share capital and board of directors. Ahangari Decl. ¶ 2.  *Bancec* and the Treaty of Amity thus prohibit seizing Bank Melli's assets to satisfy judgments against the government of Iran.

### 2.     *Section 201(a) of the TRIA Does Not Abrogate Bancec*

Plaintiffs apparently seek to avoid *Bancec*'s clear holding on the theory that Congress abrogated *Bancec* when it enacted Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (reproduced at 28 U.S.C. § 1610 note).  Section 201(a) provides that where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of [the FSIA], the blocked assets of that terrorist party (***including the blocked assets of any agency or instrumentality of that terrorist party***) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment."  Pub. L. No. 107-297, § 201(a), 116 Stat. at 2337 (emphasis added).

Plaintiffs, however, misread the statute.  The TRIA by its terms permits execution against blocked assets of the "terrorist party"—in this case, Iran.  The parenthetical clause "***including*** the blocked assets of any agency or instrumentality of that terrorist party" means only that instrumentality assets are subject to execution when they are "includ[ed]" within the sovereign's own assets by virtue of *Bancec*. As noted above, *Bancec* recognizes circumstances where an instrumentality's assets are deemed "included" within the sovereign's assets—namely, where the instrumentality is a mere alter ego of the sovereign or there is an abuse of the corporate form.  *See* 462 U.S. at 628-34.  The TRIA's parenthetical language merely preserves that traditional exception to the presumption of separate status.  In other words, it provides for attachment "including the blocked assets of any agency or instrumentality" ***consistent with*** *Bancec*, not including such assets ***despite*** *Bancec*.

The contrary construction would defy the cardinal principle that statutes should be construed where possible to avoid breaching the Nation's international obligations.  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). As *Bancec* recognized, the presumption of separate juridical status reflects funda-

14

mental principles of international law—principles that are also codified in the express terms of a binding treaty. *See* p. 12, *supra*. The TRIA must therefore be construed, if possible, to preserve rather than repudiate those international obligations. Such a construction is particularly appropriate here given the placement of the relevant statutory language. Congress normally does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court thus should not lightly presume that Congress intended to reject international law and repudiate its treaty obligations in an oblique parenthetical.

The Eleventh Circuit rejected essentially the same contention that plaintiffs make here in *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277 (11th Cir. 1999). There, the court refused to allow execution against assets of a Cuban telephone company to satisfy a judgment against Cuba. The plaintiffs relied on the 1998 predecessor of the TRIA, which contained virtually identical parenthetical language: "(including any agency or instrumentality of such state)." *Id.* at 1287 (quoting 28 U.S.C. § 1610(f)(1)(A)). That language, the court held, was "not a sufficient basis for overcoming the presumption of separate juridical status." *Id.* at 1286. Congress had not "overrid[den] the *Bancec* presumption of separate juridical status by making instrumentalities responsible for the debts of their related terrorist-sponsoring governments." *Id.* at 1287. The court saw "no reason to interpret that section as contravening Congress' original understanding that the FSIA '[is] not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state.'" *Id.* at 1287-88 (quoting *Bancec*, 462 U.S. at 620).

Indeed, only one court of appeals has construed the TRIA to overturn *Bancec*—the Second Circuit in *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 47-50 (2d Cir. 2010). But that decision is currently the subject of a petition for a writ of certiorari pending before the Supreme Court. *See Bank Melli Iran v. Weinstein*, No. 10-947 (filed Jan. 18, 2011). The Court evidently deemed the ques-

tion sufficiently difficult that it called for the views of the Solicitor General.  *See* 131 S. Ct. 3012 (2011).  Although the Solicitor General recommended against review, the Court's decision to seek the Solicitor General's views indicates that this is an important issue.  And even if the Supreme Court denies the petition, the question will still remain open in this Circuit.  At the very least, the issues are sufficiently substantial to meet Rule 55(c)'s minimal requirements for vacating a default.  Plainly, "litigation [of this issue] would not be a wholly empty exercise." *TCI Group*, 244 F.3d at 700.

The Second Circuit's decision, moreover, is unpersuasive.  The court claimed that the TRIA's text unambiguously overturned *Bancec*, but it failed to appreciate that the text is readily susceptible to an alternative construction that confirms rather than repudiates *Bancec*'s traditional presumptions.  *See* 609 F.3d at 49-50.  The Second Circuit also placed significant weight on the legislative history—specifically, a purported floor statement by the bill's sponsor, Senator Harkin.  *See id.* at 50 (quoting 148 Cong. Rec. 23,122 (Nov. 19, 2002)).  Unbeknownst to the Second Circuit, however, that floor statement **was never made**: The videotape of that day's session shows that Senator Harkin never delivered the speech the Congressional Record attributes to him.  *See C-SPAN Video Library: Senate Session Nov. 19, 2002*, at 6:18, http://www.c-spanvideo.org/program/Senate Session3032.  The statement was evidently inserted into the Congressional Record after the Senate had voted on the bill.  *Cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 580 n.10 (2006).  Even according to the Congressional Record, moreover, the statement was made five days after the House of Representatives had voted.  *See* 148 Cong. Rec. 22,392 (Nov. 14, 2002).  That the Second Circuit's key piece of legislative history is a complete fiction wholly undermines the case's value as precedent.  The Court should vacate the default to permit full briefing of this important issue.

**MOTION TO VACATE DEFAULT**

1

### 3. *Section 1610(g) Does Not Abrogate Bancec*

2    Certain Plaintiffs also seek to execute against Bank Melli's assets based on

3   2008 amendments to the FSIA codified at 28 U.S.C. § 1610(g).  Section 1610(g)

4   provides that "the property of a foreign state against which a judgment is entered

5   under section 1605A, and the property of an agency or instrumentality of such a

6   state, including property that is a separate juridical entity or is an interest held di-

7   rectly or indirectly in a separate juridical entity, is subject to attachment in aid of

8   execution, and execution, upon that judgment as provided in this section, regard-

9   less of" five specific factors that some courts had associated with *Bancec*.  *See* 28

10  U.S.C. § 1610(g)(1).  To the extent certain Plaintiffs can invoke that provision, it

11  also does not abrogate *Bancec*, at least in the circumstances of this case.

12    Section 1610(g) does not direct courts to treat instrumentality assets as if

13  they were sovereign assets for all purposes.  Rather, it states only that courts must

14  determine whether a plaintiff can reach instrumentality assets "regardless of" five

15  specific factors such as "the level of economic control over the property by the

16  government of the foreign state" and "whether the government is the sole benefici-

17  ary in interest of the property."  28 U.S.C. § 1610(g)(1).  Thus, nothing in Section

18  1610(g)(1) prohibits a court from recognizing an instrumentality's separate juridi-

19  cal status.  The provision simply places five specific factors off limits as grounds

20  for recognizing such status.

21    In this case, there is a compelling reason for recognizing the traditional pre-

22  sumption of separate juridical status that does not appear on Section 1610(g)'s list

23  of prohibited considerations—the existence of a ***treaty*** requiring the United States

24  to respect such status.  As already explained, the Treaty of Amity between the

25  United States and Iran requires that "[c]ompanies constituted under the applicable

26  laws" of either country "have their juridical status recognized within the territories

27  of the other," art. III.1, 8 U.S.T. at 902; prohibits "unreasonable or discriminatory

28  measures," *id.* arts. III.2, IV.1, 8 U.S.T. at 902-03; and requires property rights to

17

be protected consistent with "international law," *id.* art. IV.2, 8 U.S.T. at 903. Plaintiffs' position would violate all those provisions. It would require this Court to disregard Bank Melli's "juridical status" by ignoring its corporate form without any traditional or internationally accepted basis for doing so. And it would require this Court to impose a "discriminatory measure[ ]" by recognizing an exception to the traditional respect for corporate form that applies only to foreign entities. Nothing in Section 1610(g) requires the Court to disregard the Nation's treaty obligations in that manner. *Cf. Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 162 (D.D.C. 2009) (construing Section 1610(g) not to abrogate Vienna Convention on Diplomatic Relations), *aff'd*, 618 F.3d 19 (D.C. Cir. 2010).

Section 1610(g), moreover, includes an exemption for innocent third parties. Subsection (3) provides that "[n]othing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment." 28 U.S.C. § 1610(g)(3). As the Congressional Research Service has noted, that provision can encompass instrumentalities: "[A]gencies or instrumentalities of foreign governments have not generally been considered to be liable for the debts of the foreign government itself or for other agencies or instrumentalities. ***Subparagraph (3) could be read to permit the court to protect their assets as well*** . . . ." Jennifer K. Elsea, Congressional Research Service, *Suits Against Terrorist States by Victims of Terrorism* 57 (Aug. 8, 2008) (emphasis added). Here, Bank Melli was "not liable in the action giving rise to a judgment." 28 U.S.C. § 1610(g)(3). Plaintiffs have never claimed that Bank Melli played ***any*** role in the bombings that gave rise to their judgments. Accordingly, the Court should invoke its authority under Section 1610(g)(3) to protect Bank Melli's interests.

**MOTION TO VACATE DEFAULT**

### C.   The TRIA and Section 1610(g) Do Not Apply Retroactively

Even if the TRIA or Section 1610(g) could be construed to abrogate *Bancec* and the Treaty of Amity, they would not apply to this case.  Both statutes were enacted ***after*** the events giving rise to the judgments at issue.  Accordingly, applying either statute here would violate settled Supreme Court precedent that prohibits applying statutes retroactively unless Congress expressly commands that result.

As the Supreme Court has explained, "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  If a "statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."  *Id.* at 280.  Consistent with that presumption, *Landgraf* sets forth "a two-step analysis for determining the applicability of legislation enacted after the acts that gave rise to the suit."  *Ctr. for Biological Diversity v. U.S. Dep't of Agric.*, 626 F.3d 1113, 1117 (9th Cir. 2010).  "First, courts must determine whether Congress has expressly prescribed the statute's proper reach"; if it has, the language used by Congress "controls."  *Id.* (quotation marks omitted).  "Second, absent such express language, courts must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  *Id.* (quotation marks omitted).  If it does, the statute must not be applied retroactively "absent clear congressional intent favoring such a result."  *Id.*  Those principles preclude application of either the TRIA or Section 1610(g) here.

#### 1.   The TRIA Does Not Apply Retroactively to this Case

Congress enacted the TRIA on November 26, 2002.  *See* 116 Stat. at 2337.  By that time, ***all*** the conduct underlying the judgments at issue here had already occurred.  The Bennett plaintiffs hold a judgment stemming from Iran's alleged

19

support for a bombing in Jerusalem on July 31, 2002.  Doc. No. 1 ¶ 5; Doc. No. 95 at 3.  The three other groups of Plaintiffs hold judgments stemming from even earlier incidents on November 5, 1990, June 25, 1996, and August 9, 2001.  *See* Doc. No. 95 at 5, 6, 8.  Thus, at the time of the acts for which Plaintiffs seek to hold Bank Melli liable, the TRIA had not yet been passed.  No statute authorized plaintiffs to execute against instrumentality assets despite *Bancec*'s clear mandate; alerted Bank Melli to the possibility that its assets could be seized to satisfy Iranian government debts; or warned that suits against **Iran** threatened **Bank Melli**, a juridically distinct entity, with liability.

To be sure, Bank Melli's assets were not "blocked" until October 25, 2007, when the U.S. Treasury Department's Office of Foreign Assets Control imposed sanctions based on unrelated purported concerns about the transparency of Bank Melli's banking practices and Bank Melli's provision of routine financial services to other Iranian companies.  *See* Doc. No. 16 ¶ 17; U.S. Dep't of Treasury, *Recent OFAC Actions* (Oct. 25, 2007), http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20071025.aspx.   But that later date is irrelevant.  Whether a statute operates retroactively depends on "when the ***primary conduct*** at issue in the suit took place."  *Scott v. Boos*, 215 F.3d 940, 949 (9th Cir. 2000) (emphasis added); *see also Vartelas v. Holder*, 132 S. Ct. 1479, 1488-1489 (2012) ("Vartelas' return to the United States occasioned his treatment as a new entrant, but the reason for the 'new disability' imposed on him was not his lawful foreign travel.  It was, indeed, his conviction, pre-IIRIRA, of an offense qualifying as one of moral turpitude.  That past misconduct, in other words, not present travel, is the wrongful activity Congress targeted . . . ."); *Johnson v. United States*, 529 U.S. 694, 698-701 (2000) ("Since postrevocation penalties relate to the original offense, to sentence [the defendant] to a further term of supervised release under [the new statute] would be to apply this section retroactively . . . .").  Seizing Bank Melli's assets to satisfy a judgment based on primary conduct that occurred before Con-

**MOTION TO VACATE DEFAULT**

gress enacted the TRIA would clearly "increase [Bank Melli's] liability for past conduct," regardless of when Bank Melli's assets were frozen. *Ctr. for Biological Diversity*, 626 F.3d at 1117 (quotation marks omitted).

Because application of the TRIA to this case would have a retroactive effect, there must be "clear congressional intent favoring such a result." *Ctr. for Biological Diversity*, 626 F.3d at 1117. But nothing in the text of the TRIA remotely suggests that Congress intended to disturb the well-settled presumption against retroactivity. In any event, for purposes of this motion, Bank Melli need only "identif[y] a legal issue not yet resolved within this Circuit that could ***conceivably*** operate as a meritorious defense to [plaintiff's] claims." *J & J Sports Prods., Inc. v. Gidha*, No. CIV-S-10-2509, 2011 WL 3439205, at *2 (E.D. Cal. Aug. 4, 2011) (emphasis added). That standard is easily met. Whether the TRIA applies retroactively is an issue of first impression in this Circuit. *Cf. Acree v. Snow*, 276 F. Supp. 2d 31, 33 (D.D.C. 2003) (noting that the claim that the TRIA did not apply retroactively "may be well taken"). And there is nothing in the text of the statute or true legislative history to overcome the heavy burden against retroactivity.

## 2. *Section 1610(g) Does Not Apply Retroactively to this Case*

Plaintiffs' attempts to invoke Section 1610(g) are even further afield. Congress enacted Section 1610(g) on January 28, 2008. *See* Pub. L. No. 110-181, 122 Stat. 3, 341 (2008). That date is years after the 1990 and 1996 events underlying the judgments of the only two plaintiffs who seek to collect under Section 1610(g). *See* Doc. No. 95 at 5, 8. Indeed, that date is after even the date Bank Melli's assets were frozen on October 25, 2007. Doc. No. 16 ¶ 17.

As with Section 201(a), therefore, applying Section 1610(g) here would "increase [Bank Melli]'s liability for past conduct." *Ctr. for Biological Diversity*, 626 F.3d at 1117 (quotation marks omitted). Nothing in Section 1610(g) indicates that Congress intended that effect: The amendment is silent as to its temporal scope, and contains nothing suggesting any clear congressional intent to apply the statute

21

to past events.  Section 1610(g) thus does not apply retroactively.  And again, the standard for vacating a default has been more than satisfied:  "[L]itigation [of this issue] would not be a wholly empty exercise."  *TCI Group*, 244 F.3d at 700.

For one set of Plaintiffs in particular—the Heiser plaintiffs—applying Section 1610(g) would violate not only the *Landgraf* anti-retroactivity presumption but also the constitutional prohibition against reopening final judgments set forth in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995).  *Plaut* held that "[t]he Constitution's separation of legislative and judicial powers denies [Congress] the authority . . . to reopen final judgments entered before [a statute's] enactment."  *Id.* at 240.  The Constitution gives federal courts, not Congress, "the power, not merely to rule on cases, but to **decide** them."  *Id.* at 218-19.  "By retroactively commanding the federal courts to reopen final judgments, Congress . . . violate[s] this fundamental principle."  *Id.* at 219.

Permitting the Heiser plaintiffs to collect under Section 1610(g) would violate those principles.  Section 1610(g) by its terms applies only to judgments entered under Section 1605A.  *See* 28 U.S.C. § 1610(g).  But the Heiser plaintiffs obtained a final judgment **before** Section 1605A was enacted; they obtained a Section 1605A judgment only by invoking a special congressionally created mechanism for reopening final judgments and converting them into Section 1605A judgments.  *See Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 23-24 (D.D.C. 2009).  That reopening mechanism is unconstitutional under *Plaut*.  *See* Jennifer K. Elsea, Congressional Research Service, *Suits Against Terrorist States by Victims of Terrorism* 61 (Aug. 8, 2008) (provision "may be vulnerable to invalidation" under *Plaut*); *cf. In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 68-69 (D.D.C. 2009) (noting "a legitimate question of whether this enactment offends deeply entrenched constitutional principles" but ultimately upholding it).  For that reason too, Section 1610(g) cannot be applied to this case.

**MOTION TO VACATE DEFAULT**

1

2

**D.    The Assets in this Court's Registry Are Not "Assets of" or "Property of" Bank Melli for Purposes of the TRIA or Section 1610(g)**

3

4

5

The TRIA and Section 1610(g) are also both inapplicable here for another reason:  Bank Melli may not have a sufficient interest in the assets to render them attachable under either provision.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Section 201(a) of the TRIA applies only to "the blocked assets of" the relevant party.  Pub. L. No. 107-297, § 201(a), 116 Stat. at 2337.  To be executable, therefore, the assets must be ***owned by*** Bank Melli.  *See, e.g.*, *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, — F. Supp. 2d —, No. 11 Civ. 3283, 2011 WL 6155987, at *8 (S.D.N.Y. Dec. 7, 2011).  As the Supreme Court has made clear, the "'use of the word 'of' denotes ownership.'"  *Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2196 (2011) (quoting *Poe v. Seaborn*, 282 U.S. 101, 109 (1930)).  In other words, the assets must "belong[] to" Bank Melli.  *Ellis v. United States*, 206 U.S. 246, 259 (1907). The United States agrees that "assets of" under Section 201(a) means "owned by." *See* Brief for the United States as *Amicus Curiae*, *Rubin v. Islamic Republic of Iran* 14 (1st Cir. filed June 7, 2012) (No. 11-2144).  As a result, Section 201(a) does not permit execution or attachment where a party has an "interest" in property but does not actually ***own*** it.  *See id.*

20

21

22

23

24

The same analysis applies to Section 1610(g).  That provision covers only "the ***property of*** a foreign state" or "the ***property of*** an agency or instrumentality of such a state."  28 U.S.C. § 1610(g)(1) (emphasis added).  Once again, that language requires actual ownership of the assets, not a mere property interest in them. *Calderon-Cardona*, 2011 WL 6155987, at *8.

25

26

27

28

According to Plaintiffs, the assets in this Court's registry are "investment securities interests" held by ***Visa*** that were "issued by an SEC registered management investment company (*i.e.*, mutual fund) whose shares are distributed by a subsidiary of Franklin Resources, Inc. . . . ***for the benefit of*** the Islamic Republic

23

of Iran." Doc. No. 95 at 2 (emphasis added). Plaintiffs likewise state that the "assets were ***due and owing by contract*** to Bank Melli pursuant to a commercial relationship that existed between Visa and Bank Melli, and consisted of securities issued by Institutional Fiduciary Trust (an SEC registered investment management company, *i.e.*, mutual fund, organized as a Delaware statutory trust and whose shares are distributed by a Franklin subsidiary) in uncertificated form to Visa International Service Association." *Id.* at 4 (emphasis added). Those allegations do not establish that the assets at issue are "assets of" or "property of" Bank Melli for purposes of the TRIA or Section 1610(g), as opposed to assets in which Bank Melli merely has an interest by virtue of its contractual relationship with Visa. Accordingly, Plaintiffs have failed to show that the assets are subject to execution under either provision.

## III.   Vacating the Default Will Not Prejudice Plaintiffs

Finally, the third factor favors vacating the default because vacatur will not prejudice Plaintiffs. "To be prejudicial, the setting aside of a [default] judgment must result in greater harm than simply delaying resolution of the case. Rather, the standard is whether plaintiff's ability to pursue his claim will be hindered." *TCI Group*, 244 F.3d at 701 (quotation marks and alteration omitted). "'[T]he delay must result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion.'" *Id.* (quoting *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 433-34 (6th Cir. 1996)). By its very nature, default provides a plaintiff with a "windfall," *id.*, and the loss of "a quick victory" resulting from vacating a default is "insufficient to justify denial of relief," *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1225 (9th Cir. 2000); *see also FG Hemisphere Assocs*., 447 F.3d at 840 ("Prejudice . . . appears typically and properly to contemplate costs that reconsideration of the final judgment would inflict on the non-moving party ***independent of the chance of reversal***.").

**MOTION TO VACATE DEFAULT**

Here, vacating the default will not prejudice plaintiffs.  The Clerk entered a default on April 26.  Doc. No. 79.  Bank Melli made clear on June 4, just over one month later, that it intended to move to vacate the default.  *See* Doc. Nos. 99, 102. Plaintiffs' ability to pursue their claims against Bank Melli has not been hindered by that short delay in the slightest.  No evidence has been lost, the assets remain in this Court's registry, and in the unlikely event that discovery is appropriate, it too will be unaffected.  "[T]he ordinary cost of litigating is simply not cognizable" in the prejudice analysis.  *TCI Group*, 244 F.3d at 701.

## CONCLUSION

Bank Melli's motion to vacate the April 26 default should be granted.

Dated:  June 18, 2012                    Respectfully submitted,

MOLO LAMKEN LLP


By:_____/s/_____
          Jeffrey A. Lamken

*Counsel for Third-Party Defendant*
BANK MELLI

**MOTION TO VACATE DEFAULT**