MOLO LAMKEN LLP
JEFFREY A. LAMKEN (CA Bar # 154217)
The Watergate, Suite 660
600 New Hampshire Ave.
Washington, D.C.  20037
Telephone: (202) 556-2000
Facsimile: (202) 556-2001

*Counsel for Third-Party Defendant*
BANK MELLI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL BENNETT, *et al.*, | Case No. CV 11-5807 (CRB) (NJV) |
| Plaintiffs, | **MOTION TO DISMISS** |
| v. | **Before the Honorable Charles R. Breyer and Nandor J. Vadas** |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | **Noticed Hearing:** |
| Defendants. | **September 28, 2012, 10:00 a.m.** |
| | |
| VISA INC. and FRANKLIN RESOURCES, INC., | |
| Third-Party Plaintiffs, | |
| v. | |
| BANK MELLI, *et al.*, | |
| Third-Party Defendants. | |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION.................................................................................1

INTRODUCTION .......................................................................................2

BACKGROUND .........................................................................................2

I.      Bank Melli and Its Visa Program.....................................................2

II.     Procedural History............................................................................3

SUMMARY OF ARGUMENT....................................................................4

ARGUMENT ...............................................................................................5

I.      Under the Supreme Court's Decision in *Bancec*, Bank Melli
        Cannot Be Held Liable for the Debts of Iran .................................6

        A.      *Bancec* Prohibits Execution Against Instrumentality Assets
                To Satisfy a Sovereign's Debts ...........................................6

        B.      Section 201(a) of the TRIA Does Not Abrogate *Bancec* ....9

        C.      Section 1610(g) Does Not Abrogate *Bancec*....................12

II.     The TRIA and Section 1610(g) Do Not Apply Retroactively .....14

        A.      The TRIA Does Not Apply Retroactively to this Case .....15

        B.      Section 1610(g) Does Not Apply Retroactively to this Case ....16

        C.      Permitting the Heiser Plaintiffs to Collect Under Section
                1610(g) Would Violate Separation-of-Powers Principles.....17

III.    The Assets in this Court's Registry Are Not Alleged To Be "Assets
        of" or "Property of" Bank Melli for Purposes of the TRIA or
        Section 1610(g) .............................................................................18

IV.     This Action Should Be Dismissed Pursuant to Rule 19................20

CONCLUSION.........................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15 (D.D.C. 2008)...................4

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*,
183 F.3d 1277 (11th Cir. 1999) .....................................................10, 11

*Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003
(9th Cir. 2006) ....................................................................9

*Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche
Molecular Sys., Inc.*, 131 S. Ct. 2188 (2011) ......................................18

*Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117
(D.D.C. 2007) ................................................................3, 15

*Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152
(D.D.C. 2009), *aff'd*, 618 F.3d 19 (D.C. Cir. 2010) ................................13

*Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163 (9th Cir. 1997) .......................20

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
— F. Supp. 2d —, No. 11 Civ. 3283, 2011 WL 6155987
(S.D.N.Y. Dec. 7, 2011) ..................................................18, 19, 20

*Chang v. United States*, 327 F.3d 911 (9th Cir. 2003) .............................15

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001)............................9

*City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440
(9th Cir. 2011) ..................................................................20

*Ctr. for Biological Diversity v. U.S. Dep't of Agric.*,
626 F.3d 1113 (9th Cir. 2010).....................................14, 15, 16, 17

*Ellis v. United States*, 206 U.S. 246 (1907)......................................18

*Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229
(D.D.C. 2006) ....................................................................4

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20
(D.D.C. 2009) ................................................................4, 17

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004)....................10

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ........................................................................*passim*

*Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002).........................8

*Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90
    (D.D.C. 2006) .................................................................................................4

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .............................................................11

*Hausler v. JPMorgan Chase Bank, N.A.*, — F. Supp. 2d — ,
    2012 WL 601034 (S.D.N.Y. Feb. 22, 2012) .....................................................16

*In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31
    (D.D.C. 2009) ...............................................................................................18

*In re MTC Elec. Techs. S'holder Litig.*, 74 F. Supp. 2d 276
    (E.D.N.Y. 1999) ............................................................................................16

*In re Woodson*, 839 F.2d 610 (9th Cir. 1988) .........................................................20

*Jacobs v. New York Foundling Hosp.*, 577 F.3d 93 (2d Cir. 2009) .........................18

*Johnson v. United States*, 529 U.S. 694 (2000).......................................................16

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ...................................14, 16, 17

*Montello Salt Co. v. Utah*, 221 U.S. 452 (1911) ........................................................9

*Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003)...................................................10

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804).......................10

*Newhard, Cook & Co. v. Inspired Life Ctrs., Inc.*, 895 F.2d 1226
    (8th Cir. 1990) .................................................................................................2

*Permanent Mission of India to the United Nations v. City of N.Y.*,
    551 U.S. 193 (2007) .......................................................................................22

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)........................................17, 18

*Poe v. Seaborn*, 282 U.S. 101 (1930) ......................................................................18

**MOTION TO DISMISS (NO. 3:11-CV-05807-CRB)**

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008)......................5, 20, 21, 22

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741
(9th Cir. 2006) ...................................................................................... 3

*Scott v. Boos*, 215 F.3d 940 (9th Cir. 2000) ............................................ 16

*Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176 (1982) ................. 7

*Tyson v. Holder*, 670 F.3d 1015 (9th Cir. 2012) ..................................... 16

*United States v. $85,201.00 in U.S. Currency*, No. 10-cv-79,
2011 WL 612067 (S.D. Ill. Feb. 15, 2011) .......................................... 2

*United States v. Rodgers*, 461 U.S. 677 (1983)....................................... 19

*United States v. Rodrigues*, 159 F.3d 439 (9th Cir. 1998), *amended on
denial of reh'g*, 170 F.3d 881 (9th Cir. 1999) ................................... 20

*Vartelas v. Holder*, 132 S. Ct. 1479 (2012)............................................ 16

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010),
*cert. denied*, No. 10-947, 2012 WL 2368690 (U.S. June 25, 2012) ................. 11

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).......................... 10

### TREATIES, STATUTES, AND RULES

Treaty of Amity, Economic Relations, and Consular Rights,
U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899.........................................7, 8, 10, 13, 14

28 U.S.C. § 1603(a) ................................................................................. 5

28 U.S.C. § 1603(b)................................................................................ 22

28 U.S.C. § 1604.................................................................................... 22

28 U.S.C. § 1605(a)(7) ....................................................................3, 4, 9, 17

28 U.S.C. § 1605A............................................................................4, 12, 17

28 U.S.C. § 1609.................................................................................... 5

28 U.S.C. § 1610(f)(1)(A)....................................................................... 11

28 U.S.C. § 1610(g)...........................................................................*passim*

iv

28 U.S.C. § 1610(g)(1) ................................................................12, 13, 20

28 U.S.C. § 1610(g)(3) ................................................................. 13, 14

28 U.S.C. § 1610 note................................................................ 9

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297,
    116 Stat. 2322 ................................................................*passim*

Pub. L. No. 110-181, 122 Stat. 3 (2008) ................................... 16

Fed. R. Civ. P. 12(b)(1) ...................................................... 1, 2

Fed. R. Civ. P. 12(b)(2) ...................................................... 1, 2

Fed. R. Civ. P. 12(b)(6) ...................................................... 1, 2

Fed. R. Civ. P. 12(b)(7) ...................................................... 1, 2

Fed. R. Civ. P. 19........................................................5, 21, 22

Fed. R. Civ. P. 19(b) ......................................................... 21

## LEGISLATIVE MATERIALS

H.R. 3485, 106th Cong. § 1(c) (Nov. 18, 1999)........................... 8

148 Cong. Rec. 22,392 (Nov. 14, 2002)................................... 11

148 Cong. Rec. 23,122 (Nov. 19, 2002)................................... 11

*Justice for Victims of Terrorism Act: Hearing on H.R. 3485 Before the
    Subcomm. on Immigration and Claims of the H. Comm. on the
    Judiciary*, 106th Cong. (Apr. 13, 2000) ................................ 8

## OTHER AUTHORITIES

Bank Melli Iran, *2008/09 Annual Report*, http://www.bmi.ir/Fa/uploaded
    Files/FinanceReportFiles/2009_12_21/222__03e11da898pdf ........................... 2

Brief for the United States as *Amicus Curiae*, *JPMorgan Chase Bank,
    N.A. v. LTU Lufttransport-Unternehmen*, Nos. 12-1264 & 12-1272
    (2d Cir. filed July 9, 2012) ................................................................ 19

v

Brief for the United States as *Amicus Curiae*, *Rubin v. Islamic Republic of Iran*, No. 11-2144 (1st Cir. filed June 7, 2012) .............................. 19

*C-SPAN Video Library: Senate Session Nov. 19, 2002*, http://www.c-spanvideo.org/program/SenateSession3032 ............................... 11

Jennifer K. Elsea, Congressional Research Service, *Suits Against Terrorist States by Victims of Terrorism* (Aug. 8, 2008) ............................ 13, 18

U.S. Dep't of Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx ............................................................................................ 3, 15

Herman Walker, Jr., *Provisions on Companies in United States Commercial Treaties*, 50 Am. J. Int'l L. 373 (1956) ................................................................ 7

5B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1351 (3d ed. 1998) .......................................................................................................... 2

**MOTION TO DISMISS (NO. 3:11-CV-05807-CRB)**

# **NOTICE OF MOTION**

To the Court, all parties, and counsel of record:

Please take notice that on Friday, September 28, 2012, at 10:00 a.m., before the Honorable Charles R. Breyer, at the U.S. District Court for the Northern District of California, San Francisco Courthouse, Courtroom 6 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Third-Party Defendant Bank Melli will and hereby does move the Court to dismiss the third-party complaint filed by Visa Inc. and Franklin Resources, Inc. ("Visa" and "Franklin") on February 3, 2012, and order the return of the assets currently held in this Court's registry to Visa and Franklin.  *See* Doc. No. 16.

Bank Melli respectfully moves the Court to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1), (2), (6), and (7), for the reasons set forth more fully herein.

1

# INTRODUCTION

Plaintiffs and certain third-party defendants (collectively "Plaintiffs") hold judgments against the Islamic Republic of Iran. In this action, they seek to execute those judgments against assets held by Visa Inc. and Franklin Resources, Inc. ("Visa" and "Franklin") for the benefit of Bank Melli, an Iranian bank. Bank Melli is a separate legal entity from the government of Iran. It is not named as a defendant in the judgments and had no involvement in the events underlying them.

On February 3, 2012, Visa and Franklin filed a third-party complaint in the nature of an interpleader, naming as defendants Bank Melli and other third-party defendants with potential claims against the assets. Doc. No. 16. Bank Melli now respectfully moves to dismiss that complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), (2), (6), and (7).[1]

# BACKGROUND

## I.    Bank Melli and Its Visa Program

Founded in 1928, Bank Melli is Iran's largest financial institution. *See* Bank Melli Iran, *2008/09 Annual Report* at 8, http://www.bmi.ir/Fa/uploadedFiles/ FinanceReportFiles/2009_12_21/222__03e11da898pdf. With more than 43,000 employees at 3,300 branches, the bank offers a wide range of financial services to the Iranian public and abroad. *See id.* at 11-15. Although Bank Melli's stock is currently wholly owned by the Iranian government, the bank is separately incorporated, with its own share capital and board of directors. *See id.* at 5, 34.

This case concerns assets that, according to the third-party complaint, are "due and owing by contract to Bank Melli pursuant to a commercial relationship" between Bank Melli and Visa. Doc. No. 16 ¶ 16. Under that agreement, Bank

---

[1] A motion to dismiss may be filed under Rule 12(b)(2) where, as here, the movant contends that the district court lacks in rem jurisdiction. *See* 5B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1351 (3d ed. 1998); *Newhard, Cook & Co. v. Inspired Life Ctrs., Inc.*, 895 F.2d 1226, 1228 n.2 (8th Cir. 1990); *United States v. $85,201.00 in U.S. Currency*, No. 10-cv-79, 2011 WL 612067, at *1 (S.D. Ill. Feb. 15, 2011).

Melli agreed to accept Visa cards in Iran through its branches in that country. Visa card holders used their cards to make purchases; agents then presented vouchers for the purchases to Bank Melli; Bank Melli reimbursed the agents based on the vouchers; and Bank Melli then sought reimbursement from Visa.

Following the imposition of sanctions against Iran, Visa advised that it was no longer able to make those payments to Bank Melli and placed the funds due into an account in the United States. According to the third-party complaint, those funds are "currently held by a Visa wholly owned subsidiary" and are "invested in securities issued by the Institutional Fiduciary Trust, an SEC registered investment management company (mutual fund) whose shares are distributed by a subsidiary of Franklin." Doc. No. 16 ¶ 18.

On October 25, 2007, Bank Melli's U.S. assets were blocked by the Treasury Department's Office of Foreign Assets Control ("OFAC"). *See* Doc. No. 16 ¶ 17; U.S. Dep't of Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), http://www. treasury.gov/press-center/press-releases/Pages/hp644.aspx. Due to the blocking or-der, "the assets cannot be released to Bank Melli or to anyone else without a license from OFAC or an appropriate court order." Doc. No. 16 ¶ 18.

## II.    Procedural History

Plaintiffs are four groups of individuals (the Bennett Plaintiffs, the Greenbaum Plaintiffs, the Acosta Plaintiffs, and the Heiser Plaintiffs) who ob-tained default judgments against the government of Iran and its agencies.[2] Bank

_____

[2] The court may take judicial notice of the judgments and procedural history in each of the proceedings. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

The Bennett Plaintiffs sued the Islamic Republic of Iran and the Iranian Min-istry of Intelligence and Security over the July 31, 2002, bombing of a cafeteria at Hebrew University in Jerusalem. *See Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 121 (D.D.C. 2007). On August 30, 2007, they obtained a default judgment of almost $13 million under 28 U.S.C. § 1605(a)(7). *See id.* at 130.

The Greenbaum Plaintiffs sued the Islamic Republic of Iran and the Iranian Ministry of Intelligence and Security over the August 9, 2001, bombing of a Jerusa-

1   Melli is not named as a party to any of the judgments and was not alleged to have

2   been involved in any of the events underlying them.

3       On December 2, 2011, the Bennett Plaintiffs filed a complaint against Visa

4   and Franklin seeking to execute against the assets at issue to satisfy their judgment.

5   Doc. No. 1 ¶ 3.  On February 3, 2012, Visa and Franklin filed a third-party com-

6   plaint in the nature of an interpleader, naming as defendants Bank Melli and other

7   third-party defendants with potential claims against the assets.  Doc. No. 16.  Visa

8   and Franklin later deposited the assets into this Court's registry.  Doc. Nos. 88-89.

9       On April 26, 2012, the Clerk entered a default against Bank Melli.  Doc. No.

10  79.  On June 12, however, Bank Melli entered its appearance, Doc. No. 96, and on

11  July 5, this Court entered a stipulated order vacating the default, Doc. No. 109.

12  Bank Melli now moves to dismiss the third-party complaint.

13                    **SUMMARY OF ARGUMENT**

14      The assets in this Court's registry are not subject to attachment.  Plaintiffs

15  are improperly seeking to collect judgments against the government of Iran from a

16  juridically separate Iranian bank that is not a party to the judgments and played no

17  role in the underlying events.  Supreme Court precedent is clear:  Plaintiffs may

18  not execute against assets of a juridically distinct instrumentality to satisfy a judg-

19  lem restaurant.  *See Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 94

20  (D.D.C. 2006).  On August 10, 2006, they obtained a default judgment of almost
    $20 million under 28 U.S.C. § 1605(a)(7).  *Id.* at 108.

21      The Acosta Plaintiffs sued the Islamic Republic of Iran and the Iranian Min-
    istry of Intelligence and Security over the November 5, 1990, shooting of Rabbi

22  Meir Kahane, Irving Franklin, and U.S. Postal Police Officer Carlos Acosta.  *See*
    *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 18 (D.D.C. 2008).  They

23  initially sued under 28 U.S.C. § 1605(a)(7), but later amended the complaint to as-
    sert a claim under 28 U.S.C. § 1605A.  *Id.* at 18 n.1.  On August 26, 2008, they ob-
    tained a default judgment exceeding $350 million.  *See id.* at 29-32.

24      The Heiser Plaintiffs sued the Islamic Republic of Iran, the Iranian Ministry

25  of Information and Security, and the Iranian Islamic Revolutionary Guard Corps
    over the June 25, 1996, bombing of the Khobar Towers in Saudi Arabia.  *See Estate*

26  *of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 22 (D.D.C. 2009).  On
    December 22, 2006, they obtained a default judgment of over $254 million under

27  28 U.S.C. § 1605(a)(7).  *See Estate of Heiser v. Islamic Republic of Iran*, 466 F.
    Supp. 2d 229, 356 (D.D.C. 2006).  On September 30, 2009, they obtained a further

28  default judgment of almost $337 million under 28 U.S.C. § 1605A.  *Heiser*, 659 F.
    Supp. 2d at 31.

1   ment against the sovereign.  *See First Nat'l City Bank v. Banco Para El Comercio*

2   *Exterior de Cuba*, 462 U.S. 611, 626-67 (1983) ("*Bancec*").

3         The two statutes Plaintiffs rely on—the Terrorism Risk Insurance Act of

4   2002 ("TRIA"), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337, and 28

5   U.S.C. § 1610(g)—do not provide otherwise.  But even if they did, those statutes

6   would not apply retroactively to the judgments at issue here.  Both statutes were

7   enacted **after** the events giving rise to the judgments at issue.  And nothing in ei-

8   ther statute overcomes the longstanding presumption that legislation does not apply

9   retroactively unless Congress clearly manifests that intent.

10        The assets at issue are also not attachable for another reason:  The complaint

11  fails to allege that they are "assets of" or "property of" Bank Melli within the

12  meaning of the TRIA or Section 1610(g).  According to the complaint, the assets

13  are "due and owing by contract to Bank Melli pursuant to a commercial relation-

14  ship" between Bank Melli and Visa.  Doc. No. 16 ¶ 16.  That allegation does not

15  establish that Bank Melli holds legal title to the assets.

16        Finally, this suit must also be dismissed because Bank Melli is a required

17  party that cannot be joined to the action without violating its sovereign immunity.

18  Under *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), a suit must be

19  dismissed under Federal Rule of Civil Procedure 19 in those circumstances.  For

20  that reason too, this action should not proceed.

21                              **<u>ARGUMENT</u>**

22        Under the Foreign Sovereign Immunities Act, "the property in the United

23  States of a foreign state shall be immune from attachment arrest and execution"

24  unless certain narrow exceptions apply.  28 U.S.C. § 1609.  The term "foreign

25  state" is defined to include instrumentalities, *see id.* § 1603(a), and there is no dis-

26  pute that Bank Melli is an instrumentality of the Islamic Republic of Iran, *see* Doc.

27  No. 16 ¶ 7.  The third-party complaint alleges that Bank Melli has an interest in the

28  funds at issue—they are "funds due and owing by contract to Bank Melli pursuant

1    to a commercial relationship with that bank."  Doc. No. 16 ¶ 16.  Thus, unless

2    some exception to immunity applies, the funds are immune from attachment or

3    execution, the third-party complaint must be dismissed, and the funds must be re-

4    turned to Visa and Franklin.

5        No such exception applies.  Plaintiffs claim the assets are attachable under

6    the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat.

7    2322, 2337, or 28 U.S.C. § 1610(g).  But neither statute authorizes attachment of

8    assets of a separate instrumentality that was not a party to the judgment.  Neither

9    statute applies retroactively to this case.  And neither statute applies to assets in

10   which the instrumentality is alleged to hold a beneficial interest but not legal title.

11   **I.    Under the Supreme Court's Decision in *Bancec*, Bank Melli Cannot Be**

12   **       Held Liable for the Debts of Iran**

13       The third-party complaint should be dismissed because Plaintiffs are seeking

14   to recover from the wrong party.  Plaintiffs hold judgments against the government

15   of Iran, its Ministry of Information and Security, and/or its Revolutionary Guard

16   Corps. *See* pp. 3-4 n.2, *supra*.  Bank Melli is not the government of Iran, but rather

17   a juridically distinct instrumentality.  It was not a party to the actions underlying

18   the judgments and was not involved in any of the events giving rise to them.  Plain-

19   tiffs' effort to hold a juridically distinct instrumentality liable for the sovereign's

20   debts is improper.

21   **A.    *Bancec* Prohibits Execution Against Instrumentality Assets To**

22   **       Satisfy a Sovereign's Debts**

23       In *First National City Bank v. Banco Para El Comercio Exterior de Cuba*,

24   462 U.S. 611 (1983) ("*Bancec*"), the Supreme Court held that "government in-

25   strumentalities established as juridical entities distinct and independent from their

26   sovereign should normally be treated as such."  *Id.* at 626-27.  That presumption of

27   separate juridical status derives from "international law," "[d]ue respect for the ac-

28   tions taken by foreign sovereigns," and "comity between nations."  *Id.* at 623, 626-

6

27.  "Freely ignoring the separate status of government instrumentalities," the Supreme Court explained, "would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign," which could cause others to "hesitate before extending credit." *Id.* at 626.  "As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated." *Id.  Bancec* recognized only two narrow exceptions—where the sovereign and instrumentality are alter egos or where the corporate form is abused to work a fraud or injustice. *See* 462 U.S. at 628-34.

*Bancec*'s rule is also reflected in longstanding U.S. treaty obligations. Scores of treaties between the United States and foreign nations obligate the United States to recognize the juridical status of corporate entities. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180-82 & nn.6-7, 185-86 & n.13 (1982); Herman Walker, Jr., *Provisions on Companies in United States Commercial Treaties*, 50 Am. J. Int'l L. 373, 379-81 (1956).  The Treaty of Amity between the United States and Iran is clear:  It requires that "[c]ompanies constituted under the applicable laws" of each country must "have their juridical status recognized within the territories of the other."  Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, art. III.1, Aug. 15, 1955, 8 U.S.T. 899, 902.  It also requires each country to "refrain from applying unreasonable or discriminatory measures that would impair" those entities' rights, *id.* art. IV.1, 8 U.S.T. at 903, and to grant judicial protections "upon terms no less favorable than those applicable to nationals and companies of [the other country] or of any third country," *id.* art. III.2, 8 U.S.T. at 902-03.  Finally, it requires each country to grant "most constant protection and security" to property of the other country's entities, "in no case less than that required by international law." *Id.* art. IV.2, 8 U.S.T. at 903.

Since *Bancec* was decided, Congress and the Executive Branch have rejected efforts to abrogate it.  In 1999, for example, a proposal to amend the Foreign

7

Sovereign Immunities Act would have provided that "all [blocked] assets of any agency or instrumentality of a foreign state shall be treated as assets of that foreign state." H.R. 3485, 106th Cong. § 1(c) (Nov. 18, 1999). The State, Treasury, and Defense Departments submitted a joint statement warning of dire consequences if Congress enacted the amendment. *See Justice for Victims of Terrorism Act: Hearing on H.R. 3485 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. 48-54 (Apr. 13, 2000). The proposal, they stated, was "fundamentally flawed" and would "seriously damag[e] . . . important U.S. interests." *Id.* at 48. Even though the bill was limited "to terrorism-list states and their majority owned entities," refusing to respect separate juridical status would set a "dangerous precedent" and "create the perception that the United States is unreliable as a location for banking or investment." *Id.* at 49, 53. It would encourage other nations to take "similar actions" against assets of U.S. instrumentalities. *Id.* at 53. And it would threaten "substantial U.S. taxpayer liability for takings claims . . . before international [tribunals]." *Id.* at 54. Congress did not enact that proposal.

Courts have likewise rejected efforts to circumvent *Bancec*. In *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002), for example, the plaintiff obtained a wrongful death judgment against Iran and sought to enforce it against an Iranian bank. He urged that the FSIA's terrorism provisions overrode *Bancec*'s presumption of separate juridical status. *Id.* at 1071 n.10. The Ninth Circuit disagreed, ruling that the provisions "did not alter the *Bancec* presumption." *Id.*

Those principles foreclose Plaintiffs' attempts to execute against Bank Melli's assets here. Bank Melli is an instrumentality juridically separate from Iran. *See* Doc. No. 16 ¶ 7; p. 2, *supra*. And the third-party complaint contains no suggestion that either of *Bancec*'s two narrow exceptions—for alter egos and abuses of the corporate form—applies here. *See* 462 U.S. at 628-34. *Bancec* and the Treaty of Amity thus prohibit seizing Bank Melli's assets to satisfy judgments

8

1   against the government of Iran.

2      **B.      Section 201(a) of the TRIA Does Not Abrogate *Bancec***

3         Plaintiffs apparently seek to avoid *Bancec*'s clear holding on the theory that

4   Congress abrogated *Bancec* when it enacted Section 201(a) of the Terrorism Risk

5   Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322,

6   2337 (reproduced at 28 U.S.C. § 1610 note).  Section 201(a) provides that, where

7   "a person has obtained a judgment against a terrorist party on a claim based upon

8   an act of terrorism, or for which a terrorist party is not immune under section

9   1605(a)(7) of [the FSIA], the blocked assets ***of that terrorist party (including the***

10  ***blocked assets of any agency or instrumentality of that terrorist party)*** shall be

11  subject to execution or attachment in aid of execution in order to satisfy such judg-

12  ment."  Pub. L. No. 107-297, § 201(a), 116 Stat. at 2337 (emphasis added).

13        Plaintiffs, however, misread the statute.  The TRIA by its terms permits exe-

14  cution against blocked assets of the "terrorist party"—in this case, Iran.  The paren-

15  thetical clause "***including*** the blocked assets of any agency or instrumentality of

16  that terrorist party" means only that instrumentality assets are subject to execution

17  when they are "includ[ed]" within the sovereign's own assets by virtue of *Bancec*.

18  "[T]he word 'including' is ordinarily defined as a term of ***illustration***, signifying

19  that what follows is an ***example*** of the preceding principle."  *Ariz. State Bd. for*

20  *Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) (empha-

21  sis added); *see also id.* at 1008 (rejecting definition of "including" to mean "in ad-

22  dition to"); *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) ("To 'in-

23  clude' is to 'contain' or 'comprise as part of a whole.'"); *Montello Salt Co. v.*

24  *Utah*, 221 U.S. 452, 466 (1911) ("including" is not a "word of enlargement").  As

25  noted above, *Bancec* recognizes circumstances where an instrumentality's assets

26  are deemed "included" within the sovereign's assets—where the instrumentality is

27  an alter ego or there is an abuse of the corporate form.  *See* 462 U.S. at 628-34.  In

28

9

those circumstances, the blocked assets of an agency or instrumentality are ***examples*** of blocked assets of the terrorist party.  The TRIA's parenthetical language thus preserves that traditional exception to the presumption of separate status.  But it does not create another exception.  In other words, it provides for attachment "including the blocked assets of any agency or instrumentality" ***consistent with*** *Bancec*, not including such assets ***despite*** *Bancec*.

The contrary construction would defy the cardinal principle that statutes "'ought never to be construed to violate the law of nations if any other possible construction remains.'"  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (quoting *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)); *see also Munoz v. Ashcroft*, 339 F.3d 950, 958 (9th Cir. 2003).  As *Bancec* recognized, the presumption of separate juridical status reflects fundamental principles of international law—principles that are also codified in the express terms of a binding treaty.  *See* p. 7, *supra*.  The TRIA must therefore be construed, if possible, to preserve rather than repudiate those international obligations.

Nothing in the TRIA evidences any clear congressional intent to depart from international law or abrogate the Treaty of Amity.  To the contrary, Plaintiffs' arguments rest entirely on a single ambiguous parenthetical reference.  Congress normally does not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  The Court should not lightly presume that Congress intended to override decades of precedent, reject international law, and repudiate its treaty obligations in such an oblique manner.

One court of appeals has already rejected Plaintiffs' interpretation.  In *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277 (11th Cir. 1999), the court refused to allow execution against assets of a Cuban telephone company to satisfy a judgment against Cuba.  The plaintiffs relied on the 1998 predecessor of the TRIA, which contained virtually identical parenthetical language: "'(including any agency or instrumentality of such state).'"  *Id.* at 1287

10

**MOTION TO DISMISS (NO. 3:11-CV-05807-CRB)**

1    (quoting 28 U.S.C. § 1610(f)(1)(A)).   That language, the court held, was "not a

2    sufficient basis for overcoming the presumption of separate juridical status."   *Id.* at

3    1286.   Congress had not "overrid[den] the *Bancec* presumption of separate juridi-

4    cal status by making instrumentalities responsible for the debts of their related ter-

5    rorist-sponsoring governments."   *Id.* at 1287.   The court saw "no reason to interpret

6    that section as contravening Congress' original understanding that the FSIA '[is]

7    not intended to affect the substantive law determining the liability of a foreign state

8    or instrumentality, or the attribution of liability among instrumentalities of a for-

9    eign state.' "   *Id.* at 1287-88 (quoting *Bancec*, 462 U.S. at 620).

10        Admittedly, the Second Circuit recently construed the TRIA to overturn

11   *Bancec*.   *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 47-50 (2d Cir.

12   2010), *cert. denied*, No. 10-947, 2012 WL 2368690 (U.S. June 25, 2012).   But that

13   court's analysis is unpersuasive.   The court claimed that the TRIA's text unambi-

14   guously overturned *Bancec*, but it failed to appreciate that the text is readily sus-

15   ceptible to an alternative construction that confirms *Bancec*'s traditional presump-

16   tions.   *See id.* at 49-50.   The Second Circuit also placed significant weight on the

17   legislative history—specifically, a purported floor statement by the bill's sponsor,

18   Senator Harkin.   *See id.* at 50 (quoting 148 Cong. Rec. 23,122 (Nov. 19, 2002)).

19   Unbeknownst to the Second Circuit, however, that floor statement ***was never***

20   ***made***:   The videotape of that day's session shows that Senator Harkin never deliv-

21   ered the speech the Congressional Record attributes to him.   *See C-SPAN Video*

22   *Library: Senate Session Nov. 19, 2002*, at 6:18, http://www.c-spanvideo.org/

23   program/SenateSession3032.   The statement was evidently inserted into the Con-

24   gressional Record after the Senate had voted on the bill.   *Cf. Hamdan v. Rumsfeld*,

25   548 U.S. 557, 580 n.10 (2006).   Even according to the Congressional Record,

26   moreover, the statement was made five days after the House of Representatives

27   had voted.   *See* 148 Cong. Rec. 22,392 (Nov. 14, 2002).   That the Second Circuit's

28   key piece of legislative history is a complete fiction wholly undermines the case's

11

1   value as precedent.

2       **C.      Section 1610(g) Does Not Abrogate *Bancec***

3       Some of the Plaintiffs apparently also seek to execute against Bank Melli's

4   assets based on 2008 amendments to the FSIA codified at 28 U.S.C. § 1610(g).

5   Section 1610(g) provides that "the property of a foreign state against which a

6   judgment is entered under section 1605A, and the property of an agency or instru-

7   mentality of such a state, including property that is a separate juridical entity or is

8   an interest held directly or indirectly in a separate juridical entity, is subject to at-

9   tachment in aid of execution, and execution, upon that judgment as provided in this

10  section, regardless of" five specific factors that some courts had associated with

11  *Bancec*.  28 U.S.C. § 1610(g)(1).  That provision also does not abrogate *Bancec*, at

12  least in the circumstances of this case.

13      Section 1610(g) does not direct courts to treat instrumentality assets as if

14  they were sovereign assets for all purposes.  Rather, it states only that courts must

15  determine whether a plaintiff can reach instrumentality assets "regardless of" five

16  specific factors—"the level of economic control over the property by the govern-

17  ment of the foreign state"; "whether the profits of the property go to that govern-

18  ment"; "the degree to which officials of that government manage the property or

19  otherwise control its daily affairs"; "whether that government is the sole benefici-

20  ary in interest of the property"; and "whether establishing the property as a sepa-

21  rate entity would entitle the foreign state to benefits in United States courts while

22  avoiding its obligations."  28 U.S.C. § 1610(g)(1).  The provision thus precludes

23  courts from relying on those five enumerated factors as grounds for recognizing

24  separate status.  But nothing in Section 1610(g)(1) prohibits a court from uphold-

25  ing an instrumentality's separate juridical status on ***other*** grounds.

26      Here, there are compelling reasons to recognize Bank Melli's separate ju-

27  ridical status wholly apart from the five prohibited grounds listed in Section

28

12

**MOTION TO DISMISS (NO. 3:11-CV-05807-CRB)**

1610(g)(1).  Specifically, the United States and Iran have entered into a treaty requiring the United States to respect the separate status of Iranian instrumentalities. As already explained, the Treaty of Amity requires that "[c]ompanies constituted under the applicable laws" of either country "have their juridical status recognized within the territories of the other," art. III.1, 8 U.S.T. at 902; prohibits "unreasonable or discriminatory measures," *id.* arts. III.2, IV.1, 8 U.S.T. at 902-03; and requires property rights to be protected consistent with "international law," *id.* art. IV.2, 8 U.S.T. at 903.  Plaintiffs' position would violate all those provisions.  It would require this Court to disregard Bank Melli's "juridical status" by ignoring its corporate form without any traditional or internationally accepted basis for doing so.  And it would require this Court to impose a "discriminatory measure[]" by recognizing an exception to the traditional respect for corporate form that applies only to foreign entities.  The Nation's treaty obligations are a compelling reason to apply the traditional *Bancec* presumption of separate status, and nothing in Section 1610(g) makes those treaty obligations a prohibited consideration.  *Cf. Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 162 (D.D.C. 2009) (construing Section 1610(g) not to abrogate Vienna Convention on Diplomatic Relations), *aff'd*, 618 F.3d 19 (D.C. Cir. 2010).

Section 1610(g), moreover, includes an exemption for innocent third parties. Subsection (3) provides that "[n]othing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment."  28 U.S.C. § 1610(g)(3).  As the Congressional Research Service has noted, that provision can encompass instrumentalities:  "[A]gencies or instrumentalities of foreign governments have not generally been considered to be liable for the debts of the foreign government itself or for other agencies or instrumentalities.  ***Subparagraph (3) could be read to permit the court to protect their assets as***

13

1    *well* . . . ." Jennifer K. Elsea, Congressional Research Service, *Suits Against Ter-*

2    *rorist States by Victims of Terrorism* 57 (Aug. 8, 2008) (emphasis added). Here,

3    Bank Melli clearly was "not liable in the action giving rise to [the] judgment." 28

4    U.S.C. § 1610(g)(3). The third-party complaint nowhere alleges that Bank Melli

5    played ***any*** role in the events giving rise to the judgments. Accordingly, the Court

6    should invoke its Section 1610(g)(3) authority to protect Bank Melli's interests.

## II.    The TRIA and Section 1610(g) Do Not Apply Retroactively

8          Even if the TRIA or Section 1610(g) could be construed to abrogate *Bancec*

9    and the Treaty of Amity, they would not apply to this case. Both statutes were en-

10   acted ***after*** the events giving rise to the judgments at issue. Applying either statute

11   here thus would violate the settled rule that statutes do no apply retroactively

12   unless Congress expressly commands that result.

13         "[T]he presumption against retroactive legislation is deeply rooted in our ju-

14   risprudence, and embodies a legal doctrine centuries older than our Republic."

15   *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). If a "statute would oper-

16   ate retroactively, our traditional presumption teaches that it does not govern absent

17   clear congressional intent favoring such a result." *Id.* at 280. Consistent with that

18   presumption, *Landgraf* sets forth "a two-step analysis for determining the applica-

19   bility of legislation enacted after the acts that gave rise to the suit." *Ctr. for Bio-*

20   *logical Diversity v. U.S. Dep't of Agric.*, 626 F.3d 1113, 1117 (9th Cir. 2010).

21   "First, courts must 'determine whether Congress has expressly prescribed the stat-

22   ute's proper reach' "; if it has, the language used by Congress "controls." *Id.* (quot-

23   ing *Landgraf*, 511 U.S. at 280). "Second, absent such express language, courts

24   must 'determine whether the new statute would have retroactive effect, *i.e.*,

25   whether it would impair rights a party possessed when he acted, increase a party's

26   liability for past conduct, or impose new duties with respect to transactions already

27   completed.' " *Id.* (quoting *Landgraf*, 511 U.S. at 280). If it does, the statute must

28

not be applied retroactively "absent clear congressional intent favoring such a result." *Id.* Those principles preclude application of either the TRIA or Section 1610(g) here.

### A. The TRIA Does Not Apply Retroactively to this Case

Congress enacted the TRIA on November 26, 2002. *See* 116 Stat. at 2337. By that time, ***all*** the conduct underlying the judgments at issue here had already occurred. The Bennett Plaintiffs hold a judgment stemming from Iran's alleged support for a bombing in Jerusalem on July 31, 2002. *See* p. 3 n.2, *supra*. The three other groups of Plaintiffs hold judgments stemming from even earlier incidents on November 5, 1990, June 25, 1996, and August 9, 2001. *See* pp. 3-4 n.2, *supra*. Thus, at the time of the acts for which Plaintiffs seek to hold Bank Melli liable, the TRIA had not yet been enacted. No statute authorized plaintiffs to execute against instrumentality assets despite *Bancec*'s clear mandate; alerted Bank Melli to the possibility that its assets could be seized to satisfy Iranian government debts; or provided notice to Bank Melli that suits against ***Iran*** threatened ***Bank Melli***, a juridically distinct entity, with liability.

Plaintiffs have argued that the TRIA is not impermissibly retroactive because Bank Melli's assets were blocked after the TRIA became law in 2002. *See* Doc. 103 at 9. To be sure, Bank Melli's assets were not "blocked" until October 25, 2007, when the U.S. Treasury Department's Office of Foreign Assets Control imposed sanctions based on unrelated purported concerns about the transparency of Bank Melli's banking practices and Bank Melli's provision of routine financial services to other Iranian companies. *See* U.S. Dep't of Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx. But that later date is irrelevant. A statute "is retroactive if it alters the legal consequences of acts completed before its effective date."

15

1    *Chang v. United States*, 327 F.3d 911, 920 (9th Cir. 2003).  Whether a statute op-

2    erates retroactively thus depends on "'when the **primary conduct** at issue in the

3    suit took place.'"  *Scott v. Boos*, 215 F.3d 940, 949 (9th Cir. 2000) (quoting *In re*

4    *MTC Elec. Techs. S'holder Litig.*, 74 F. Supp. 2d 276, 280 n.3 (E.D.N.Y. 1999))

5    (emphasis added); *see also Vartelas v. Holder*, 132 S. Ct. 1479, 1488-1489 (2012)

6    ("Vartelas' return to the United States occasioned his treatment as a new entrant,

7    but the reason for the 'new disability' imposed on him was not his lawful foreign

8    travel.  It was, indeed, his conviction, pre-IIRIRA, of an offense qualifying as one

9    of moral turpitude.  That past misconduct, in other words, not present travel, is the

10   wrongful activity Congress targeted . . . ."); *Johnson v. United States*, 529 U.S.

11   694, 698-701 (2000); *Tyson v. Holder*, 670 F.3d 1015, 1022 (9th Cir. 2012).

12          Seizing Bank Melli's assets to satisfy a judgment based on primary conduct

13   that occurred before Congress enacted the TRIA would clearly "'increase [Bank

14   Melli's] liability for past conduct,'" regardless of when Bank Melli's assets were

15   frozen.  *Ctr. for Biological Diversity*, 626 F.3d at 1117 (quoting *Landgraf*, 511

16   U.S. at 280).  Because applying the TRIA to this case would have a retroactive ef-

17   fect, there must be "clear congressional intent favoring such a result."  *Id.*  There is

18   none.  Nothing in the text or legislative history of the TRIA remotely suggests that

19   Congress intended to disturb the well-settled presumption against retroactivity.

20          **B.      Section 1610(g) Does Not Apply Retroactively to this Case**

21          Plaintiffs' attempts to invoke Section 1610(g) are even further afield.  Con-

22   gress enacted Section 1610(g) on January 28, 2008.  *See* Pub. L. No. 110-181, 122

23   Stat. 3, 341 (2008).  That date is years after the 1990 and 1996 events underlying

24   the judgments of the only two plaintiffs who seek to collect under Section 1610(g).

25   *See* pp. 3-4 n.2, *supra*.  Indeed, that date is after even the date Bank Melli's assets

26   were frozen on October 25, 2007.  Doc. No. 16 ¶ 17.

27          As with Section 201(a), therefore, applying Section 1610(g) here would

28

"'increase [Bank Melli]'s liability for past conduct.'" *Ctr. for Biological Diversity*, 626 F.3d at 1117 (quoting *Landgraf*, 511 U.S. at 280). Nothing in Section 1610(g) indicates that Congress intended that effect: The amendment is silent as to its temporal scope, and contains nothing suggesting any clear congressional intent to reach past events. Section 1610(g) thus does not apply retroactively.

### C. Permitting the Heiser Plaintiffs to Collect Under Section 1610(g) Would Violate Separation-of-Powers Principles

For one set of Plaintiffs in particular—the Heiser Plaintiffs—applying Section 1610(g) would violate not only the *Landgraf* anti-retroactivity presumption but also the constitutional prohibition against reopening final judgments set forth in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995). *Plaut* held that "[t]he Constitution's separation of legislative and judicial powers denies [Congress] the authority . . . to reopen final judgments entered before [a statute's] enactment." *Id.* at 240. The Constitution gives federal courts, not Congress, "the power, not merely to rule on cases, but to **decide** them." *Id.* at 218-19. "By retroactively commanding the federal courts to reopen final judgments, Congress . . . violate[s] this fundamental principle." *Id.* at 219.

Permitting the Heiser Plaintiffs to collect under Section 1610(g) would violate *Plaut*. Section 1610(g) by its terms applies only to judgments entered under Section 1605A. *See* 28 U.S.C. § 1610(g). But the Heiser Plaintiffs obtained a final judgment under Section 1605(a)(7) **before** Section 1605A was enacted. *See* pp. 3-4 n.2, *supra*. They seek to collect under Section 1610(g) only because they returned to the district court and reopened their final judgment to convert it into a Section 1605A judgment pursuant to a special congressionally created mechanism purporting to authorize such reopening. *See Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 23-24 (D.D.C. 2009).

Reopening a final judgment and obtaining a new judgment allegedly enforceable against additional parties violates the separation-of-powers principles set

17

forth in *Plaut*.   *See* Jennifer K. Elsea, Congressional Research Service, *Suits Against Terrorist States by Victims of Terrorism* 61 (Aug. 8, 2008) (provision "may be vulnerable to invalidation" under *Plaut*); *cf. In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 68-69 (D.D.C. 2009) (noting "a legitimate question of whether this enactment offends deeply entrenched constitutional principles" but ultimately upholding it).   No feature of a judgment could be more fundamental than the parties against which it is enforceable.   Legislative revision of the parties bound by a final judgment thus cannot be reconciled with *Plaut*.   For that reason too, Section 1610(g) cannot be applied here.

## III.   The Assets in this Court's Registry Are Not Alleged To Be "Assets of" or "Property of" Bank Melli for Purposes of the TRIA or Section 1610(g)

The TRIA and Section 1610(g) are also inapplicable for another reason:  The complaint fails to allege that the assets at issue are "assets of" or "property of" Bank Melli for purposes of those provisions.

Section 201(a) of the TRIA applies only to "the blocked assets *of*" the alleged terrorist party.   Pub. L. No. 107-297, § 201(a), 116 Stat. at 2337 (emphasis added).   As the Supreme Court has made clear, the " 'use of the word "of" denotes ownership.' "   *Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2196 (2011) (quoting *Poe v. Seaborn*, 282 U.S. 101, 109 (1930)).   In other words, the assets must "belong[] to" Bank Melli.   *Ellis v. United States*, 206 U.S. 246, 259 (1907); *see also Jacobs v. New York Foundling Hosp.*, 577 F.3d 93, 100 (2d Cir. 2009).

"The plain language of TRIA § 201 requires **both** that the accounts be 'blocked assets' and that these blocked assets be 'of that terrorist party.' "   *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, — F. Supp. 2d —, No. 11 Civ. 3283, 2011 WL 6155987, at *8 (S.D.N.Y. Dec. 7, 2011).   To be subject to execution, therefore, the assets must be **owned by** Bank Melli.   *Id.*   In *Calderon-Cardona*, for example, the court held that blocked Electronic Fund Transfers held

18

by various banks were not owned by a state or its instrumentalities because, under state law, "the interest of an originator or a beneficiary in a midstream [Electronic Fund Transfer] falls short of property ownership." *Id.* at *9. Absent ownership, such assets were not attachable.

The United States agrees. It has filed *amicus* briefs in multiple cases making clear that "assets of" under Section 201(a) means "owned by." *See* Brief for the United States as *Amicus Curiae*, *Rubin v. Islamic Republic of Iran*, No. 11-2144, at 14 (1st Cir. filed June 7, 2012); *see also* Brief for the United States as *Amicus Curiae*, *JPMorgan Chase Bank, N.A. v. LTU Lufttransport-Unternehmen*, Nos. 12-1264 & 12-1272, at 16 (2d Cir. filed July 9, 2012). Section 201(a) of the TRIA thus does not permit execution or attachment where a party merely has an "interest" in property but does not actually **own** it. As a result, "assets 'of' Iran are a **narrower category** than assets in which Iran has 'any interest of any nature whatsoever.'" U.S. Brief in *Rubin*, *supra*, at 15 (emphasis added). If Congress had wanted to expand the category of attachable assets, it would have applied the TRIA not only to "blocked assets of" an alleged terrorist party but also to assets in which that party " 'has any right, title, or interest.' " *Id.* at 16 (quoting *United States v. Rodgers*, 461 U.S. 677, 692 (1983)).

That standard is not met here. The third-party complaint contains no allegations establishing that Bank Melli holds legal title (as opposed to a mere beneficial interest) in the funds at issue. It describes the assets as funds held by Visa that are "**due and owing by contract** to Bank Melli pursuant to a commercial relationship with that bank." Doc. No. 16 ¶ 16 (emphasis added). Plaintiffs have elsewhere described the assets as funds held by Visa "**for the benefit of** the Islamic Republic of Iran," Doc. No. 95 at 2 (emphasis added), as "assets . . . **due and owing by contract** to Bank Melli pursuant to a commercial relationship," *id.* at 4 (emphasis added), and as "securities issued . . . in uncertificated form **to Visa International Service Association**," *id.* (emphasis added). The complaint does not establish that

19

the funds are "assets of" Bank Melli for purposes of the TRIA, as opposed to assets in which Bank Melli merely has a beneficial interest by virtue of its contractual relationship with Visa.

As the Ninth Circuit has made clear, "[a]n entitlement or right to receive is an interest distinct from ownership." *United States v. Rodrigues*, 159 F.3d 439, 448 (9th Cir. 1998), *amended on denial of reh'g*, 170 F.3d 881 (9th Cir. 1999).  A transfer of a right to receive royalties, for example, is not a "'transfer of . . . ***ownership***.'" *Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997) (emphasis added); *see also In re Woodson*, 839 F.2d 610, 618 (9th Cir. 1988) ("One can own [an insurance policy] yet not be its beneficiary and, conversely, one can be the beneficiary of a policy one does not own."); *cf. City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 444 (9th Cir. 2011) (outlining the "common law distinction between ownership interests and possessory interests").  That the assets at issue are alleged to be due and owing by contract to Bank Melli thus falls short of alleging that Bank Melli ***owns*** them.  Accordingly, Plaintiffs have failed to allege that the assets are subject to execution under the TRIA.

The same analysis applies to Section 1610(g).  That provision covers only "the ***property of*** a foreign state" or "the ***property of*** an agency or instrumentality of such a state."  28 U.S.C. § 1610(g)(1) (emphasis added).  Once again, that language requires actual ownership, not a mere property interest. *Calderon-Cardona*, 2011 WL 6155987, at *8, 15.  And, once again, the complaint does not allege ownership——only that the assets are "***due and owing by contract*** to Bank Melli pursuant to a commercial relationship."  Doc. No. 16 ¶ 16 (emphasis added).  Like the TRIA, therefore, Section 1610(g) provides no basis for execution.

## IV.   This Action Should Be Dismissed Pursuant to Rule 19

Finally, this case must be dismissed under *Republic of the Philippines v. Pimentel*, 553 U.S. 851 (2008), because Bank Melli is a required party that cannot be

joined due to its sovereign immunity.  Under Federal Rule of Civil Procedure 19, an action must be dismissed where a required party cannot feasibly be joined and the action cannot proceed among the remaining parties in equity and good conscience.  *See* Fed. R. Civ. P. 19.  Courts must consider four factors: (1) "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"; (2) "the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment; shaping the relief; or other measures"; (3) "whether a judgment rendered in the person's absence would be adequate"; and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  Fed. R. Civ. P. 19(b).

In *Pimentel*, the Supreme Court addressed the application of those factors to a case like this—an interpleader action where a sovereign asserts an interest in the assets but cannot be joined as a party because of its sovereign immunity.  553 U.S. at 854-55.  The Court held that, in such circumstances, the action must be dismissed.  *Id.* at 873.  The case involved human rights victims who had obtained a judgment against Ferdinand Marcos and sought to attach property held by a bank. *Id.* at 857-58.  The bank interpleaded the assets and named, among other potential claimants, the Republic of the Philippines and the Philippine Presidential Commission on Good Governance.  *Id.* at 859.  The Republic and the Commission asserted immunity and moved to dismiss the entire action pursuant to Rule 19.  *Id.*

The Supreme Court held that the case had to be dismissed.  Under Rule 19(b)'s first factor—the extent to which a judgment rendered in the sovereign's absence might prejudice the entity or the other parties—the Court held that "[a] case ***may not proceed when a required-entity sovereign is not amenable to suit***."  553 U.S. at 867 (emphasis added).  The Court explained:  "[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."  *Id.*

1      The second Rule 19 factor favored dismissal because "[n]o alternative reme-

2 dies or forms of relief have been proposed . . . or appear to be available."  553 U.S.

3 at 870.  The third factor likewise favored dismissal:  "Going forward with the ac-

4 tion without the Republic and the Commission would not further the public interest

5 in settling the dispute as a whole because the Republic and the Commission would

6 not be bound by the judgment in an action where they were not parties."  *Id.* at

7 870-71.  Finally, the fourth factor favored dismissal because any prejudice to the

8 plaintiff bank in the interpleader action "is outweighed by prejudice to the absent

9 entities invoking sovereign immunity."  *Id.* at 872.

10      This case must be dismissed for the same reasons.  As an instrumentality of

11 a foreign sovereign, Bank Melli is "***presumptively*** immune from suit unless a spe-

12 cific exception applies."  *Permanent Mission of India to the United Nations v. City*

13 *of N.Y.*, 551 U.S. 193, 197 (2007) (emphasis added); *see* 28 U.S.C. §§ 1603(b),

14 1604.  Plaintiffs have not identified any exception that would allow this Court to

15 overcome that presumption and exercise subject-matter jurisdiction over Bank

16 Melli (as opposed to the government of Iran itself ).  Nor has Bank Melli consented

17 to jurisdiction in this action:  Upon appearing in the case, it expressly "reserv[ed]

18 all other jurisdictional, immunity, and other defenses and objections."  Doc. No.

19 108 ¶3.  "A case may not proceed when a required-entity sovereign is not amena-

20 ble to suit."  *Pimentel*, 553 U.S. at 867.  Accordingly, as in *Pimentel*, this case

21 must be dismissed.

22

23

24

25

26

27

28

1

## CONCLUSION

2      Bank Melli's motion to dismiss should be granted.

3

4   Dated:  August 6, 2012                    Respectfully submitted,

5                                             MOLO LAMKEN LLP

6

7                                             By:_____/s/_____
                                                    Jeffrey A. Lamken
8

9                                             *Counsel for Third-Party Defendant*
                                              BANK MELLI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28