1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3            BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

4

5    ------------------------------)
                                   )
6    Michael Bennett, *et al.*,        )
                                   )
7                       Plaintiffs,  )
                                   )
8        v.                        )      No. C 11-5807 CRB
                                   )
9    The Islamic Republic of Iran, )
     *et al.*,                         )
10                                 )
                        Defendants.  )   San Francisco, California
11                                 )   Friday, November 16, 2012
     ------------------------------)      (36 pages)
12

13

14                   TRANSCRIPT OF PROCEEDINGS

15

     APPEARANCES:
16

17   For Plaintiffs:          Bond & Norman
     (Bennetts)               777 Sixth Street, NW
18                            Suite 410
                              Washington, DC 20001
19                      BY:   JANE NORMAN

20   For Plaintiff/
     3rd Party Deft:          Stroock & Stroock & Lavan, LLP
21                            180 Maiden Lane
                              New York, New York 10038
22                      BY:   CURTIS C. MECHLING

23   3rd Party Plaintiff:     Baker & McKenzie
     (Visa, Franklin)         Two Embarcadero Center
24                            Eleventh Floor
                              San Francisco, California 94111
25                      BY:   BRUCE H. JACKSON

1    **APPEARANCES** (cont:)

2

3    **3rd Party Deft:        MoloLamken, LLP**
     **(Bank Melli)           600 New Hampshire Avenue, NW**
4                            **Washington, DC 20004**
                     **BY:   JEFFREY ALAN LAMKEN**
5                            **ROBERT KRY**

6                            **Law Office of John D. Cline**
                            **235 Montgomery Street**
7                            **Suite 1070**
                            **San Francisco, California 94104**
8                     **BY:   JOHN CLINE**

9    **3rd Party Deft:        DLA Piper, LLP**
     **(Heiser)               555 Mission Street**
10                           **Suite 2400**
                            **San Francisco, California 94105**
11                    **BY:   FRANK THOMAS PEPLER**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    Friday, November 16, 2012

2                                                       (11:00 a.m.)

3         (In open court)

4         DEPUTY CLERK:  All rise.

5         Please be seated.

6         Calling Case C 11-5807, Michael Bennett vs. the Islamic

7    Republic of Iran.

8         Appearances, Counsel?

9         MR. JACKSON:  Bruce Jackson on behalf of the third

10   party plaintiffs, Visa, Inc. and Franklin.

11        THE COURT:  Good morning.

12        MR. LAMKEN:  Jeffrey Lamken on behalf of Bank Melli.

13   With me I have Mr. Robert Kry, Mr. John Cline.

14        THE COURT:  Good morning.

15        MR. MECHLING:  Good morning, your Honor.  Curt

16   Mechling, Stroock & Stroock, on behalf of third party

17   defendants and judgment matter plaintiffs; and Acosta and

18   Greenbaum plaintiffs.

19        MR. PEPLER:  Good morning, your Honor.  Frank Pepler of

20   DLA Piper appearing on behalf of the Heiser judgment creditors

21   who are defendants in the interpleader action.

22        MS. NORMAN:  Good morning, your Honor.  Jane Norman.  I

23   represent the Bennetts, and my client, Michael Bennett, who's

24   the lead plaintiff and the father of Marla Bennett, who was

25   killed, is here, right here (indicating).
```

```
1            THE COURT:  Good morning.

2            It appeared to me that I ought to actually handle this

3    in the order of the issue of the motion for discharge of the

4    third party interpleaders first, and then deal with the motion

5    to dismiss.  Though I understand the argument that I ought to

6    decide immunity first.  When I say "first", I think what it

7    means is you ought to decide it very early in the case rather

8    than later in the case.  But it's not an inflexible rule.  And

9    then I decide the discharge issue first.  Seems to me they

10   sense that, especially in light of the fact that I'm going to

11   grant it, that then we don't have to deal with Visa and

12   Franklin at this point, may become relevant -- they may become

13   relevant -- they're not going anywhere.  May become relevant

14   later if, in fact, I grant the motion to dismiss.  Then the

15   funds would go back to Visa and Franklin.

16           And there we are.  I mean, you know, then they, in a

17   sense, would be brought back into the case, only because the

18   interpleader action has been defeated.  And so the funds are

19   then returned to the party interpleading the funds.  And then

20   it goes wherever it goes from that point on.

21           But at this point -- and I also anticipate that the

22   motion to dismiss -- it's a complicated motion.  There are a

23   lot of parts to it, and a lot of arguments.  And there just

24   doesn't seem to me to make any sense at all to keep Visa and

25   Franklin in at this point.
```

1      With respect to the fees, the fees will be set at a

2 later date.

3      So I will grant the motion to dismiss -- pardon me, the

4 motion to discharge the interpleaders.

5      MR. LAMKEN:  Your Honor, I apologize for interrupting.

6 Could I have one moment to try to talk you out of that?

7      THE COURT:  Sure.  You can have as many moments as you

8 want.

9      MR. LAMKEN:  I think the difficulty right now is that

10 because the Court hasn't established the attached jurisdiction

11 over Bank Melli, that the jurisdiction to Bank Melli doesn't

12 exist, the Court actually can't grant the requested discharge

13 because the requested discharge says that it enjoins Bank

14 Melli from pursuing Visa and Franklin for the requested funds.

15 And it also says that it discharges any claims Bank Melli has

16 against Visa and Mastercard for the requested funds.  And

17 that's just Paragraphs 1 and 2.

18      THE COURT:  But if I grant your motion, then I return

19 to the question of the status of the interpleader.  And any

20 discharge is not a final discharge; it's a discharge pending a

21 resolution of your claims, of your immunity.  It just means

22 that during this period of time they're not going to be

23 subjected to other claims relating to these funds by other

24 parties.

25      MR. LAMKEN:  Your Honor, so long the discharge isn't as

1    to Bank Melli and that Bank Melli isn't permanently

2    precluded --

3         THE COURT:  No, you're not permanently precluded.

4    The -- for the pendency of this action, you are precluded.

5         MR. LAMKEN:  I think, your Honor, then it's possible

6    that the precise terms of the proposed order would have to be

7    redone, but in that context, I'm not going to waste the

8    Court's time.

9         THE COURT:  I'll take a look at the order.  Make sure

10   that it covers your situation.

11        MR. LAMKEN:  Thank you.

12        THE COURT:  So --

13        MR. JACKSON:  Your Honor, just one clarification.  I

14   take it at some point that if Bank Melli's motions are denied

15   and the Court orders the funds turned over to one or more of

16   the claimants, we would want to be discharged at that point,

17   at least from any claims that Bank Melli may have against

18   the --

19        THE COURT:  Well, I guess the answer is:  Let's see

20   what happens.

21        MR. JACKSON:  All right.

22        MR. LAMKEN:  Thank you, your Honor.

23        THE COURT:  Because now we're talking about what will

24   happen if, in fact, I grant -- or I deny their motion to

25   dismiss.  What's the impact of all of that?  And I think I

```
1    have to figure that out.  I haven't figured that part out yet.
2    But I am just saying that from this point forward, until Visa
3    and Franklin receive notice from the Court, you are
4    discharged.  You're not permanently discharged.  You're
5    temporarily discharged.  No problem with that, right?
6              MR. JACKSON:  No problem, your Honor.
7              THE COURT:  I'm just trying to end the fees.
8              MR. JACKSON:  Well, we haven't asked for any fees.
9              THE COURT:  Yeah.
10             MR. JACKSON:  But we won't.
11             THE COURT:  Eventually, you will.
12             MR. JACKSON:  May I be permitted to stay for the rest
13   of the arguments, since I have an intellectual interest?
14             THE COURT:  Of course.
15             Okay.  So let's talk a little bit about the motion to
16   dismiss.  I think that the parties, the -- well, let's see,
17   what do I call the -- the claimants?  What do I call you
18   people?
19             MR. MECHLING:  Judgment creditors?
20             THE COURT:  I'll call you whatever you'd like to be
21   called.  My sense is that you would like a greater opportunity
22   to address the issues that we have in connection with the
23   motion to dismiss.  That was my sense.
24             MR. MECHLING:  That is correct, your Honor.
25             THE COURT:  And it may be that the bank wants to -- and
```

```
1    what I want to do is raise some questions that I would like

2    answered, and then we'll have an argument later.  Soon.  But

3    after everybody has something in mind.

4         So, here are some, going through, here's some issues --

5    well, I think it's clear that if the bank -- when I talk about

6    bank, I'm talking about Bank Melli -- if you are dismissed,

7    the funds will be returned to Franklin and Visa; isn't that

8    correct?

9         MR. LAMKEN:  That's correct, your Honor.  We think,

10   under Pimentel Rule 19, Bank Melli would be what's formerly

11   called an indispensable party, and I don't think anyone has

12   said the proceeding could go forward without Bank Melli, so it

13   would have to be.

14        MR. MECHLING:  Just to clarify, your Honor, we believe

15   that Bank Melli is not an indispensable party and this matter

16   could proceed without their presence.  So I didn't want --

17        THE COURT:  Well, they're here.

18        MR. MECHLING:  I didn't want to leave counsel's

19   statement unanswered.

20        THE COURT:  Okay.

21        MR. LAMKEN:  That was not my understanding from the

22   briefing.  I don't remember seeing any argument that Bank

23   Melli is anything but indispensable.

24        THE COURT:  I think it would be easier if we get the

25   two principal lawyers up at the podium, because I have a lot
```

```
 1    of questions, and obviously if anybody wants to join, you may.

 2    You're free to do so.

 3         Yes?

 4         MR. LAMKEN:  Your Honor.

 5         THE COURT:  Am I -- is it before me whether or not Bank

 6    Melli is an indispensable party?

 7         MR. LAMKEN:  Yes, your Honor.  We moved for a dismissal

 8    of the case under Rule 19.  First, because Bank Melli is

 9    jurisdiction-immune, and there is no exception.

10         And second, because absent Bank Melli, the case cannot

11    proceed.  We believe that -- I did not see any argument that

12    under the equities, that this case could proceed absent Bank

13    Melli.  And we believe that Pimentel forecloses any such

14    argument.

15         MR. MECHLING:  And we contend, your Honor, that the

16    indispensable party argument is an irrelevancy here because

17    this is a -- this is a post-judgment enforcement action.  The

18    relevant party before the Court is the res, the property.

19    We're seeking to execute against that property.  We're not

20    seeking to adjudicate the liability of Bank Melli for any

21    underlying claim.

22         So the only sovereign immunity that's relevant here is

23    the sovereign immunity that may attach to that property.  And

24    we submit that under TRIA and under 1610(g), there is no

25    sovereign immunity for the property.  And Bank Melli is
```

1   welcome to appear in the case to contest whether that property

2   is executable, but, you know, their presence or absence

3   doesn't determine when this case can go forward.

4           MR. LAMKEN:  Your Honor, that simply can't be

5   reconciled with *Pimentel*.  *Pimentel* was also a case in which

6   they're attempting to interplead funds and adjudicate

7   entitlement for the funds without the presence of a sovereign

8   claimant.  And the Supreme Court held in no uncertain terms

9   that the proceeding could not go forward absent that claimant.

10          THE COURT:  So is *Pimentel*, to refresh my recollection,

11  an action to collect a judgment?

12          MR. LAMKEN:  Pardon?

13          THE COURT:  Was it an action to collect a judgment?

14          MR. LAMKEN:  Yes, your Honor.  It was a judgment

15  against the -- I think it was the -- it was against the

16  Marcos.

17          THE COURT:  Marcos estate.

18          MR. LAMKEN:  Exactly.  And it's -- Pimentel's holding

19  was, "where sovereign immunity is asserted, and the claims of

20  the sovereign are not frivolous, dismissal of the action must

21  be ordered where there is a potential for injury to the

22  interests of the absent sovereign."

23          That's on Page 867 of the decision.  And so I think

24  it's absolutely clear under *Pimentel* that absent Bank Melli,

25  this case cannot proceed.

1          In terms of --

2          THE COURT:  Well, I think what I'd like judgment

3    creditors to do is address that in their argument.

4          MR. MECHLING:  Yes, your Honor.

5          THE COURT:  Okay.  I just really want to sort of

6    identify issues.  I'm not going to rule on any of these

7    issues.  And I just want to make sure that when we have the

8    argument, we try to anticipate in short order -- we will know

9    what everybody's saying on these issues.

10         MR. LAMKEN:  I suppose I'm assisting my brother here in

11   figuring out what's what he's going to answer, so....

12         THE COURT:  There you go.

13         MR. MECHLING:  I hope I return the favor.

14         MR. LAMKEN:  Very much.

15         THE COURT:  I think you'll have that opportunity.  Very

16   good.

17         Isn't the issue of liability already established?  And

18   doesn't that then reflect upon whether any additional

19   liability or new liability is imposed on Iran?  In other

20   words, whether certain laws are retroactive turns in part, and

21   perhaps maybe entirely, on the issue of whether some new --

22   since the statute's silent on that issue, whether then it

23   increases or imposes a new liability on the sovereign.  Talk

24   about that for a minute.

25         Or on the bank, for that matter.

| | |
|---|---|
| 1 | MR. LAMKEN:  I think that's correct, your Honor. |
| 2 | THE COURT:  So the question is:  This is an action to |
| 3 | collect a judgment for which the government of Iran is liable. |
| 4 | In other words, if Iran had a piece of property, say, Iran's |
| 5 | property, and I had a judgment, then today -- I get one today, |
| 6 | could I go to the land or the property and collect, seize, you |
| 7 | know, attempt to enforce my judgment as -- on that particular |
| 8 | asset?  I think today the answer would be yes.  Under the law. |
| 9 | I could do that. |
| 10 | I think. |
| 11 | MR. LAMKEN:  Your Honor, our position is, no, that |
| 12 | neither the TRIA nor 1610(g) abrogates the separate juritical |
| 13 | status of Bank Melli or any other instrumentality. |
| 14 | But, in terms of -- |
| 15 | THE COURT:  Forgetting the bank.  I'm just now talking |
| 16 | about there was a piece of property, and on the title it said, |
| 17 | "Iran".  Forget any -- whether you go after a bank or a third |
| 18 | party or whether the bank and the government are the same. |
| 19 | Forget all that.  Just say, There's no issue here.  It's -- |
| 20 | Iran comes and says, That's mine.  That's mine.  You know. |
| 21 | Can, then, under the law, can I get a judgment today, a |
| 22 | default -- a valid default judgment of a million dollars?  Can |
| 23 | I go -- and that piece of property is located in |
| 24 | San Francisco, and I go and I say, I want that, I'm telling |
| 25 | the sheriff to sell that piece of property or that property. |

```
1    It's in the name of Iran.  Could I do that?

2         MR. LAMKEN:  Certainly if it falls within one of the

3    exceptions to the immunity from attachment in 1609 or 1610,

4    the answer would be yes.

5         THE COURT:  Okay.  Okay.  Now, what complicates it in

6    this case was that the judgment was obtained prior to the

7    enactment of these statutes.  Right?

8         MR. LAMKEN:  We would say the conduct occurred.  The

9    conduct occurred.

10        THE COURT:  The conduct.  Be that as it may -- the

11   conduct occurred.  Well, I'm not as sharp on all the facts,

12   you'll have to forgive me, I promise to be better acquainted

13   with all the facts at the time of the argument.  But the

14   judgment was obtained, it was obtained subsequent to these

15   enactments or prior to these enactments.

16        MR. MECHLING:  There were a number of judgments, your

17   Honor, and I believe all of them were obtained prior to

18   enablement of TRIA in 2002.

19        But for purposes of retroactivity analysis, I think the

20   critical question is:  What was the change in law that

21   adversely affected Bank Melli?  And the change in law that

22   adversely affected Bank Melli was the -- what adversely

23   affected Bank Melli was the fact that TRIA made its assets

24   executable for judgments against Iran.  Then, in 2007,

25   subsequent to that, Bank Melli was put on the list of
```

```
1    specially designated nationals by the Treasury and by

2    executive order of the president as being a proliferater of

3    weapons of mass destruction which blocked their assets.  So

4    the statute was enacted in 2002 that said:  If you get on this

5    list, if you are designated by Treasury and the government as

6    subject to blocking, your assets can be blocked and they can

7    be subject to execution.

8            Five years after that, their assets were blocked.  So I

9    don't believe that there is a retroactivity issue here as

10   concerns Bank Melli.

11           THE COURT:  You can conceive the conduct that gave rise

12   to the judgment was conduct that occurred before these

13   enactments.

14           MR. MECHLING:  That's correct.

15           THE COURT:  So that's not an issue.  And of course,

16   that's what they point to.

17           MR. MECHLING:  That's correct.

18           MR. LAMKEN:  Precisely so, your Honor.  And in our

19   view, the answer's clear, because the question:  What is the

20   primary conduct at issue in this suit?  If the primary conduct

21   at issue in the suit predates the enactment, then that is

22   retroactive.  If it attaches new consequences to that conduct,

23   it is retroactive.  And here, there are absolutely clear --

24           THE COURT:  Well -- sorry.

25           MR. LAMKEN:  The consequences are clear.
```

```
1           THE COURT:  I'm interested in your term "consequences".
2     Because what -- what we mean by that in what I call real world
3     terms is an asset that previously was not reachable is now
4     reachable.  An asset which could support payment of a judgment
5     becomes available where previously it was not available.  Is
6     that correct?
7           MR. MECHLING:  Yes, your Honor.  And --
8           THE COURT:  I'll let everybody speak.  So --
9           MR. MECHLING:  And what happened here once was Congress
10    acted in 2002 and said, Such assets are no longer going to be
11    subject to foreign sovereign immunity.  And then Bank Melli
12    went on its way, on notice of that, did whatever it did.  And
13    in 2007, it was designated as a -- as an SDN.  And its assets
14    were blocked.  So it was on notice that if it engaged in
15    whatever conduct that got them on that list, those -- one of
16    the consequences of that would then be after the enactment of
17    TRIA, that those assets could be subject to execution.
18          THE COURT:  But the conduct -- subject matter judgment
19    occurred first?
20          MR. MECHLING:  That is correct.
21          THE COURT:  It wasn't like -- I mean yes, you're right,
22    that if they persisted in a particular form of conduct,
23    however that's shown and whatever occurred, then particular
24    assets would be subject to forfeiture, and your argument there
25    is, well, you know, they got a notice which said Congress
```

1   enacted a law, say, look, see those things out there that are

2   yours?  Just want to tell you something:  They're subject to

3   attachment in the event you do "X".  You're on a list.  You do

4   "X", and so forth and so on.

5        MR. MECHLING:  Right.

6        THE COURT:  So you say, Well, okay, they did "X".  I

7   mean, there's a procedure which says that they did "X".  And

8   therefore they were on notice that -- if they did what they

9   were told had certain consequences, and they did that, and

10  that's the way it is.

11       But your basic argument, as I understand it, is

12  something slightly different.  It's not that, Well, they were

13  sort of on notice.  It's, This is just talking about

14  collection of a judgment against assets which previously may

15  have been not subject to judgment, but subsequently became

16  available for judgment.  So it's not a change in liability,

17  because the liability's always there.  It's a change in

18  collectability.  That is execution.  How you go about getting

19  your dough, as I tell every litigant when they walk out of

20  this case, this court, and they have a judgment in their hand,

21  I say, Good luck.  Because there's a big, big difference, and

22  every lawyer knows this, between getting a judgment and

23  getting a collectable judgment.

24       And your argument is, as I understand it, it's, you

25  know, your argument is, all this was -- affected

```
 1   collectability.

 2           MR. MECHLING:  That's correct, your Honor.

 3           THE COURT:  That's your argument (to Mr. Mechling).

 4           Your argument, as I understand it, is:  Not so fast,

 5   Judge (to Mr. Lamken).  Of course it affects the

 6   collectability, but that's just arguing the result.  Yes, we

 7   don't think it's collectable against this asset.  But we have

 8   some reasons why we don't think it's collectible against the

 9   asset, and those actually go to, in a sense, the liability.

10   As an example, whether I defend the case or not.

11           And this is a judgment, made all -- I'll use a pun --

12   this is a decision made all the time by parties:  If I think I

13   don't have anything that they can collect against, I may allow

14   that -- I may allow it to go by way of default.  I think in

15   this case they were default judgments, were they not?  So I

16   make the decision, I'm immune.  And as of that date, I was.

17   There wasn't any question there.  So I let it go to judgment.

18   And then they pass a law which says, Oh, not so fast.  You

19   know, those assets that you thought couldn't be collected

20   upon, they can.

21           And that basically changes, after the fact, it changes

22   the calculus that a party goes through in determining whether

23   or not to contest liability.

24           So then the question becomes:  Well, is that one of the

25   risks that a party takes in deciding not to defend an action?
```

```
1    That is, that rich uncle may die and suddenly I come into

2    untold millions of dollars; I win the big lottery.  I have no

3    assets today and tomorrow I win the lottery.  And now that

4    judgment creditor who has a default judgment against me goes

5    and collects it.

6         So -- and those are events that can happen.  This is a

7    different kind of event.  This is a Congressional enactment

8    event, and that makes a difference.

9         Go ahead.

10        MR. LAMKEN:  I think that's exactly right.  You might

11   take a risk of changing facts but you do not take the risk of

12   changing law unless Congress makes the law retroactive.  At

13   the time of the conduct here Bank Melli faced no legal

14   liability.  It was a completely separate, juridically

15   distinguished element protected by international law, federal

16   common law.  It could not be liable.

17        Now, according to their application of the TRA at

18   Section 1610(g), Bank Melli is liable for conduct it had

19   nothing to do with, and it is going to be required to pay a

20   judgment.

21        THE COURT:  Let me ask you this, because you use the

22   word liable and that of course is your result.  I mean that's

23   your argument.  But I look at -- liability means something

24   slightly different to me in terms of -- in terms of this case.

25   In other words, they didn't -- the Bank Melli didn't cause the
```

```
1    conduct.  No one -- if they were a separate entity out there,
2    nobody would sue the Bank Melli and say you caused these hoar
3    renne do you say things that happened, maybe them, but I don't
4    know that they would.  But that wasn't the case.  The case was
5    against the government of Iran.  And so when we talk about,
6    well now the bank is liable by operation of law, I don't know
7    whether that's really true.  It's not that the bank is liable.
8    It's that the bank is holding -- has -- or did have control of
9    an asset -- and maybe it means the same thing.  Maybe I'm just
10   using words here.  But they have an asset which can satisfy a
11   judgment.  So you say well is that a question of liability?
12   Or is that somehow different?  It's a question of
13   collectability.  Collecting ownership of an asset as distinct
14   from the asset itself giving -- the asset itself -- and the
15   asset satisfies the judgment, but it doesn't have any sort of
16   independently ability.
17        MR. MECHLING:  That's our view of the case your Honor.
18        MR. LAMKEN:  But I think that an example would clarify.
19   If there were a very large judgment against Frito-Lay, for
20   example, and someone just turned around and said, I'm just
21   going to collect that from Pepsi, and Congress passed a law
22   saying, Fine, don't collect your judgment from Frito-Lay,
23   collect it from Pepsi, no one would say, Oh, that's just
24   collectability or collecting it from one entity rather than
25   the other.  Suddenly Pepsi's paying a judgment that was
```

1    formerly only against another entity.

2           And that's exactly what you have here.  You have a

3    judgment against Iran, collectable against Iran.

4           THE COURT:  But what if -- because Frito-Lay and

5    Pepsi -- I don't know, are they related?

6           MR. LAMKEN:  Yes, Pepsi owns Frito-Lay.  Precisely why

7    I showed that example.  They're affiliates.  And the

8    subsequent law is -- they are distinct, they are not treated

9    as one and the same.  They are different people.  And what the

10   claim made here is Congress changed that substantive law.  As

11   a rule of substantive law, these are separate entities and

12   they are not liable for each other's debts.  And the problem

13   is, Congress did exactly what my example suggests, it says,

14   Yes, we know you're completely distinct, and you're different

15   entities, but we are going to make one of you pay the judgment

16   against the other.

17          And that is a subsequently retroactive law because it

18   changes the consequences of conduct that was completed long

19   before the laws were enacted.

20          We've mentioned the blocking of Bank Melli's assets.

21   All those events are relevant because retroactivity looks at

22   the primary conduct underlying the suit.  Not secondary things

23   that happened later on.  And the primary conduct underlying

24   the suit isn't blocking.  It isn't whatever led to the

25   blocking.  It is the conduct which resulted in the judgments.

1   For example here, Bank Melli's liability or its amenability to

2   collection, if you will, the amount is not determined by what

3   caused the blocking order.  It's determined by the damages

4   caused by the underlying conduct in the suit.  Punitive

5   damages result.  Not from the badness or reprehensibility of

6   whatever Bank Melli did that caused it to be on the blocking

7   list.  It's based on the reprehensibility or badness, if you

8   will, of the underlying conduct in the suit.

9          And if you look at the legislative record, what

10  Congress was getting at, what Congress was punishing here were

11  acts of terrorism and providing compensation to victims of

12  terrorism.  It was not attempting to make blocking legislation

13  more efficacious.  In fact, the Justice Department and the

14  State Department, when there were prior express efforts to

15  make blocked assets available for collection, blocked assets

16  of instrumentalities, had warned that it was a bad idea:  It

17  undermined the Executive branch's authority because it meant

18  that the Executive branch no longer had a carrot and stick it

19  could use in blocking assets, and unblocking, that the assets

20  would be dissipated.

21          THE COURT:  Is the State Department an interested

22  party -- not a party, but are they interested in this

23  litigation?  That is to say, I've had litigation involving

24  other countries, and there is a procedure where a district

25  court can ask the State Department for its position.

1       MR. MECHLING:  Your Honor, my understanding is that

2   OFAC -- the Office of Foreign Asset Control in the Treasury --

3   keeps track of these cases.  We have put them on notice of

4   these cases.  And to date, they have not come into this case

5   as they have in others in which I've been involved raising

6   similar issues.

7       MR. LAMKEN:  Likewise, your Honor, the Justice

8   Department is aware of this case.  We have notified them of

9   the case and we have not received an indication that they are

10  interested in participating.  That, of course, could change

11  over time for both OFAC and the Justice Department.

12      THE COURT:  Of course, the Court can always solicit --

13      MR. MECHLING:  Yes, and I have been in cases where the

14  court has in fact solicited the position of the government.

15      THE COURT:  Not like the last argument, whether it's

16  appropriate to, you know, arguing why the State Department is

17  doing what they did and why they did what they did, the

18  positions that they took with respect to whether it was a

19  blockage or -- I don't know, I'll have to think more about it,

20  whether there's an issue that the State Department would be

21  interested in.  I guess the answer is no because they haven't

22  come in.

23      MR. LAMKEN:  Right.  Now, I think in the case there is

24  no issue as to whether or not the assets are in fact blocked

25  assets.  That hasn't been disputed.  If it were to become

1    disputed, the government might have interest; we might want to

2    notify them.  But the current status, that hasn't been an

3    issue in the case.

4         MR. MECHLING:  There have been other cases in which the

5    government has come to question whether blocked assets are in

6    fact subject to execution.  In this case, notably, the

7    government has not.

8         And going back to your Honor's original point on the

9    retroactivity issue, this is a case of collectability.  This

10   is a case of execution on existing assets.  And it is not a

11   case to adjudicate any original liability or, you know, bad

12   conduct by Bank Melli.  It's purely a question of whether,

13   under TRIA and 1610(g), these assets have been made available

14   for execution for these plaintiffs on judgments that they

15   previously obtained.

16        And just to clarify one point alluded to by opposing

17   counsel:  There's no question of punitive damages here.  Under

18   TRIA, you can only get the compensatory portion of your

19   damages.  So it's not a question of how bad was Bank Melli,

20   was it evil or not.  The only question is:  Were there assets

21   blocked and, under TRIA, are those assets now subject to

22   execution?

23        MR. LAMKEN:  And the amount of compensatory damages is

24   based on the harm that occurred, based on the underlying

25   conduct, occurred before TRIA, before 1610(g) were enacted.

1    And the question is:  Okay, Iran is liable?  It did something.

2    Can you turn around and say, We're going to make Bank Melli a

3    juridically distinct entity, pay that judgment even though the

4    judgment is not against it?  And argue that is substantive

5    liability?  You can call it collectability all you want, but

6    from Bank Melli's perspective, what's happening is

7    consequences for prior conduct by somebody else are being

8    imposed on it, based on laws that were enacted long after that

9    conduct took place.

10        MR. MECHLING:  And your Honor, all of these arguments

11   were raised and considered by the Second Circuit in *Weinstein*

12   and rejected.  The retroactivity argument was rejected in the

13   *Hausler* case cited in our papers, because even if you look --

14        THE COURT:  In the *Hausler* case, weren't the funds

15   blocked before the passage of TRIA?  Were the funds blocked?

16        MR. LAMKEN:  Yes, your Honor, I believe so.  And I

17   think also *Weinstein* didn't actually address the retroactivity

18   issue, it addressed the constitutional issues.  Counsel in

19   that case apparently was more enamored of the constitutional

20   argument rather than the statutory argument.  So there's no

21   express parallel in *Weinstein* that I could find.

22        THE COURT:  Let's say in bankruptcy you have an

23   exemption -- you have a homestead exemption, right, where if

24   you homestead your property, it's not subject to, I think, the

25   bankruptcy, you can't attach it and so forth, in a bankruptcy

```
1    proceeding.  It's separate and apart from it.  Let's say
2    Congress took away that exemption so it could be part of the
3    bankruptcy plan.  Why are they really doing anything
4    differently in this case?  They were saying that your assets
5    are exempt from collection, and then they say, no, they're
6    not.  That's what they're saying.  No, they're not.  I had a
7    bankruptcy homesteading exemption, and then they said, No,
8    it's not.
9            MR. LAMKEN:  I think the difference --
10           THE COURT:  Take away protection.
11           MR. LAMKEN:  That is simply the collectability of a
12   debt against the debtor and saying, Debtor, you have assets,
13   they are yours.  And we're going to make you pay your debt
14   with those assets.
15           This is different.  This is saying, Debtor, we're going
16   to make you pay your judgment by reaching out to somebody else
17   who's distinct and make them pay the judgment.
18           THE COURT:  Of course.
19           MR. LAMKEN:  That's just very, very different.
20           THE COURT:  I -- it is certainly the plaintiff's view
21   that the bank and the government are one and the same, isn't
22   it?
23           MR. MECHLING:  More than that, your Honor.  That TRIA
24   and 1610(g) get rid of that, the *Bancec* presumption of
25   separateness, and say that in order to permit these plaintiffs
```

1    to be able to collect on to their judgments, we will deem the

2    assets to be the same.  That is, assets of instrumentalities

3    and agencies to be those of the state.  And here, there's

4    really no leap of logic to get there because, as Bank Melli

5    itself admits, it's 100 percent owned by the government of

6    Iran.

7            MR. LAMKEN:  And Frito-Lay's a hundred percent owned by

8    Pepsi.  Yet we accept the juritical separateness of those

9    corporations every single day, your Honor.  The substantive

10   international law on which everybody -- everybody -- depends

11   in extending credit to assets like Bank Melli is they're not

12   going to be liable for judgments against their sovereigns.

13   Sovereigns create those entities so they can get credit

14   because people know they will not be liable for judgments

15   against their sovereigns.  And yet in this case, the claim is

16   that Congress overturned that substantive legal separateness

17   and changed the law, and not only did so, did that for conduct

18   that occurred prior to the enactments.  That is core

19   retroactivity, your Honor.  It's attaching new consequences to

20   events that occurred long before the law was created.  Bank

21   Melli wasn't liable back when these events occurred, and now

22   it must pay the judgment because Congress changed the

23   substantive law.

24           And it isn't really a question of immunity.  It is not

25   a procedural question.  The *Bancec* decision makes absolutely

1    clear these are substantive questions of liability.

2        THE COURT:  If the plaintiffs amended their complaint

3    and they said that these assets, the blocked assets, actually

4    belonged to the government -- I mean, that wouldn't make any

5    difference in your argument.

6        MR. LAMKEN:  No, no.  If, for example, the plaintiff

7    said, Look, under the standards and the law that existed at

8    the time of this conduct, these assets were assets of Iran,

9    they were not assets of Bank Melli, they were not distinct

10   under the existing law at the time -- then we have no

11   retroactivity problem, your Honor.  That goes away.  But

12   there's been no claim at all that Bank Melli's an alter ego of

13   the government of Iran or that the injustice and fraud

14   exception applies, and those are the only two narrow

15   exceptions that existed in the law at the time of the conduct

16   in this case.  And that was as a matter of substantive

17   domestic law, substantive international law.

18        And in the *Bancec* decision, which looked at those, made

19   them formal federal common law and said Congress has not

20   changed them in the FSIA, which deals only with immunities,

21   not with substantive liability.

22        MR. MECHLING:  Of course, the law in the argument there

23   is that the purpose of Section 201 of TRIA and 1610(g) of the

24   Foreign Sovereign Immunities Act, was to abrogate *Bancec*, to

25   make the assets of otherwise foreign sovereign

1    instrumentalities and agencies available to execution.  And

2    Bank Melli's assets even then would not have been subject to

3    execution but for subsequent events after the enactment of

4    TRIA which got those assets blocked, and thereby, under the

5    terms of TRIA, available for execution.

6         MR. LAMKEN:  Your Honor, I think the problem is, first,

7    even to assume that's what 1610(g) and TRIA mean, there is no

8    indication that Congress meant that to be retroactive.  Hence,

9    there's no claim that this is intentionally retroactive.

10        And secondly, we do not agree that that is the

11   sentiment.  On the legislative intent, what we'd point to is

12   the statement of Senator Harkin, which turns out never to have

13   been uttered on the Senate floor --

14        THE COURT:  I don't think that makes any difference.

15   So they get up, if you watch C-SPAN, if you have a stomach for

16   it, you see -- of course, they get up and by unanimous consent

17   they can expand and put their remarks on the record.  So I

18   don't think that's --

19        MR. LAMKEN:  It's critical in two respects, actually,

20   your Honor.  First, whatever value you're going to give it, it

21   doesn't overcome the *Charming Betsy* canon that you don't read

22   statutes to abrogate, to violate international law or treaty

23   obligations, unless there is no alternative construction.  And

24   whatever weight you want to give to Senator Harkin's

25   nonstatements, they're not sufficient to overcome that.

1          But second is actually to give any weight to those
2     statements is a real problem because when it was originally
3     proposed in other legislation to get rid of juritical
4     separateness, the Justice Department and the State Department
5     came running forward and said, This is a terrible idea, and
6     they opposed it.  And to give weight to an after-the-fact
7     statement inserted into the record which gave neither them nor
8     any other legislator -- that this oblique parenthetical
9     supposedly was overruling a Supreme Court case and
10    contravening the law of nations and contravening a solemn
11    treaty obligation, Senate-ratified -- that defeats the
12    process, your Honor.
13         So we don't think Senator Harkin's statement can be
14    given any weight, and, in fact, the parenthetical does not
15    overrule *Bancec*.
16         The statements -- the language says, "assets of the
17    terrorist party".  And that means assets belonging to the
18    terrorist party.  Now, under *Bancec*, that would include, for
19    example, if the instrumentality's an alter ego, then that
20    would qualify as an asset of the terrorist party.  And the
21    parenthetical which has "including" is illustrative.  It
22    doesn't say, "plus assets of instrumentalities", which is how
23    the Second Circuit construed it.  It says, "including assets
24    of instrumentalities".  And that means blocked assets of
25    instrumentalities, if they qualify as assets of the terrorist

1    party under *Bancec*, notwithstanding *Bancec*.

2         And we think that that's clear from the text, because

3    one would speak of, for example --

4         THE COURT:  Well, no, I mean --

5         MR. LAMKEN:  You have it --

6         THE COURT:  The problem is that I don't feel adequately

7    prepared to engage in a meaningful -- I've just finished a

8    six-week trial yesterday.  So I'm not as up to speed on this

9    as possible.  And I've also thought, in looking at it quickly,

10   that the parties may want to supplement their submission.  You

11   don't have to.  But I wanted to clear out Visa and Franklin,

12   clear out that issue right now, get to what I think is the

13   heart of the case for right now.

14        And so I was going to set a date for you to submit

15   additional briefs, should you choose to do so, and then set an

16   argument date.  I want to do it this year.  I mean, people

17   have been waiting a long time to get a resolution of this.  So

18   it really -- do you have your calendars handy?  Are you --

19   where are you all located?

20        MR. MECHLING:  I'm in New York, your Honor.

21        THE COURT:  So you're delighted to be here.

22        MR. LAMKEN:  Washington, D.C., your Honor.

23        THE COURT:  And you're even happier.

24        MR. LAMKEN:  Compared to Washington, D.C.,

25   San Francisco is absolutely delightful, your Honor.

```
1          MR. MECHLING:  As things stand, I'm still flooded out

2   of my office.

3          THE COURT:  Downtown?

4          MR. MECHLING:  We won't be back in for another month.

5          MR. LAMKEN:  I'm sorry to hear that.

6          THE COURT:  That's terrible.  They showed the PATH

7   station in, I guess, New Jersey today on the Today show and I

8   couldn't believe the devastation that was caused there.  They

9   said that it was 13-foot-high waves.

10          MR. MECHLING:  Yes, and my office, the lobby in my

11   office sits, give or take, five or six feet above sea level,

12   so 13 feet was not a good development.

13          THE COURT:  Well, I want to warn all the people in the

14   South of Embarcadero and the Marina Districts:  You're not

15   safe.  When the high tide comes, head to the hills.

16          Okay.  At any rate, know that it's also the holidays,

17   but I would like to try.  This is really a very good time for

18   me to get these issues in front of me and think about them and

19   try write something on them.  So I would like to do it in

20   December, though I know that that's a miserable month to

21   travel.  Is there a day that -- I'm really available.  I can

22   do it in an afternoon.  You can come out in the morning.

23   Which probably -- or we could have the argument in the morning

24   and you can leave in the afternoon.  What's convenient for

25   you?
```

1        MR. MECHLING:  Your Honor, my only constraint is that

2   on the 22nd of December --

3        THE COURT:  Don't worry about that.  22nd of December?

4   That's a Saturday, isn't it?

5        MR. MECHLING:  So anything before that Saturday, I'm

6   good.

7        THE COURT:  Okay.  All right.  What if we were to have

8   an argument on the -- either December 13th, December 11th,

9   December 4th, December 6th.  I sort of like Tuesdays and

10  Thursdays because that allows you some travel time if you want

11  to and doesn't ruin your weekends.

12       MR. MECHLING:  Your Honor, any day of the week of

13  December 10th is open for me.

14       THE COURT:  What would be convenient for you, Counsel?

15       MR. LAMKEN:  Your Honor, so long as I'm in Washington

16  from 2:00 to 6:00 on December 12th, I can be here.  So I

17  guess --

18       THE COURT:  Would you like to do it then on

19  December 11th?  Or maybe that's not good for you.  Which is

20  better, the 11th or the 13th?

21       MR. LAMKEN:  The morning of December 11 or the

22  afternoon of December 13.  Either of them would be equally

23  convenient for me.

24       THE COURT:  The 11th.

25       MR. LAMKEN:  I should check with Mr. Cline as well.

1          THE COURT:  Let's do the 13th.

2          MR. LAMKEN:  Thank you, your Honor.

3          THE COURT:  Let's do the 13th at 2:00.  So you could

4    actually come out in the morning.  And if you have any further

5    briefs, can you get them filed by November 30th?  Does that

6    give you enough time, or do you want to have December -- don't

7    want to ruin your Thanksgiving.  December 5th?

8          MR. MECHLING:  Yes, your Honor, December 5th.

9          THE COURT:  Is that okay?

10          MR. MECHLING:  Yeah.

11          THE COURT:  All right.  Yes, sir.

12          MR. LAMKEN:  And you were thinking, for example,

13    simultaneous letter briefs?

14          THE COURT:  That's fine, yeah.  You know what you want

15    to say.

16          MR. LAMKEN:  Very well.

17          THE COURT:  Better that than back and forth.  So do

18    simultaneous briefs, and if you want to say something about

19    the other person's brief in oral argument, you can do so.

20          MR. MECHLING:  I'm sorry, your Honor, what time on

21    December 13th?

22          THE COURT:  Let's do 2:00 o'clock.  Is that all right?

23          MR. LAMKEN:  Certainly.

24          THE COURT:  Okay.  I'm sorry to pull you out here.  I

25    was -- but I wanted to start this process and get a couple of

```
 1   things cleared up, and it's been very helpful.  Now I get to
 2   think about it a bit, try to figure it out.
 3            MR. LAMKEN:  You'll never hear a complaint from me for
 4   an opportunity to come to San Francisco.  So...
 5            THE COURT:  There you go.
 6            My condolences to both of you gentlemen on the poor
 7   performance of your teams in the Playoffs.  Though Washington,
 8   I have to hand it to the Washington team, they were a great
 9   team this year.  Great team.  Incredible, the Nationals.
10   Incredible.  That was your team.
11            The Yankees....
12            MR. MECHLING:  Your Honor, my team is the Steelers.
13            THE COURT:  Good luck Sunday night.
14            MR. JACKSON:  Should I submit a revised order?
15            THE COURT:  Would you please?  And in view of the
16   parties and -- I'll take a look at it.  I'd like to be able to
17   do it by way of stipulation if I can.
18            MR. LAMKEN:  We'll do our best to save the work of the
19   court.
20            THE COURT:  There's no big tactical thing that's going
21   on here.  We just want to make sure that people's rights are
22   preserved and that we don't spend a lot of time in litigation
23   and so forth.
24            MR. LAMKEN:  Very well.
25            MR. PEPLER:  Frank Pepler, on behalf of the Heiser
```

1   judgment creditors.  I only have to commute from South of

2   Market, so travel isn't a big thing.  But there's a specific

3   issue that counsel has raised that is directed solely to the

4   Heiser defendants, which is the effect of the adoption of

5   1650(a).

6         THE COURT:  Well, if you want to address that in a

7   brief, feel free to do so.

8         MR. PEPLER:  Okay.

9         MR. LAMKEN:  That's the *Plaut vs. Spendthrift Farm*

10   issue, whether or not there's a unconstitutional revision of

11   an otherwise final judgment.  I think that's what counsel's

12   referring to.  Yes.

13        THE COURT:  You can address it in your briefs.

14        MR. PEPLER:  It's briefed and responded to.

15        THE COURT:  Okay.  Thank you very much.

16        MR. LAMKEN:  Thank you, your Honor.

17        MR. MECHLING:  Thank you.

18        MS. NORMAN:  Thank you.

19        MR. JACKSON:  Thank you.

20        MR. PEPLER:  Thank you.

21        (Adjourned)

22                         oOo

23

24

25

1

2

3

4

5                    CERTIFICATE OF REPORTER

6

7          I, Connie Kuhl, Official Reporter for the United
   States Court, Northern District of California, hereby certify
8    that the foregoing proceedings were reported by me, a
   certified shorthand reporter, and were thereafter transcribed
9    under my direction into written form.

10   _____

11                 Connie Kuhl, RMR, CRR
                 Friday, December 7, 2012
12

13

14

15

16

17

18

19

20

21

22

23

24

25