IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BENNETT, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, ET AL., <br><br> Defendants. | No. C 11-05807 CRB <br><br> **ORDER DENYING MOTION TO DISMISS** |

This case involves an Iranian instrumentality that seeks to avoid payment to American victims of Iranian terrorist acts. Specifically, four groups of judgment creditors ("Plaintiffs") who hold judgments against Iran seek to recover assets ("the Blocked Assets") held by Third Party Plaintiffs Visa and Franklin.[1] Those assets are owed to an Iranian instrumentality, Bank Melli, but have been blocked by executive orders issued by the President of the United States and blocking regulations issued by the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"). Visa and Franklin brought this interpleader action "to obtain a determination as to which [of the groups of judgment creditors], if any, has priority with respect to those assets to satisfy their judgments or their claims." Compl.

---

[1] Visa is a financial services company that had a commercial relationship with Third Party Defendant Bank Melli. Compl. (dkt. 16) ¶ 16. A Franklin subsidiary distributed shares in the mutual fund in which the Blocked Assets were invested. Id. ¶ 18.

¶ 4. Bank Melli has appeared in the case, and now moves to dismiss it in its entirety. See generally MTD (dkt. 112).

# I. BACKGROUND

### A. Bank Melli and the Blocked Assets

Bank Melli is Iran's largest financial institution. MTD at 2. Its stock is wholly owned by the Iranian government. Id. The Blocked Assets at issue in this case are "funds due and owing by contract to Bank Melli pursuant to a commercial relationship with [Visa]." Compl. ¶ 16. In 1984, the United States designated Iran a terrorist party pursuant to section 6(j) of the Export Administration Act of 1797, and, pursuant to the International Emergency Economic Powers Act, the President directed that "all property and interests in property in the United States of persons and entities listed in the order or subsequently listed are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Id. ¶ 17. The United States added Bank Melli to the list, freezing its assets, in October 2007, upon finding that from 2002 to 2006, Bank Melli had "facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs," "provided a range of financial services on behalf of Iran's nuclear and missile industries," and "employed deceptive banking practices to obscure its involvement from the international banking system." Id.; Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, U.S. Dep't of the Treasury Press Ctr. (Oct. 25, 2007), http://www.treasury.gov/press-center/press-releases/pages/hp644.aspx (hereinafter "10/25/07 Fact Sheet").

Visa and Franklin claim no ownership interest in the Blocked Assets and "only continue[] to hold them because, pursuant to OFAC regulations, the assets cannot be released to Bank Melli or to anyone else without a license from OFAC or an appropriate court order." Compl. ¶ 18.[2]

//

---

[2] Bank Melli does not dispute this, arguing that "[i]f this Court rules in favor of Bank Melli, the assets will go back to Visa and Franklin." Opp'n to Discharge Mot. (dkt. 119) at 2-3.

### B. Procedural History

Plaintiffs are four groups of individuals (the Bennett Plaintiffs, the Greenbaum Plaintiffs, the Acosta Plaintiffs, and the Heiser Plaintiffs) who obtained default judgments against the government of Iran. See MTD at 2. The Bennett Plaintiffs sued Iran over the July 31, 2002 bombing of a cafeteria at Hebrew University in Jerusalem. MTD at 3 n.2. On August 30, 2007, they obtained a default judgment of almost $13 million under 28 U.S.C. § 1605(a)(7). Id. The Greenbaum Plaintiffs sued Iran over the August 9, 2001 bombing of a Jerusalem restaurant. Id. On August 10, 2006, they obtained a default judgment of almost $20 million under 28 U.S.C. § 1605(a)(7). Id. The Acosta Plaintiffs sued Iran over the November 5, 1990 shooting of various individuals, including U.S. Postal Officer Carlos Acosta. Id. On August 26, 2008, they obtained a default judgment exceeding $350 million under 28 U.S.C. § 1605A. Id. The Heiser Plaintiffs sued Iran over the June 25, 1996 bombing of the Khobar Towers in Saudi Arabia. Id. On December 22, 2006, they obtained a default judgment of over $254 million under 28 U.S.C. § 1605(a)(7); on September 30, 2009, they obtained a further default judgment of almost $337 million under 28 U.S.C. § 1605A. Id. Bank Melli is not named as a party to any of the judgments and is not alleged to have been involved in any of the events underlying them. Id. at 4.

On December 2, 2011, the Bennett Plaintiffs filed a complaint against Visa and Franklin, seeking to execute against the Blocked Assets in order to satisfy their judgment. Id. On February 3, 2012, Visa and Franklin filed their Third Party Complaint in the nature of an interpleader, naming as defendants Bank Melli and other third-party defendants with potential claims to the Blocked Assets. See generally Compl. Visa and Franklin subsequently deposited the assets into this Court's registry. See dkts. 88-89.

On April 26, 2012, the Clerk entered a default against Bank Melli. See dkt. 79. On June 12, 2012, however, Bank Melli entered its appearance, see dkt. 96, and on July 5, 2012, this Court entered a stipulated order vacating the default, see dkt. 109. Bank Melli then moved to dismiss the case. See generally MTD.

The Court discharged Visa and Franklin at the November 16, 2012 hearing, and heard preliminary argument on the merits of Bank Melli's motion to dismiss. The parties each filed supplemental briefs, see Bank Melli Br. (dkt. 124); Pls. Br. (dkt. 125), and then, on December 13, 2012, participated in a second and more fulsome hearing on the motion to dismiss. See Mins. (dkt. 127). The Court then took the motion under submission.

## II. DISCUSSION

Bank Melli's motion makes four arguments for dismissal: (A) that under First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"), it cannot be held liable for Iran's debts; (B) that the statutes on which Plaintiffs rely to pursue the Blocked Assets, the Terrorism Risk Insurance Act of 2002 (TRIA), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (hereinafter "TRIA"), and the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1610(g) (hereinafter "section 1610(g)"), do not apply retroactively; (C) that TRIA and section 1610(g) only apply where the assets at issue are "assets of" and "property of" Bank Melli, allegations that are missing here; and (D) that Federal Rule of Civil Procedure 19 requires dismissal. See generally MTD. This Order addresses each argument in turn.

### A. Bancec

Bank Melli argues first that it cannot be held liable for the debts of Iran, because, although it is an instrumentality of Iran, it is juridically distinct. See MTD at 6. No doubt, the Supreme Court held in Bancec, 462 U.S. at 626-27, that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." In addition, the Treaty of Amity between the United States and Iran states that "[c]ompanies constituted under the applicable laws" of each country must "have their juridical status recognized within the territories of the other." Treaty of Amity,

//
//
//
//

4

Economic Relations, and Consular Rights, U.S.-Iran, Art. III ¶ 1, Aug. 15, 1955, 8 U.S.T. 899.[3]

However, two statutes permit judgment creditors to execute on Blocked Assets in this context, abrogating <u>Bancec</u> as to terrorism-based judgments against foreign state sponsors of terrorism. Section 1610(g)[4] states that "the property of a foreign state against which a judgment is entered under section 1605A, <u>and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity</u> . . . <u>is subject to attachment in aid of execution, and execution, upon that judgment</u>." TRIA[5] similarly provides:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28 United States Code, the blocked assets of that terrorist party <u>(including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment</u> in aid of execution in order to satisfy such judgment.

Neither of these statutes is the least bit ambiguous – both allow for attaching the blocked assets of a terrorist instrumentality.[6] The Court therefore agrees with the Second Circuit's holding in <u>Weinstein</u> that the statutes' plain language defeats Bank Melli's argument. 609 F.3d at 49 ("If this did not constitute an independent grant of jurisdiction over the agencies and instrumentalities, the parenthetical would be a nullity.").

//
//
//

---

[3] <u>But see</u> <u>Weinstein v. Islamic Rep. of Iran</u>, 609 F.3d 43, 53 (2d Cir. 2010), <u>cert. denied</u>, 133 S. Ct. 21 (June 25, 2012) (explaining that the Supreme Court found in <u>Sumitomo Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176 (1982), that this language is found in a number of treaties, and was not designed to give separate juridical status to instrumentalities).

[4] Emphasis added.

[5] Emphasis added.

[6] Bank Melli makes various arguments for a strained interpretation of this language in which instrumentalities' assets are not subject to attachment, including relying on cases decided before these statutes were enacted; the Court rejects such arguments as unpersuasive.

Incidentally, the Second Circuit went on to explain that its interpretation was also supported by a floor statement by one of TRIA's sponsors.[7] Id. at 50. Bank Melli mischaracterizes Weinstein as having "based its holding on" that legislative history – not so. See Reply (dkt. 117) at 6; Weinstein, 609 F.3d at 50 ("even if, contrary to fact, there were an ambiguity here, it would be resolved in plaintiff's favor by the legislative history"). Bank Melli then makes much of the fact that Senator Harkin's words "were never uttered on the Senate floor" but were added to the congressional record after the vote. See Reply at 6-7. As Plaintiffs note, "Senators can, and routinely do, revise and extend their on-floor remarks for inclusion in the Congressional Record." Pls.' Opp'n to MTD (dkt. 115) at 9 n.7. Regardless of the weight to which the floor statement is entitled, however, the plain language of the statutes is unambiguous and dispositive. The Court therefore rejects this argument for dismissal.

### B.    Retroactivity

Bank Melli next argues that, even if the statutes mean what the Court understands them to mean, they cannot be applied to this case without rendering them impermissibly retroactive. MTD at 15-17. A statute "is retroactive if it alters the legal consequences of acts completed before its effective date." Chang v. United States, 327 F.3d 911, 920 (9th Cir. 2003) (citing Miller v. Florida, 482 U.S. 423, 430 (1987)). To determine whether a statute is retroactive, courts apply the two-part test set out in Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994).

"First, courts must 'determine whether Congress has expressly prescribed the statute's proper reach,'" in which case the language used by Congress controls. See Ctr. for Biological Diversity v. U.S. Dep't of Agric., 626 F.3d 1113, 1117 (9th Cir. 2010) (quoting Landgraf, 511 U.S. at 280). The Court rejects Plaintiffs' argument that TRIA's plain language expresses Congress' intent that it apply retroactively. See Pls. Br. at 4. Plaintiffs note that Section 201 of TRIA states that it applies "in every case" in which a person "has

---

[7] That statement included the language: "for purposes of enforcing a judgment against a terrorist state, title II does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities." 148 Cong. Rec. S11524-01 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin).

6

obtained a judgment" against a terrorist party . . . and renders the terrorist party's blocked assets subject to execution to the extent of any compensatory damages for which the terrorist party "has been adjudged liable." Id. While that language might support Plaintiffs' interpretation, it falls quite short of an "'unambiguous directive' or 'express command' that the statute . . . be applied retroactively." See Ctr. for Biological Diversity, 626 F.3d at 1118 (quoting Martin v. Hadix, 527 U.S. 343, 354 (1999)).

Second, under Landgraf, "absent such express language, courts must 'determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" Id. at 1117 (quoting Landgraf, 511 U.S. at 280). If a statute would operate retroactively at step two, it does not apply. Id. Bank Melli states, and Plaintiffs do not dispute, that at the time of the conduct underlying Plaintiffs' judgments, Bank Melli's assets could not have been seized to satisfy Iranian government debts. MTD at 15. Accordingly, Bank Melli contends, seizing Bank Melli's assets now to satisfy a judgment based on "conduct that occurred before Congress enacted [the laws] would clearly 'increase [Bank Melli's] liability for past conduct.'" Id. at 16. Although this argument holds some initial appeal, the Court finds that it falters under close scrutiny, for two alternative reasons.

### 1. Bank Melli's Conduct Post-TRIA

Bank Melli's argument depends upon a simplified narrative in which the only significant events, for example, in the case of the Bennett Plaintiffs, are: (1) the bombing at Hebrew University, in July 2002; (2) TRIA's enactment, in November 2002; and (3) the Bennett Plaintiffs' default judgment against Iran, in August 2007. Such a narrative enables Bank Melli to argue that, as a statute's retroactivity turns on "when the primary conduct at issue in the suit took place," the primary conduct at issue here is the bombing. See MTD at 16 (citing Scott v. Boos, 215 F.3d 940, 949 (9th Cir. 2000)). But Bank Melli's narrative omits an additional event of great significance: the freezing of Bank Melli's assets in October 2007 in light of OFAC's findings that, from 2002 to 2006, "Bank Melli . . . provided a range

of financial services on behalf of Iran's nuclear and missile industries." See 10/25/07 Fact Sheet. Plaintiffs therefore argue that, because "the illicit conduct underlying the blocking of Bank Melli's property and subjecting such property to execution in satisfaction of judgments against Iran[] occurred years after TRIA's enactment," Bank Melli should have understood that "its nefarious conduct could and would result in its U.S. property being blocked and executed against pursuant to TRIA." Pls.' Opp'n to MTD at 16.

Bank Melli responds that "later secondary conduct – even if wrongful – does not eliminate a statute's retroactive effect." Bank Melli Br. at 2. In support of this assertion, Bank Melli relies on three cases, Johnson v. United States, 529 U.S. 694 (2000), Vartelas v. Holder, 132 S. Ct. 1479 (2012), and Tyson v. Holder, 670 F.3d 1015 (9th Cir. 2012). See Reply at 11; Bank Melli Br. at 2-3. None apply here.

In Johnson, 529 U.S. at 697-98, Congress had enacted a statute authorizing a court to impose an additional term of supervised release if a defendant violated conditions of his initial release; the defendant had been convicted before Congress enacted the statute, but he violated the conditions of his release after Congress enacted the statute. Johnson appealed his sentence, arguing that applying the new statute to him violated the Ex Post Facto Clause. Id. at 698. The Sixth Circuit found that the application of the statute was not retroactive, because it punished Johnson's violations of the conditions of supervised release, which occurred after the statute was amended. Id. at 698-99. The Supreme Court disagreed, concluding that the "postrevocation penalties relate to the original offense," and that "to sentence Johnson to a further term of supervised release under [the statute] would be to apply this section retroactively." Id. at 701.

Importantly, the Court's conclusion in Johnson was driven by "the serious constitutional questions that would be raised by construing revocation and reimprisonment as punishment for the violation of the conditions of supervised release." Id. at 700. The Court noted that conduct violating supervised release need not be criminal and need only be found by a judge under a preponderance of the evidence standard; in addition, where the conduct is criminal, it could form the basis for a separate prosecution, which would trigger double

8

jeopardy concerns. Id. It is for those reasons that the Court "attribute[d] postrevocation penalties to the original conviction." Id. at 701. None of those reasons are present here: proof beyond a reasonable doubt, double jeopardy, and the myriad of weighty constitutional issues that surround criminal sentencing have no bearing on this civil matter.

Vartelas and Tyson, though not criminal cases, are similarly inapposite.[8]

In Vartelas, 132 S. Ct. at 1485, a legal permanent resident had pled guilty to conspiracy to make or possess counterfeit securities in 1994, for which he received a short sentence. He traveled regularly thereafter to visit his aging parents in Greece, but in 2003, he was stopped upon his return and an immigration officer classified him as an alien seeking admission under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), a statute enacted in 1996. Id. at 1483, 1485. The Second Circuit rejected Vartelas's argument that IIRIRA operated prospectively. Id. at 1486. The Supreme Court disagreed, holding that neither Vartelas's sentence nor the immigration law in effect in 1994 prevented Vartelas from visiting his parents in Greece, and so applying IIRIRA to him attached "'a new disability' to conduct over and done well before the provision's enactment." Id. at 1487. As in Johnson, the Court's conclusion was based on the principle that it was unfair to attach additional penalties to the original crime. Rejecting the government's argument that "the relevant event" was Vartelas's "post-IIRIRA act of returning to the United States," id. at 1488, the Court held that Vartelas's "past misconduct . . . not present travel, is the wrongful activity Congress targeted," id. at 1489.

In so holding, the Court drew a sharp distinction between cases in which the subsequent act was illegal and/or dangerous, and those in which the subsequent act was "innocent." See id. at 1489-90. Thus it distinguished Racketeer Influenced and Corrupt Organizations Act (RICO) prosecutions that encompassed pre-enactment conduct, because "those prosecutions depended on criminal activity . . . occurring after the provision's

---

[8] The case law has long recognized a relationship between criminal and immigration cases. See Bridges v. Wixon, 326 U.S. 135, 154 (1945) ("Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty – at times a most serious one – cannot be doubted.").

9

effective date," as opposed to IIRIRA, which does not. Id. at 1489. And it distinguished Fernandez-Vargas v. Gonzales, 548 U.S. 30 (2006), in which the Court held that an IIRIRA provision, providing that an alien who reenters the country after having been removed can be removed again under the same removal order, could be applied to an alien who returned illegally before IIRIRA's enactment. Id. The Court explained that it was an "'alien's choice to continue his illegal presence . . . after the effective date of the new la[w],'" and "'not a past act that he is helpless to undo'" that subjected him to the new law. Id. (quoting Fernandez-Vargas, 548 U.S. at 44). The Court contrasted the alien in Fernandez-Vargas with Vartelas, whom it "several times stressed, engaged in no criminal activity after IIRIRA's passage." Id. (emphasis added). The Court likewise distinguished cases dealing with laws that prevent felons from possessing firearms, laws that prevent persons convicted of sex crimes against minors from working in jobs involving contact with minors, and laws that prevent a person who has been adjudicated as mentally defective from possessing guns; those laws "target a present danger," while "[t]he act of flying to Greece" did not make Vartelas "hazardous." Id.; id. n.7. Deeming Vartelas's travel and return "innocent" acts that "involved no criminal infraction," the Court concluded that applying IIRIRA to bar Vartelas from traveling abroad "rested not on any continuing criminal activity, but on a single crime committed years before IIRIRA's enactment." Id. at 1490. Bank Melli cannot argue that its assistance in Iran's nuclear proliferation efforts is either an "innocent act," akin to visiting one's elderly parents in Greece, or something Bank Melli was "helpless to undo." The Court's concerns in Vartelas are absent here.

Moreover, Tyson is analogous to Vartelas. In Tyson, 670 F.3d at 1017, a lawful permanent resident was convicted in 1980 of importing heroin, following her consent to a bench trial with stipulated facts and testimony. Twenty-four years later, she left the United States and was denied re-entry. Id. She sought a waiver of inadmissibility under former § 212(c), which had been repealed in 1996. Id. In so doing, she relied on INS v. St. Cyr., 533 U.S. 289 (2001), in which the Supreme Court had held that § 212(c) relief remained available to aliens who entered plea bargains with the expectation that they would remain

10

eligible for a waiver. Id. The Ninth Circuit concluded that Tyson was entitled to invoke St. Cyr. Id. at 1020. The court explained that applying the repeal of § 212(c) to Tyson would impose "an impermissible retroactive effect on aliens . . . who in reliance on the possibility of discretionary relief, agreed to a stipulated facts trial." Id. at 1022.

Tyson turned on an a lawful permanent resident's settled expectations about the impact of a criminal conviction. See id. at 1021-22. In light of St. Cyr., it is no surprise that the court found it unfair to prevent Tyson from applying for a § 212(c) waiver. And, consistent with Vartelas, it is no surprise that the court would not wish to add to the consequences of Tyson's original conviction by denying her re-entry based only on the innocuous act of travel. See id. at 1021 (identifying the only two consequences of Tyson's stipulated facts trial in 1980).

All three of Bank Melli's cases therefore involve, and reject, attempts to attach extra penalties to an individual's original criminal conviction based on subsequent innocuous or non-criminal behavior. That is not this case. This case involves, instead: (1) terrorist act(s) by the government of Iran; (2) the enactment of TRIA, which did not make Bank Melli's assets subject to attachment for Iranian debts, but should have put Bank Melli on notice of that possibility; and (3) default judgment(s) against Iran; followed by (4) Bank Melli's support for Iran's nuclear and missile industries; and (5) this government's resulting decision to freeze Bank Melli's assets. There is no original criminal conviction against Bank Melli. Bank Melli's assets are subject to attachment in this case because of Bank Melli's own actions, post-TRIA, in supporting Iran's nuclear and missile industries. Those actions are not innocuous or harmless. Accordingly, the Court rejects Bank Melli's retroactivity argument.

### 2. Post-Judgment Enforcement Action

In the alternative, Bank Melli's retroactivity argument fails because Bank Melli misconstrues what TRIA does. Bank Melli argues that Plaintiffs seek to use TRIA to make it liable for something for which it was not liable pre-TRIA. MTD at 15. In both motion hearings and in its supplemental briefing, Bank Melli has maintained that liability and collectability are interchangeable concepts; that is, that collecting money from Bank Melli in

connection with Iran's actions is the equivalent of holding Bank Melli liable for Iran's actions. See, e.g., Bank Melli Br. at 3-4 (citing snippets from various cases using terms like "liability for a money judgment"). The Court disagrees. This case is not about holding Bank Melli liable for Iran's actions, it is simply about collecting money from Iran, wherever that money can be found.[9]

Neither TRIA nor section 1610(g) speak of shifting liability from a terrorist party to its instrumentality. Both speak of attaching an instrumentality's assets in aid of executing a judgment against a terrorist party. See section 1610(g) (stating that "the property of an . . . instrumentality of such a state . . . is subject to attachment in aid of execution, and execution, upon that judgment"); TRIA (stating that "(. . . the blocked assets of any . . . instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment"). These laws "merely provide[] an exception to foreign sovereign immunity from execution for assets of . . . instrumentalities of foreign sovereign terrorist parties in the post-judgment context of execution and attachment proceedings to satisfy judgments against such foreign sovereign terrorist parties 'for which there was original jurisdiction under the FSIA.'" Pls.' Opp'n to MTD at 13 (citing Bennett, et al., v. Islamic Rep. of Iran, et al., No. 11-80065, 2011 WL 3157089, at *5 (N.D. Cal. July 26, 2011)).

Bank Melli's argument to the contrary presupposes that Bancec, 462 U.S. at 626-27, which held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," stands for an immutable principle of law. But Congress created the presumption of separateness in the first place, see Bancec, 462 U.S. at 627 (in enacting FSIA, "Congress clearly expressed its intention that duly created instrumentalities of a foreign state are to be accorded a presumption of independent status"), and it had the power to revoke that presumption. As discussed above, Congress revoked that presumption in this context through TRIA and

---

[9] By way of analogy, it is as if, after Plaintiffs had obtained their default judgments against Iran, Iran had gone out and purchased Bank Melli. Like shares in Bank Melli, the law recognizes the Blocked Assets as assets of Iran, to which Iran's judgment creditors are entitled. Cf. Pls. Br. at 3-4 ("Iran's liability for the amounts owed under the Judgments remains the same; the scope of the assets subject to execution in satisfaction of the Judgments, however, has increased.").

12

section 1610(g). See Estate of Heiser v. Islamic Rep. of Iran, 807 F. Supp. 2d 9, 15 (D.D.C. 2011) (section 1610(g) abrogates Bancec in the context of terrorism-related judgments); Weinstein, 609 F.3d at 51 (TRIA overrides presumption of separateness in Bancec).

Thus in Weinstein, 609 F.3d at 50, where (as here) plaintiffs sought to recover assets from Bank Melli to satisfy a judgment against Iran, the Second Circuit rejected Bank Melli's argument[10] that the court should "read the TRIA as applying, prospectively, only to judgments rendered final after the TRIA's enactment, and thus not to" judgments pre-dating TRIA. The Second Circuit explained that "[t]he effect of the TRIA . . . was simply to render a judgment more readily enforceable against a related third party. The judgment itself was in no way tampered with." Id. at 51. Here, too, the Court is not altering the judgment against Iran in order to hold Bank Melli liable; it is allowing Iran's judgment creditors to recover from Iran's instrumentality because that instrumentality is no longer presumed to be separate from Iran.[11] The Court therefore also rejects Bank Melli's retroactivity argument because TRIA relates to collectability, not liability.

### C.     "Assets of" Bank Melli

Bank Melli also urges dismissal because, it argues, it does not actually own the Blocked Assets. See MTD at 18-20. For TRIA or section 1610(g) to apply, the funds at issue must be "assets of" or "property of" Bank Melli. See TRIA; section 1610(g)(1); Calderon-Cardona v. JPMorgan Chase Bank, N.A., 867 F. Supp. 2d 389, 400 (S.D.N.Y. 2011) ("For the accounts at respondent banks to be attachable, then, North Korea or one of its agencies or instrumentalities must actually own it."). In the Complaint, however,

---

[10] As counsel for Bank Melli candidly conceded at the motion hearing, Bank Melli did not make a retroactivity argument in Weinstein, and so the Second Circuit did not squarely address that issue. Nonetheless, Bank Melli argued there that TRIA violated the separation of powers doctrine, and, in connection with that argument, that TRIA should only be applied prospectively. Id.

[11] That this case is not about Bank Melli's liability is further supported by the case law on joinder (discussed below). Where plaintiffs have secured default judgments against Iran, its instrumentalities need not even be served with post-judgment motions, which suggests that collecting assets from those instrumentalities is not about the instrumentalities' liability. See Peterson v. Islamic Rep. of Iran, 627 F.3d 1117, 1130 (9th Cir. 2010) ("[s]ervice of post-judgment motions is not required"); Estate of Heiser, 807 F. Supp. 2d at 23 ("Congress did not [intend] to require service of garnishment writs on agencies or instrumentalities of foreign states responsible for acts of state-sponsored terrorism").

13

1 Plaintiffs allege only that the Blocked Assets are "due and owing by contract to Bank Melli,"
2 not that Bank Melli "owns" them. See Compl. ¶ 16.

3 No matter. As Plaintiffs note in their briefing, Federal Rule of Civil Procedure 69
4 provides that enforcement proceedings in federal courts are governed by the law of the state
5 in which the Court sits, although a federal statute governs if applicable. Pls.' Opp'n to MTD
6 at 19; Fed. R. Civ. P. 69(a)(1). The Ninth Circuit explained in Peterson, 627 F.3d at 1130,
7 that "[t]he FSIA does not provide methods for the enforcement of judgments against foreign
8 states, only that those judgments may not be enforced by resort to immune property. . . .
9 Therefore, California law on the enforcement of judgments applies to this suit insofar as it
10 does not conflict with the FSIA."[12]

11 California law treats the Blocked Assets as subject to execution. In California, all
12 property of a judgment debtor, regardless of the type of interest, is subject to enforcement of
13 a money judgment. See Cal. Civ. Proc. Code §§ 680.310 ("'Property' includes real and
14 personal property and any interest therein."), 695.010(a) ("Except as otherwise provided by
15 law, all property of the judgment debtor is subject to enforcement of a money judgment."),
16 699.710 (all property subject to enforcement of money judgment also subject to levy). This
17 includes property of a judgment debtor that is held by a third party. See id. § 708.210 ("If a
18 third person has possession or control of property in which the judgment debtor has an
19 interest or is indebted to the judgment debtor, the judgment creditor may bring an action
20 against the third person"). Thus, in Peterson, 627 F.3d at 1130-31 (quoting Cal. Civ. Proc.

---

[12] Neither party has argued that federal law conflicts with state law in this case, or preempts it, as some courts have concluded. See, e.g., Hausler v. JPMorgan Chase Bank, 845 F. Supp. 2d 553, 563 (S.D.N.Y. 2012) ("the use of state property law to dictate the range of assets that are executable under the TRIA would generate absurd results"); cf. Calderon-Cardona, 867 F. Supp. 2d at 399-405 (applying state law "because [TRIA] provides no guidance for determining which blocked assets are 'of that terrorist party,'" but discussing federal law "for the sake of argument"). Bank Melli's argument on this subject is based, instead, on language from a variety of cases, and from a couple of amicus briefs, supporting the uncontroversial point that having an interest in property is not necessarily the same thing as owning property. See MTD at 19-20. Nonetheless, the Court is aware of no federal law that would alter its conclusion. Certainly, Bank Melli does not cite to any authority, federal or otherwise, holding that a party's 100% beneficial interest in an asset, or a vested right to receive a sum certain that has been reduced to cash, does not constitute an "asset of" that party. Moreover, the cases dealing with entitlement to mid-stream electronic fund transfers are distinguishable on their facts. See, e.g., Estate of Heiser v. Islamic Rep. of Iran, No. 00-2329, 01-2104, 2012 WL 3776705, at *16 (D.D.C. Aug. 31, 2012) (describing "Iran's indefinite, ephemeral interest" in blocked EFTs).

14

Code § 708.510(a)), the court noted that "California enforcement law authorizes a court to 'order the judgment debtor to assign to the judgment creditor . . . all or part of a right to payment due or to become due, whether or not the right is conditioned on future developments.'"

Here, there is no dispute that Bank Melli has a 100% beneficial interest in the Blocked Assets, and that the Blocked Assets are already "due and owing" to Bank Melli from Visa. See Compl. ¶ 16. Those funds – in an amount certain – have been deposited into the Court's registry. See dkts. 88-89. Visa has disclaimed any beneficial ownership interest in the Blocked Assets, explaining that it only continued to hold them because the assets were blocked. See Compl. ¶ 18; Pls.' Opp'n to MTD at 21 ("[B]ut for the fact that such funds are blocked, Bank Melli would be entitled to payment of those funds today."). Under such circumstances, the Court concludes that the Blocked Assets are "assets of" or "property of" Bank Melli. The Court therefore rejects this argument for dismissal.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

### D.     Rule 19[13]

Finally, Bank Melli argues that it is a required party that cannot be joined due to its sovereign immunity. MTD at 20-22. Bank Melli's argument relies almost entirely on Republic of Philippines v. Pimentel, 553 U.S. 851 (2008). Pimentel, 553 U.S. at 854-58, involved an interpleader action in which human rights victims who had obtained a judgment against Ferdinand Marcos sought to attach property held by a bank. Two of the entities in the suit, the Republic of the Philippines and the Philippine Presidential Commission on Good Governance ("the Commission"), invoked sovereign immunity, and were dismissed; however, the district court allowed the action to proceed. Id. The Ninth Circuit held that dismissal of the interpleader suit was not necessary because, although the Philippines and the Commission were "necessary parties" under Rule 19, their claim had so little merit that the interpleader action could proceed without them. Id. at 860. The Supreme Court reversed, explaining that the Court of Appeals had not given the necessary weight to the absent

---

[13] Rule 19 provides, in part:

(a) Persons Required to Be Joined if Feasible.
  (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
    (A) in that person's absence, the court cannot accord complete relief among existing parties; or
    (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
      (i) as a practical matter impair or impede the person's ability to protect the interest; or
      (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. . . .
(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
  (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
  (2) the extent to which any prejudice could be lessened or avoided by:
    (A) protective provisions in the judgment;
    (B) shaping the relief; or
    (C) other measures;
  (3) whether a judgment rendered in the person's absence could be adequate; and
  (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(a)-(b).

16

1  entities' assertion of sovereign immunity: "where sovereign immunity is asserted, and the
2  claims of the sovereign are not frivolous, dismissal of the action must be ordered where there
3  is a potential for injury to the interests of the absent sovereign." Id. at 864-67.  Bank Melli
4  argues that, as in Pimentel, it is a foreign sovereign not amenable to suit, and so the Court
5  must dismiss.  See MTD at 21-22.

      Bank Melli assumes that it is a required party.  It is not.  Bank Melli is a mere instrumentality of Iran, and as such its presence is not central to this case.  That conclusion is supported by Estate of Heiser, 807 F. Supp. 2d at 12, in which victims of state-sponsored terrorism sought to direct Sprint to turn over funds owed to the Telecommunication Infrastructure Company of Iran ("TIC"), an instrumentality of Iran.  Sprint argued that it should be permitted to interplead TIC into the proceeding.  Id. at 23.  The court explained that "Congress did not [intend] to require service of garnishment writs on agencies or instrumentalities of foreign states responsible for acts of state-sponsored terrorism" and that, accordingly, "TIC [was] not a necessary party to [the] action under applicable law."[14]  Id.; cf. Peterson, 627 F.3d at 1130 (under FSIA, plaintiff need not serve post-judgment motions on foreign state).  Here, the Blocked Assets are owed to an instrumentality of judgment debtor Iran; such property is therefore stripped of immunity and subject to execution as a matter of law.  See TRIA; section 1610(g).  Bank Melli has failed to demonstrate either that "in [its] absence, the court cannot accord complete relief among existing parties" or that "disposing of the action in [its] absence may (i) . . . impair or impede [its] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."  See Fed. R. Civ. P. 19(a).

      This case is therefore distinguishable from Pimentel, where there was no dispute that the Philippines and the Commission were required parties.  See 553 U.S. at 863 ("[t]he application of subdivision (a) of Rule 19 is not contested").  The dispute in Pimentel centered on Rule 19(b), "whether the action may proceed without the Republic and the Commission,

---

[14] The court added that Sprint had also not established a risk of being subjected to double liability over the funds, but that was not the basis for its conclusion that TIC was not a necessary party. See id. at 23-24.

17

given that the Rule requires them to be parties." Id. at 864. Because this Court finds that Bank Melli is not a required party, it need not reach Rule 19(b), and the question of whether Bank Melli can be joined. The Court notes, however, that, unlike in Pimentel, 553 U.S. at 865, where "[i]mmunity . . . [was] uncontested," here there are two applicable statutory exceptions to immunity, which alleviate any concerns about prejudice to Bank Melli or about the adequacy of a judgment rendered in Bank Melli's absence. See TRIA; section 1610(g); see also Weinstein, 609 F.3d at 50 ("[W]e find it clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment."). Bank Melli's response, that the exceptions to immunity pertain to the property, and not to Bank Melli, see Bank Melli Br. at 7, only reinforces the Court's conclusion that the statutory scheme is not about Bank Melli's liability, but about Plaintiffs' ability to collect from Iran. This case could proceed without Bank Melli.

Because Bank Melli is not a required party that cannot be joined under Rule 19, the Court rejects this argument for dismissal as well.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Bank Melli's Motion to Dismiss. The Court further finds that the standards of 28 U.S.C. § 1292(b) have been met,[15] and

//

---

[15] Specifically, the Court finds that the issues raised by Bank Melli in favor of dismissal are controlling issues of law, and could "materially affect the outcome of the litigation in the district court." In re Cement Antitrust Litig., 673 F.2d 1020, 1026 (9th Cir. 1982). If Bank Melli is correct that Bancec applies, or that the statutes are impermissibly retroactive, or that Plaintiffs have not adequately alleged that the assets are Bank Melli's property, or that it is a required party that cannot be joined, Bank Melli is entitled to dismissal. Moreover, in light of the paucity of authority on these issues, particularly as to TRIA, there is substantial ground for difference of opinion. See 28 U.S.C. § 1292(b); Levine v. United Healthcare Corp., 285 F. Supp. 2d 552, 560 (N.J. 2003) ("[T]he issue on this motion is whether there is substantial ground for debate on this issue and this Court finds that the question involved here is admittedly complicated and sufficiently close that reasonable minds could disagree with this Court's conclusion."). Finally, "an immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), as it "would conserve judicial resources and spare the parties from possibly needless expense if it should turn out that this Court's rulings are reversed," APCC Servs. v. Sprint, 297 F. Supp. 2d 90, 1000 (D.D.C. 2003).

18

CERTIFIES this Order for interlocutory appeal.

**IT IS SO ORDERED.**

Dated: February 28, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE