UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

| | |
|---|---|
| MICHAEL BENNETT, et al,<br><br>Plaintiffs,<br><br>VS.<br><br>THE ISLAMIC REPUBLIC OF IRAN et al,<br><br>Defendants. | NO. C 11-5807 CRB<br><br>San Francisco, California<br>Thursday<br>December 13, 2012<br>3:30 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs**:
BOND & NORMAN
777 Sixth Street, NW
Suite 410
Washington, DC 20001
**BY: JANE NORMAN, ESQ.**

**For Plaintiff/ 3rd Party Deft:**
STROOK & STROOK & LAVAN, LLP
180 Maiden Lane
New York, New York 10038
**BY: CURTIS C. MECHLING, ESQ.**

**3rd Party Plaintiff: (Visa and Franklin)**
BAKER & MCKENZIE
Two Embarcadero Center
Suite 1100
San Francisco, California 94111
**BY: BRUCE JACKSON, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:* ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

**APPEARANCES: (CONTINUED)**

**3rd Party Defendant:** MOLOLAMKEN, LLP
**(Bank Melli)** 600 New Hampshire Avenue, NW
Washington, DC 20004
**BY: JEFFREY LAMKEN, ESQ.**

LAW OFFICE OF JOHN D. CLINE
235 Montgomery Street
Suite 1070
San Francisco, California 94104
**BY: JOHN CLINE, ESQ.**

**3rd Party Defendant:** DLA PIPER, LLP
**(Heiser)** 555 Mission Street
Suite 2400
San Francisco, California 94105
**BY: FRANK PEPLER, ESQ.**

- - -

**P R O C E E D I N G S**

**DECEMBER 13, 2012** **3:35 P.M.**

**THE CLERK:** Calling Case C11-5807, Michael Bennett versus the Islamic Republic of Iran.

Appearances, counsel. Please come forward.

**MR. MECHLING:** Your Honor, on behalf of the Greenbaum and Acosta judgment creditors, Curt Mechling from Strook, Stroock and Lavan.

**MR. JACKSON:** Your Honor, on behalf of Visa and Franklin, the third party --

**THE COURT:** Are you still here?

**MR. JACKSON:** Well, we're still here because in trying to work out an order that took care of all the potential contingencies --

**THE COURT:** I don't think I signed anything or have even seen anything yet, have I?

**MR. JACKSON:** No. We were working on it, but time caught up with us. We thought maybe we would have some clarification that would make that easy.

**THE COURT:** Sure. We can talk about it.

**MR. JACKSON:** If the Court rules one way or another, it may give us some guidance.

Thank you.

**MR. PEPLER:** Good afternoon, your Honor. Frank Pepler of DLA Piper appearing on behalf of the Kaiser judgment

creditors.

**MS. NORMAN:** Good afternoon, your Honor. Jane Norman, attorney for the Bennett judgment creditors. And Michael Bennett, the lead plaintiff, is here with me today as well at the counsel table.

**MR. LAMKEN:** Good afternoon. Jeff Lamken on before of Bank Melli, and I have with me Mr. John D. Cline.

**THE COURT:** Good afternoon.

Well, I have several things to thank you for. One was being so accommodating on the schedule. I know you were planning on a morning argument and thank you so much for being flexible. I appreciate that.

And, of course, I also want to thank you for the submissions that you've made. And I do have some questions, I think. Let's start with the bank first.

Looking at the language of 201, just the language, isn't it clear under the language of 201 that if I had a judgment, I would be able to collect it against the bank?

**MR. LAMKEN:** No, your Honor.

**THE COURT:** What I mean by that -- I mean, just under the language -- let's say, today I got a judgment. I have a judgment. I have in my hand a judgment I obtained for conduct that occurred last year and I'm thinking to myself: How am I going to get paid? And I think: You know what? I'm going to go after the bank. And so you say: Well, what authority do

you have for that?

Can I look at 201 and say: That's my authority? I fit all -- I fit the requirements of 201. Can I say that under that narrow, not -- it doesn't apply to you. I just want to know whether the plain words of the statute would enable me at that point without more to be -- to satisfy the judgment I have through the assets of the bank.

**MR. LAMKEN:** We think not.

**THE COURT:** Okay.

**MR. LAMKEN:** And the reason for that is, this TRIA says that you can execute against the assets of that terrorist party. And there is a parenthetical that says, "including the block assets of any agency or instrumentality of that party."

So the main clause makes clear that you can seize the assets of "the terrorist party," here that would be Iran.

So that would also mean that if you had a *Bancec* exception which May -- for example, Bank Melli's assets, also assets of the terrorist party. For example, it was an alter ego. You would be able to reach those as well. They would be assets of the terrorist party.

The parenthetical "including" is illustrative. It doesn't say that you can reach the terrorist party's assets plus an instrumentality's assets. It says you can reach terrorist assets, terrorist party assets including the assets of an instrumentality or agency, which means that where *Bancec*

applies, then you may seize them.

So there's two ways that are before you of reading this. One, the plaintiff's view, which is "including the blocked assets of an agency or instrumentality of that party," means plus the agency or the instrumentality assets. And our view is, no, it means including the blocked assets of any agency or instrumentality where they are assets of the terrorist party; i.e., where they are assets that belong to a terrorist party by virtue of *Bancec*.

Another way of looking at it is, it includes them where *Bancec* would make them, so it includes them as provided in *Bancec*. And the plaintiffs would say, no, it includes them notwithstanding what *Bancec* says. And that's the difference.

**THE COURT:** Well --

**MR. LAMKEN:** What we think breaks any possible distinction is that under the *Charming Betsy Canon*, the Court should not construe a statute to violate international law or a treaty obligation unless there is no other plausible construction. We think that our construction is not merely plausible, but correct.

And, in fact, adopting the plaintiff's view would violate two different sources of law. One, international law under which --

**THE COURT:** Weren't these arguments, the ones you are now making, now making, how were they different from the

arguments that were made in the *Weinstein* case?

**MR. LAMKEN:** Well, I'm hoping they are being made better, but the answer is we lost in *Weinstein*. So we would ask you to come out differently.

**THE COURT:** Okay. That's -- let me tell you, I appreciate your candor. I think that's right. I think -- and I think that the further question I was going to ask you was: In *Weinstein*, did you -- you didn't represent the parties?

**MR. LAMKEN:** I did not.

**THE COURT:** Because you might have raised the retroactivity argument.

**MR. LAMKEN:** That's correct.

**THE COURT:** It wasn't raised in *Weinstein* that I can see. I mean, I looked at all the underlying opinion. I haven't looked at the briefs that were filed, but there's nothing that I see in Weinstein to suggest that -- the specific argument, one of the specific arguments that's being made today, which is one of retroactivity.

However, putting that aside -- that is, whether the argument was made or not -- in Weinstein, under the facts of *Weinstein*, how are those facts different from our case as it relates to retroactivity.

**MR. LAMKEN:** In terms of the dates?

**THE COURT:** Yes.

**MR. LAMKEN:** I don't know the exact dates of

underlying conduct in *Weinstein*, but I would presume that it would have the same problems in terms of retroactivity.

**THE COURT:** Okay. I mean, I looked at the dates. I think that it's pre -- it was conduct that occurred pre -- in 2000 -- no, no, no. I wrote it down somewhere.

**MR. LAMKEN:** I think, your Honor, that's correct, which is why there is a surprise that the issue was not passed -- at least passed upon in *Weinstein* itself.

**THE COURT:** Okay. Now, let me ask you a further question. One way to look at this is to say, and it's been said, this really doesn't have anything to do with liability. It has to do with collectability.

And when you look at 201, 201 just talks about collecting a judgment. That's all. They don't say in 201 that the party in 201 has done anything, committed any act which caused the underlying dispute which gave -- underlying injury which gave rise to the judgment. That's not even there. It's not discussed. It has nothing to do with it in a sense. In a sense.

So that Statute 201 talks about collectability. And there is a -- almost a -- maybe it's the fact that the English language is such that we use this term "liable" to mean a couple of different things. One thing we used in terms of whether somebody is liable for it is: Did they do something wrong that then brought about liability for their wrongful act?

The plaintiffs would say: That's not this case.

Yes, indeed, they did something wrong. The government did something wrong in whatever year that was, but we're not talking about that. We're talking about whether as a result of getting a judgment, we can't -- a bank, we'll call it the bank, is liable, we'll even use your word or the word, to pay the judgment.

But, really, the word "liable" to pay the judgment is in the context of whether or not an asset that sits there can be used, can be used to satisfy a judgment. That's a -- maybe in the English language that is a form of liability, but that's not the kind of liability we're talking about.

The bank, we can -- you can make the argument til the cows come home the bank didn't do anything wrong. At least if they did something wrong, they didn't do the wrong to the plaintiffs. They didn't do the wrong that occasioned the judgment, but they may have done -- so it's sort of irrelevant what they did was wrong because -- and here, again, you have to be careful because the President or the Secretary of the Treasury found that the bank did something.

**MR. LAMKEN:** I think for purposes of retroactivity, whether you call it "liability" or "collectability," it doesn't make a difference. And that's for two reasons.

One of them is -- I would like to give an example. If one imagine that Congress, for example, enacted a statute that

said: Parents will hereafter be liable for the torts of their children. And someone tried to apply that statute to a tort committed by a child a year earlier. That would be retroactive clearly. And it wouldn't cease to be retroactive merely because Congress wrote the statute to say: Parents will be not liable for the torts of the children, but any judgment against the child will be collectable from the parents.

If you still try and apply that to an act by the child before the statute's enactment, that is retroactive. And the reason it's retroactive, and the phrase that the Supreme Court uses in *Langraph*, is: Does it alter the legal consequences of acts previously committed? And it alters the legal consequences. Whether you call it "liability" or "collectability," the events were long since passed.

**THE COURT:** You say "legal consequences." Okay. So let's -- let's figure that out. Let's talk about that for a minute.

I do something wrong. I'm judgment proof, by the way, both where I sit today and in my -- by way of example. So I don't -- you can sue me. You can sue me and you'll get a judgment and you won't get a cent.

Then finally I win the lottery. Finally I win the lottery. So you go and you say: Okay. Now I'm going to collect the judgment against you. So you say: Okay, the -- in a sense the consequences of the act have changed.

Maybe you'll argue: Well, they haven't really changed because you were always liable. It's just that we couldn't collect from you.

Now what the -- you can argue in the parent/child situation is in a sense it's the same thing because now we say that the wrong of the child can be collected against the parent. So it makes a judgment collectable.

Does it change a consequence? Yes. In the real world sense it changes a consequence in that now you'll have something to be collected, whereas before you didn't. But in another sense it doesn't change the consequence because the liability doesn't change. It's always -- the father, the parent, is always liable. That hasn't changed. And if you were to say -- it doesn't change. It's because the liability has been established.

**MR. LAMKEN:** I think it does change and I think you put your finger right on it. From the parent's perspective, everything has changed. There was a judgment for which they were not responsible. They didn't have to pay it. They were not liable. It was not collectable from them because they are a separate person. They are distinct.

Now, they are -- they are either liable for the payment, liable for the judgment, they have to pay the judgment. However you want to phrase it. From the parent's perspective they are now liable for a judgment they previously were not.

And why are they now liable? Because Congress passed a law changing the legal consequences of an act the child previously committed. That is the essence of retroactivity. And that is clearly what's happening here.

**THE COURT:** Doesn't that happen? Can't a child -- I can't take the example of a child, but I was thinking here that one could say the bank did something to eliminate the separateness. When you're talking about unfairness to the bank, which is what you're talking about, they did something to dissolve the shield that they had before them. They had a shield that protected them from satisfying a judgment. That shield has disappeared as a result of certain things.

As a result, they no longer have the protection of the shield, but they are not liable for the judgment in the sense that they contributed to the judgment. The only thing that -- their only role is now they can be -- they can be used to satisfy a judgment.

Maybe I'm arguing the same thing again. I don't know.

**MR. LAMKEN:** I think the key thing here is the dissolution of a shield that you're referring to. It's actually telling one person to pay the judgment owed by another. And that's exactly what plaintiffs think that the TRIA and Section 1610(g) do; is they tell one person, one legal person to pay the judgment of another.

And it's very clear that nothing has changed about Bank

Melli. It is still a separate legal person from Iran. Section 1603 of the FSA defines an instrumentality, I'm quoting, as a separate legal person, corporate or otherwise.

And the Supreme Court has made very clear that the essence of being a corporate entity is a distinct personality.

And if I could quote four sentences from *Dole Food* it says:

"The corporation and its shareholders are distinct entities. An individual shareholder by virtue of his ownership of shares does not own the corporation's assets. A corporate parent which owns the shares of the subsidiary does not for that reason alone own or have legal title to the assets of the subsidiary. Four, the fact that the shareholder is a foreign state does not change the analysis."

**THE COURT:** No. I understand all that, but I think you -- I think you can't read that much into it when you're talking about foreign entities. And the reason is that with -- under the corporate structure, at least as it exists in the United States and perhaps in civil law countries, you -- there are mechanisms by which you can test the separateness. It may be that Corporation X is the alterego of Corporation Y and, therefore, they wouldn't be entitled to be honored in that respect, being treated separately.

Here, Congress, or the president, or whomever, was

confronted with a situation in a sense. There would be no way, no way realistically to determine in some reasonably fair manner whether these entities are separate from one another. Is the bank actually separate for purposes of satisfying a judgment? Is it really a separate entity?

So they hopscotched it. They said: Okay. We're not addressing that. But for purposes of collection, for purposes of collection we're not going to treat them as separate entities. And that's -- you know, I'm not sure that Congress can't do that.

And, by the way, they do that now, don't they? In other words, in other words, if I -- if I commit an act today or if -- or Iran commits an act today, I can -- and I get a judgment, a default judgment, I can satisfy it against the bank.

**MR. LAMKEN:** Under *Weinstein*, that's correct.

**THE COURT:** Even though it's just as separate. It hasn't become a different entity. It's the same entity. It's the bank.

**MR. LAMKEN:** Your Honor, I think that -- I mean, to back up just a little bit.

To the extent that you were saying that it can't be -- it's very hard to apply this rule because they are foreign entities or something like that, it's just not true.

The last sentence is:

"The fact that the shareholder is a foreign state does not change the analysis."

That's *Dole*. *Bancec* itself involved foreign entities and the Supreme Court found that the Cuban entity -- there was the alter ego of Cuba -- and said -- actually, it didn't do an alter ego. It decided it was an injustice and, therefore, made this entity pay a judgment that was against Cuba.

**THE COURT:** Can I ask you a question? Two questions? Is the -- the bank is a foreign bank, is that right?

**MR. LAMKEN:** It is.

**THE COURT:** And the shareholders -- it's not one of these things that's come to the United States and become a United States --

**MR. LAMKEN:** No, no. If that were true, it would not be entitled to sovereign immunity because it has to be foreign.

**THE COURT:** Number two, the ownership of the bank is 100 percent opened by the government, is that correct?

**MR. LAMKEN:** That is correct. And that is one of the things that makes it a sovereign entity, is it is owned --

**THE COURT:** And one of the things that might suggest a unity of interest -- that is to say that the shareholders aren't so separate. If the shareholders are the same thing as the government, which they are, which you concede that they are -- and that was pointed out in *Weinstein* -- you know, I'm not so sure your last argument, when you talk about the

shareholders being separate, I think that this is undermined somewhat by the fact that the shareholders are the very entity that committed the wrongful act to begin with, the alleged -- the defaulted wrongful act.

**MR. LAMKEN:** Your Honor, that happens all the time with shareholders and subsidiaries. A parent could commit a tort and you still can't get the assets of the subsidiary because they are separate entities.

And there is no evidence that Congress did this because they thought the standard rules in Bancec, alter egos, injustice were improper where Courts couldn't apply them to foreign entities.

The reason Congress did it is it wanted to punish foreign terrorist activities more effectively. It wanted to compensate the victims. But both of those are pointing to the primary conduct underlying the judgment. That is the judgment, the conduct that Iran engaged in. And that all predates the statute.

And for that reason to make Bank Melli pay the judgment now would be retroactive. It's altering the consequences of events that previously occurred and visiting new liability on Bank Melli based on the later enacted statute.

**THE COURT:** You use the word "liability."

**MR. LAMKEN:** Or collectability, I'm sorry.

**THE COURT:** No, no.

**MR. LAMKEN:** It makes Bank Melli pay money it didn't have to pay based on events that previously occurred, based on the statute that post dated them.

And, again, the statute itself, how much does Bank Melli have to pay? Compensatory damages based on the underlying conduct of the judgment. Are there punitive damages? If there are, the punitive damages are based on the reprehensibility of the underlying conduct.

Everything is keyed to the underlying conduct. This is a statute that is -- if --

**THE COURT:** I'm not sure that that's not true in a sense. It's all keyed. That is, as the first mover in all of this, it was the underlying conduct. But I don't know. I don't know what that exactly means. I mean, I -- it's not a dispute on the facts.

**MR. LAMKEN:** Right. And I think the answer is if you're trying to figure out what it's retroactive to, I think you mentioned the possibility that it's retroactive -- the key date is actually when Bank Melli's assets were blocked as opposed to -- or when Bank Melli committed the conduct that causes the assets to be blocked.

But the Ninth Circuit and the Supreme Court have both said you look to the primary conduct underlying the suit. And the primary conduct underlying the suit is not anything Bank Melli did, as we pointed out. It's something that Iran did. And

it's conduct that predates the statute. And for that reason this would be a retroactive application.

In fact, if you look at the legislative -- if look at the legislative history, there is no suggestion that Congress was trying to enhance blocking or make blocking more effective. The Executive Branch opposed it because they thought a blocking would be less effective if it couldn't get back the assets and use it as a carrot.

**THE COURT:** I guess both administrations opposed it, but if you want me to look at the legislative history, why wouldn't I -- it was Senator Harkin or Senator Allen, his statement saying this is to -- the purpose of this amendment, 201, is to give relief to people who already have judgments, who otherwise are finding it collectable. That's how I interpret the 201 to read.

And notwithstanding your interpretation of what assets are reachable and so forth, a plain reading of that statute can give that interpretation.

Obviously, it would be nicer if Congress added the words: "It is intended that this statute operate retroactively," or a sentence which says: "It is not intended for this statute to run retroactively with respect to CODA." It didn't do either.

But you have a statement by a senator that says: "I interpret this statute to read -- to mean you can collect on a preexisting judgment." That's what it says.

**MR. LAMKEN:** Your Honor, first, there's two problems with that. One is that that is fake legislative history. It's not anything that actually happened or was uttered or that any other senator could have heard. It's inserted after the fact.

Whatever weight one wants to give legislative history generally, that one is going to have to get the weight that's as close to zero as you can possibly get.

The second thing is the standard for retroactivity is very, very daunting. Under the Ninth Circuit precedent in the case called *Booze*. It's not retroactive unless there is no other possible construction of the statute. And this statute isn't clearly, on its face, retroactive. It simply says you may collect judgments --

**THE COURT:** I think that's true. I mean, I would be surprised -- I will hear from the plaintiffs, but -- to argue, if they are going to argue, that you -- that you have to interpret the statute retroactively. There is no other way to interpret it. Maybe they will convince me of that.

But it doesn't look that the way to me from the -- I mean, yes, they could have chosen slightly other words. They could have used the words "in every case in which a person obtains a judgment."

**MR. LAMKEN:** Your Honor, I don't even think that would have been enough. Because if you look at *Booze* itself, *Booze* in that statute, Congress had said: No person shall be

able to rely on securities fraud in order to prove a -- as a RICO predicate.

And the Ninth Circuit looked at that and said: That's not retroactive, even though it says no person. We're not going to read it to mean no person, including people who were injured under the RICO statute before the statute's enactment. That sort of absolutist language isn't enough. There has to be some indication that this is meant to apply retroactively and such a clear indication that -- you know, I think it states here that unless --

(Court reporter interruption.)

**MR. LAMKEN:** I'm sorry. ...so clear that it could sustain only one interpretation.

And under the *Booze* case where it said "no person," well, that just doesn't mean it's retroactive.

And, likewise, here every case doesn't mean it's retroactive. "Has obtained." That only means that the statute doesn't apply unless you actually have a judgment. It doesn't say: Well, we're going to apply the statute to conduct that predates the statute's enactment.

And because of the high burden of establishing retroactivity, we don't think you can read the statute to be retroactive. The burden is just too daunting.

**THE COURT:** Let me ask plaintiff's counsel. Maybe I'll start with the second argument first for the plaintiff's

counsel.

If I decided and agreed with the bank and said in order for you to collect, you have to read the statute that it's retroactive. You disagree with that, of course. Let's say I said: I think they are right. I think it changes liability. Whatever their reasons are. They have 10 reasons.

**MR. MECHLING:** Right.

**THE COURT:** Do you lose? In other words, do you lose on the retroactivity argument because the statute isn't clearly retroactive.

**MR. MECHLING:** Your Honor, I believe that there are three, maybe four reasons we don't lose. And I'll start with the one you just raised.

I believe that on its face and judged in the context of its legislative history, this statute clearly does, both TRIA and 1610(g) clearly does and was intended to apply, quote, retrocatively; that is, with respect to conduct that long preceded --

**THE COURT:** Okay. Let's start with the statute first.

**MR. MECHLING:** Sure.

...in which a person has obtained, past tense, a judgment. In every case in which a person has obtained.

Bear in mind the context in which this statute came into being. This is TRIA, which was enacted in 2002. And as the

case law makes clear discussing the legislative history and the legal context in which it came up, in 2002 Congress was faced with a situation in which literally hundreds of plaintiffs who already had judgments for acts many years in the past against terrorist states, Iran, Libya, Sudan, were unable to enforce those judgments. And so in 2002 Congress enacted TRIA to enable any -- in every case any person who has obtained, past tense, a judgment to collect on the assets of an agency or instrumentality.

And in 2008 under the NDAA Congress broadened the category of assets that were obtainable in such a circumstance to include not only blocked assets, which is what TRIA does, but also unblocked assets if you could find the assets of an agency or instrumentality.

But let me go back one more step. I think the statute, and under a *Langraph* analysis you look and see: Was it intended to apply retroactively? I believe that the statute -- statutes clearly are.

But I would direct the Court's attention to the Supreme Court's jurisprudence in this area. The best statement I think is in the *Republic of Austria v Altman* case mentioned in our opposition brief where the Court says: You know, retroactivity in FSIA is a special creature.

Mr. Lamken refers to: Well, what's the primary conduct? What's the primary conduct? In the *Altman* case the Supreme

Court said the primary conduct, the line where you start measuring retroactivity from, is from the time that the sovereign state claims sovereign immunity, not the time when the underlying act that might give rise to liability happened perhaps years in the past.

The Court said no. Under FSIA it says that: Henceforth, any claims of sovereign immunity by the foreign sovereign will be handled by this statute, will be subject to this statute.

And so in the *Altman* case, for example, the Supreme Court had absolutely no problem finding that the FSIA, as written in 1976, applied to conduct by the Austrian government during the Holocaust almost 40 years before.

And I submit that in this case applying that analysis, there is no retroactivity here because the claim of foreign sovereign immunity that brings us to this courtroom this afternoon is a claim that Bank Melli asserted this past summer. So there is no retroactivity.

But even if you got to a -- and then I think *Altman* says basically in an FSIA context, you don't even look at the *Langraph* analysis.

I submit that even if you got there, you would have to conclude under *Langraph* that there is no retroactivity here because *Langraph* says: Well, what we're interested in protecting are the reasonable expectations and sort of the reliance interest of the foreign sovereign state.

In 2005 the government started freezing the assets of Iranian financial enterprises. In 2007, in October of 2007 Bank Melli's assets were frozen, and that's what brings us here today.

And the law is clear, that once a -- a foreign sovereign's assets are frozen, it has no more expectation. No more reliance interest. As I think as the Court in *Hausler* observed, that at that point --

**THE COURT:** Well, but did it have an expectation of non-collectability with respect to those assets before 2005? I mean, you say, well, since 2005 they didn't -- they couldn't have had that. But what about pre-2005?

Are you saying they could have had that then? And if they did have that then, why couldn't you -- under this analysis, why couldn't you say: Well, let's talk about when the -- once the act was done or doing the act, when they committed the terrorist act in 1996 and the other years, what should they have known? And if their expectation was, well, yes, they are liable -- they should certainly know that they're liable, but they had no expectation that a bank, even that they owned, would also be used to satisfy the judgment.

And, indeed, if you go back to 1996, that wouldn't be available, would it? They couldn't -- they couldn't have gotten the assets from the bank in 1996, '97, '98, whenever they got their default judgment, as of that date. Maybe the

default judgments occurred after the blocking. I may be wrong in that. But prior to the blocking, prior to the blocking, but the wrongful act occurred, would they have an expectation then that they could collect against Bank Melli?

**MR. MECHLING:** Your Honor, the operative date to look at is the date as of which the claim of sovereign immunity --

**THE COURT:** But that was your earlier argument.

**MR. MECHLING:** Right, right.

Okay. And moving on to the next level. As of 2002 there could not have been any expectation because -- as to assets that might be blocked in the future because the statute said if your assets get blocked, they will be subject, regardless of when the original judgment is obtained against Iran, for execution in satisfaction of that judgment.

**THE COURT:** But the problem with expectations -- I mean, maybe I buy your argument. I don't know. I'd have to look at it again.

The problem with expectations is that they will always say: What were the expectations at the time that the wrongful conduct occurred?

And so you -- you're in that -- you've jumped into that pit, and it's a tough one to fight your way out of because in -- when the wrongful act occurred, there were a different set of circumstances out there with respect to what was at risk.

So your better argument -- I think your better argument is: This has nothing to do with expectations. Nothing to do with expectations.

**MR. MECHLING:** That's right.

**THE COURT:** Nothing to do with retroactivity. All it is, there's an asset there. Congress says you can have that asset if you've got a judgment. Go get it.

**MR. MECHLING:** That is correct. And that -- you know, the only time that's relevant here is as of the date of the claim of the immunity. And when immunity was claimed here, there was no immunity.

**THE COURT:** This is all gone by.

**MR. MECHLING:** Right. All gone by. All gone by.

Your Honor, you asked counsel some questions about distinctions between collectability and liability. And I think that what's gone on here is that there has been some confusion as to what we are talking about.

We're not talking about Bank Melli's responsibility. We're talking about collectability of Bank Melli's assets. And that is one of -- that I believe -- you know, the issue of liability in the sense that Mr. Lamken uses the term and has used it in his papers is a non-issue. It's just a non-issue under TRIA.

TRIA says that blocked assets of a terrorist state, including those of its agencies and instrumentalities without

more, those are subject to attachment, execution. And the same statute does away with the distinction that counsel is so eager to hang onto, and I understand why, the distinction between the bank and its sovereign state.

In saying that there is some immutable principle of international law that would be violated by conflating the assets of the instrumentality with the sovereign state, I think that Bank Melli just misreads the law.

I think it's important to remember that *Bancec* didn't stand for some immutable principle that sovereign agencies and instrumentalities will be forever kept separate and treated sacrosanct from their sovereigns. No. What *Bancec* said was that the Court would find a presumption, a common law presumption of separateness, and it found that common law presumption of separateness based upon its reading of the policies underlying the FSIA as then written back -- I think in 1983 was the date of the *Bancec* decision.

The FSIA changed in very important ways in 2002 and was further changed in 2008. Under TRIA, Section 201 and under Section 1610(g), Congress said: "We are doing away with that presumption."

And that's the way foreign sovereign immunity works under our jurisprudence. It's not the Supreme Court divining immutable principles of international law. It's the Supreme Court following the statements of Congress. It is for Congress

and the Executive Branch to determine the parameters of foreign sovereign immunity.

Congress and the Executive Branch here have clearly spoken and have said that under the circumstances of this case where you have plaintiffs who have suffered death or injury as a result of terrorist acts and have judgments for those, where you have the agency or instrumentality, foreign sovereign, Bank Melli -- which quite candidly tells the Court it's a 100 percent, wholly-owned enterprise of the government of Iran -- and where that foreign sovereign, that foreign agency or instrumentality has been designated by the Executive Branch as a specially designated national and its assets frozen, that's the end of the inquiry. That's why this case is indistinguishable from *Weinstein*.

**THE COURT:** From *Weinstein*.

Well, I think that's right. I mean, the unfortunate thing about *Weinstein* is that the arguments that thing I'm hearing today weren't admitted in *Weinstein*.

Were I do come out on the bank's side in this, I think that effectively would -- it would create a conflict with *Weinstein*, though not on the reasoning of *Weinstein* because *Weinstein* didn't address that issue.

But another thing sort of occurred to me while thinking about this was, the right to sue Iran in the United States courts was given to the plaintiffs when? When were they able

to bring -- is it -- what statute did they act under to grant them jurisdiction to bring these lawsuits?

**MR. MECHLING:** Well, they acted under the exceptions created under 1605. And I can't give you the exact -- 28 USC Section 1605.

**THE COURT:** When was that enacted -- my recollection is that Congress enabled your clients to bring actions as of a particular date. I'm just trying to --

**MR. MECHLING:** I'm sorry. I don't have the date.

**THE COURT:** I thought it was 1996, but maybe I'm wrong in that.

**MR. MECHLING:** I don't know whether I have it on my timeline or not.

**THE COURT:** What I was going to say -- and this again, I've got to figure this out.

But whether one could say: Well, how odd. Congress gives these people the right to bring a lawsuit and effectively there's no remedy. There is no way that they are going to collect the assets.

They are going to find the government liable, but that's the end of the matter because there's no way for them to collect it, basically. They can't go over there and collect it.

I don't know. Is there a mechanism where the government of Iran would give some kind of full faith and credit to the

judgments of this court? I doubt it.

So then the question is: Okay. Well, what about Iran's assets? Because that's the only way to collect. If, in fact, Congress is giving the right to people to sue, they actually have to have, to be a meaningful right, some mechanism or some procedure or some view as to its collectability. And here, absent the ability to collect against Iran and then against the Bank Melli or another -- other entities that are, you know, in -- I don't know, working hand-in-hand with the government, there's no effective remedy. There's no effective remedy.

It's a mockery, because you have a right, but no remedy. And I don't know, that goes back. That predates all of this. That predates the bringing of the lawsuit. And so if one sits there and says, all right -- and maybe there's an argument saying, well, people sue all the time and there is no way that they can necessarily get a judgment -- they can get a judgment or collect a judgment. I'll have to think that one through.

**MR. MECHLING:** Your Honor, I think, you know, your point is well taken. People sue all the time not knowing whether their judgment is going to be collectable. And it was -- it was obvious from the statute that, okay, they have got this right to sue. You can obtain a judgment against Iran. And then like any plaintiff with a judgment, it's up to you to find an asset that you can execute against.

And the background -- and that goes right to the point

about the background of TRIA and 1610(g). What Congress found as of 2002 was that every time it attempted to create a remedy for plaintiffs, like the people who are before you today, the President would step in and issue an Executive order saying: Well, I'm going to waive whatever liability Iran may have or some other state may have.

In 2002 Congress said enough and created a very broad and non-waivable TRIA. And then they further expanded the assets that were available under 1610(g) in, I think, 2008.

And so that's why we're here today, because Congress has provided a remedy. It's provided a comprehensive remedial regime that is intended to capture all property and interests, not only of terrorist states, but also of agencies and instrumentalities of terrorist states.

TRIA 201 and 1610(g), I say, very clearly state that intention. And the courts that have looked at this, the *Hausler* Court, the *Weinstein* Court, the *Levin* case, which is referred to in the *Hausler* case, have all found that Congress intended a broad, sweeping remedial regime to provide a remedy for just such judgment creditors who may have gotten this judgments years ago, but now by the Act of Congress in 2002 and 2008 finally have a remedy.

We seek to have this Court provide the redress that Congress intended, and that is to permit the execution of their judgments against the blocked assets that are before this Court

to give these plaintiffs the redress Congress intended.

**THE COURT:** Thank you.

Any response?

**MR. LAMKEN:** Your Honor, if I could --

**THE COURT:** Sorry. You have to start again.

**MR. LAMKEN:** Before turning to the Rule 19, I wanted to address briefly *Altman* and plaintiff's reliance on *Altman*.

I think it's just simply a mistake to rely on *Altman*. *Altman* is a case addressing a change in the Court's jurisdiction, whether the Court has jurisdiction over an entity. And rules about the Court's jurisdiction and rules about procedure almost always apply to all the cases pending. They just do as a matter of course. You don't really have to do retroactivity analysis. They apply.

But *Bancec* isn't a rule of jurisdiction. It isn't a rule of sovereign immunity. The Supreme Court made it very clear that it was a rule of substantive law.

And I'm looking at Page 620. And it's saying:

> "The Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality or the attribution of liability among instrumentalities of a foreign state."

It's a question of substantive law. As a matter of fact, when the Court went through and decided that the FSIA really didn't speak to this and didn't change it, it said the FSIA is

all about immunity, all about the jurisdiction of the Courts. It's not about substantive liability.

*Bancec* is a rule of substantive liability. When you change the rule and you say one person is responsible, it's collectable for them, they are liable for a judgment they previously weren't liable for, you're changing the substantive law of who must pay and you're doing it retroactively, if you apply to it conduct that predates it.

In terms of expectations, I wanted to briefly mention those. I think the Court is right. Before 2002 there was no expectation by any agency or instrumentality that its assets would be seizable for the wrongs of the sovereign. But I don't think that's actually the right question.

Retroactivity isn't a question about whether or not an individual entity has expectations because retroactivity applies to everybody. The law is either retroactive to everybody or it's retroactive to nobody. It's actually a question of expectations of the entire community. Everybody affected. Is this going to alter what everybody has been relying on for years?

And *Bancec*, again, makes it clear that the international community and the domestic community relies heavily on the separateness of instrumentalities and agencies when making important decisions. And *Bancec* points out that when people loan money to an agency or instrumentality, they rely on that

separateness to make sure that that money isn't going to be seized by the sovereign or by the creditors of the sovereign.

This is one of the things that facilitates credit transactions and allows, for example, debtors with poor credit histories to get money. They have a separate instrumentality. The money is there in a separate instrumentality and no one can reach it for the debt of the sovereign. So when that gets changed retroactively, it upsets everybody's expectation.

**THE COURT:** Well, but here there was a mechanism in place. That is, you have the government of Iran. So what to they do? They create a bank. They created a bank. How did they do that? They give money to the bank. What do they get in exchange? Shares. Okay. So they have taken assets of Iran and given it to the bank, sold it to the bank in exchange for shares.

Now, you can make the argument had they not created this bank and had the assets been in the United States, they certainly could be subject to seizure. But they took some of their assets, put it in the bank, and now you've changed their expectations by saying: You know, you've now sheltered those assets. That is to say, nobody can reach those.

**MR. LAMKEN:** In fact, your Honor, Bank Melli was an institution before -- separate in the government before it became governmentally owned.

But even apart from that --

**THE COURT:** Well, government acquired.

**MR. LAMKEN:** Even apart from that factual distinction is --

**THE COURT:** Sorry?

**MR. LAMKEN:** Even apart from that factual distinction --

**THE COURT:** Didn't the government acquire it?

**MR. LAMKEN:** The government now owns all the shares, that's correct.

**THE COURT:** So it acquired it. So for the -- that may predate the government. I know that that makes a difference in my argument.

**MR. LAMKEN:** The reliance, however, your Honor, is everybody who loans money to the bank, does business with the bank, otherwise interacts with the bank because they do that on the understanding established in *Bancec*, embedded in international law, respected in the treaty of amity between the United States and Iran that separate instrumentality's assets are not seizable to satisfy judgments against the sovereign.

And so if you based on conduct that predates the statute go back and make that -- those assets seizable, you upset all of those expectations. And I think it's those expectations that matter. Not, you know, did Bank Melli rely or did Iran itself rely. It's the reliance of everybody in the community who relies on the corporate separateness to ensure that their

contributions are respected.

Turning briefly to the statute, whether the statute does away with the distinction between the sovereign and its instrumentalities. That's one thing it doesn't do. Section 1603 is still clear that the instrumentality is a separate legal person, hasn't been amended.

The only thing that the statute -- that TRIA at most does, at most, it makes the assets that belong to a separate entity seizable, collectable, subject to liability, whatever you want to call it, to satisfy the judgment against another entity. That is a substantive change in law. It is not a change of immunity. It means that somebody who wasn't going to have to pay before now has to pay. Pure and simple.

If the Court doesn't have other questions on retroactivity, I wanted to briefly touch on, for example, the *Pimentel* argument.

**THE COURT:** Go head.

**MR. LAMKEN:** The FSIA establishes two separate immunities. The first is an immunity from jurisdiction. Section 1604 says:

"Except as provided in Sections 1605 through 1607 there is no jurisdiction against foreign sovereigns -- over foreign sovereigns."

It provides a separate immunity for assets belonging to the foreign sovereigns. And that is in Sections 1608 -- or

1609 with exceptions in 1610. So in other words, in order to hail a foreign entity into court and to seize assets belonging to it, you actually have to overcome both immunities.

And I wanted to mention just a little diversion. In terms of does the FSIA set up an odd rule where you can get a judgment and it's not collectable? The answer is yes, and intentionally so. The rule before the FSIA was you could sue a foreign sovereign if the State Department let you do so, but you could never collect the judgment. It was a matter of grace from the foreign sovereign to give it to you.

The Congress liberalized that a little bit in Section 1610, provided exceptions, but they were still pretty narrow. So it's still the case, with respect to every nation that's subject to suit in the courts of the United States, it's much easier to get a judgment than it is to collect it. And that's intentionally so.

**THE COURT:** Unless they have assets here.

**MR. LAMKEN:** Unless they have assets -- but there's exceptions. I mean, there's certain assets that are seizable. They have to be for commercial activity. If it's the sovereign itself, it has to be the asset itself that was used in commercial activity, for example. There are very narrow exceptions.

And so the ability to collect from a foreign sovereign is intentionally much narrower than the ability to sue a foreign

sovereign.

And there is another reason for that other than just history of the United States that it was always that way. A lot of foreign nations consider it an absolute and utter affront to their sovereignty to have their assets seized. Being sued, that's one thing; but actually having their assets seized is considered a true affront. And so in proceeding under the FSIA, the United States has proceeded relatively cautiously.

But backing up. So we have the two immunities: 1604, immunity from suit; 1609 immunity of assets from execution.

In this case plaintiffs cannot identify an exception to Bank Melli's jurisdictional immunity. It's immune from the Court's jurisdiction. It has to be dismissed. And under *Pimentel*, the case -- the suit cannot proceed without it. It is a necessary party.

And the quote from *Pimentel*, and I emphasized this before and I can't emphasize it more:

> "Where sovereign immunity is asserted and the claims of the sovereign are not frivolous dismissal of action must be ordered where there is potential injury to the interests of the absent sovereign."

Clear and simple. If you don't have jurisdiction over the sovereign, the case cannot proceed.

Now, plaintiffs have a number of theories why they think

they can get around that language.

First, they say: Well, the Court can adjudicate Bank Melli's claims. It's the defenses in the absence of Bank Melli.

Well, that's exactly what got the Ninth Circuit reversed in *Pimentel*. The Ninth Circuit said: We actually don't think the Republic of Philippines is actually a necessary party because we don't think their claims are very good. We don't think they will prevail. The Supreme Court said no. Unless the claim -- unless the interest is frivolous, you have to have jurisdiction over that entity.

Okay. So the plaintiffs also rely on cases involving whether or not you actually have to serve a foreign entity in order to collect on its assets. Well, whatever the service of process requirements applicable here would be, *Pimentel* is clear. You don't have jurisdiction over the sovereign. You can't proceed with the suit.

And this is not just some post-judgment motion against Iran. It's a separate action. It's an interpleader. It's brought to get assets from another entity, a legally separate entity, Bank Melli. And the rule is that unless you actually serve an entity in an interpleader, it's not bound. So plaintiff can't bind Bank Melli. We're going to serve it. We're going to bring it in and then say: But we're going to bind it without it being here. You can't have it both ways.

It's for exactly that reason that Chief Judge Lambreth's decisions in *Hausler* is not at all on point for this case. Setting aside for the moment he didn't cite *Pimentel*. In that chase all Chief Judge Lambreth said was: I'm not going to let Sprint file an interpleader belatedly in this case because I don't think it's subject to competing claims.

There is no indication here that the Iranian entity TIC was going to come after it, so it doesn't have to. He didn't say: Oh, we're going to have an interpleader. We're going to bind Tick. We're going to bind Iran, and we're going to do it without having the parties. And he couldn't do that because *Pimentel* would prevent it.

Yet, that's exactly what plaintiffs are asking for here. They're asking for this suit to proceed in our absence without jurisdiction and, yet, to have it bind Bank Melli and have assets for which Bank Melli has a claim, they are owed to Bank Melli according to the complaint, adjudicated.

In the end, I don't think that there is any way to get around *Pimentel* here. You have to have -- I guess I should point out, plaintiffs have two other arguments.

They point to 1610(g), and they point to the TRIA and they say: Ah-hah, these provide my immunity. Those overcome Bank Melli's jurisdictional immunity under 1604.

But there's a bunch of difficulties with that. The first is that Section 1604 says the bank is -- that foreign

sovereigns are immune except as in provided in Section 1605 through 1607. It doesn't include 1609, 1610. It's only 1605 through 1607.

Second, if you look at the language of the TRIA and you look at the language of 1610(g) they are both talking about the immunity of assets. They are talking about the separate immunity of assets. They don't give the Court jurisdiction over Bank Melli.

If the Court doesn't have any questions about the *Pimentel* action, I could proceed or I could let.

**THE COURT:** I'm trying to figure out why it's not too late to raise these issues. I mean, I guess, you know, they are coming against you to say, we just want to collect what you're holding.

**MR. LAMKEN:** Your Honor --

**THE COURT:** And then --

**MR. LAMKEN:** It's not too late because Bank Melli is a distinct entity. It has its own sovereign immunity. It's asserting its sovereign immunity now. Sovereign immunity isn't even waivable. The Court would have to raise it on its own motion if Bank Melli weren't here asserting it.

So I don't think there's any way one could say that it's too late in the day for Bank Melli to even say: We're a sovereign. There's no basis under 1605 through 1607 --

**THE COURT:** You say that *Weinstein* was wrong in that

regard.

**MR. LAMKEN:** I think to the extent *Weinstein* actually addresses the issue, I think it is dead wrong. I don't think *Weinstein* tarried very long with the 1604. I don't think *Weinstein* actually went through the analysis.

But I think if you look at the two separately -- 1609 would be for the asset, 1604 immunity for the sovereign entity -- this case can't proceed.

**THE COURT:** Shouldn't read anything into the fact that the Supreme Court didn't grant cert.

**MR. LAMKEN:** Pardon me?

**THE COURT:** Shouldn't read anything into the fact that the Supreme Court didn't grant cert, and that the government filed an amicus brief urging that cert not be granted.

**MR. LAMKEN:** That's correct, your Honor. Frankly, notwithstanding my great respect for the Office of the Solicitor General, it's not very easy to get the government to side with an Iranian institution these days.

The short answer is when the Supreme Court denies cert, it denies cert. The government said it wasn't important enough and disagreed with our construction of the statute. But that wasn't a *Pimentel* issue. The only issue --

**THE COURT:** This is Ninth Circuit -- this is obviously a decision going up to the Circuit and they are going

to rule. If they rule contrary to *Weinstein*, then you've got an interesting case for the Supreme Court.

**MR. LAMKEN:** I have a more interesting case if they rule contrary to *Pimentel*. *Pimentel* is absolutely clear in terms of what you do. There is a sovereign immunity. 1604 provides sovereign immunity. There is no exception any way you can point to. The case can't go forward.

**THE COURT:** Okay. Do you want to respond to the *Pimentel* argument?

**MR. MECHLING:** Sure. I think I can do so briefly.

*Pimentel* and Rule 19 don't have any application here because, first and foremost, this is a garnishment. This is a turnover case. And Bank Melli is no more a necessary party here than any judgment debtor would be in a garnishment situation. It's no more a necessary party here than Ferdinand Marcos was in *Pimentel.*

The reason that *Pimentel* couldn't go forward was that there was another claimant to the property that did have sovereign immunity and everybody admitted that, and the Supreme Court decided that under those circumstances the case couldn't go forward.

Here we believe the law is pretty clear; that an agency or instrumentality whose assets are to be executed against under TRIA or under 1610(g) are not necessary parties.

*Peterson* in the Ninth Circuit has addressed this. It says

that there is no need under the statute even to serve them with post-judgment process. The only process that's required is the service long ago made on Iran.

The *Heiser* case, counsel attempts to distinguish it. I don't think you can distinguish it. In *Heiser* Judge Lamberth said you don't need to bring in the foreign sovereign agency or instrumentality. They are not a necessary party here, and denied that request. So they are not a necessary party. That disposes of Rule 19 and *Pimentel* right off the bat.

But in addition to that, joinder is feasible. Joinder is feasible under 28 USC 1330(a) and (b) which creates jurisdiction in this Court for any enforcement of judgments under 1605, and personal jurisdiction is here pursuant to service of process under 1608, which counsel for Bank Melli consented to.

And I commend to the Court's attention the analysis of exactly this issue in the *Weininger* case where the Court, you know, looked at this and said, you know, for purposes of this collection action, which is sort of quasi in rem, I've got good jurisdiction based on 1330 and service of process under 1608. So I think that those considerations dispose of *Pimentel*.

I guess I would only note in closing on this that to interpret TRIA and 1610(g) in the fashion that Bank Melli would is in a way perverse because, as I discussed earlier, the whole purpose of the statute is to make available a remedy for these

people, and for -- and for a foreign sovereign agency or instrumentality to come forward and say:  Oh, well, you have your remedy, but you can't enforce it because I'm a necessary party and, oh, I've got sovereign immunity, where Congress has clearly stripped them of sovereign immunity, certainly as to these blocked assets, I respectfully submit creates a travesty of the statute.

**THE COURT:**  Thank you very much.  I appreciate it. And I hope, don't think anybody is expecting me to rule right now, are you, because I'm not going to.  I will give it thought and write an opinion which somebody will take up.

**MR. JACKSON:**  Your Honor?

**THE COURT:**  And then maybe I after I do it, you want to come back or write a letter as to -- depending on what I do, you can meet-and-confer and see whether you can agree on an appropriate next step.

Obviously, if I rule in favor of the bank, then the assets go back to the -- they go back to the bank, isn't that right?

**MR. JACKSON:**  Your Honor had suggested --

**THE COURT:**  They go back to you.

**MR. JACKSON:**  Your Honor had suggested at the earlier hearing that -- well, that it was going to grant the motion for discharge and I went back and read the transcript that was helpfully supplied by Bank Melli with its papers and there was an indication that the bank said:  Well, this would be a

discharge at least until the case becomes final.

My client is obviously interested -- clients are interested in being discharged. We tried to work out some language that was appropriately contingent and we couldn't --

**THE COURT:** I don't think -- realistically I don't think there is anything you have to do. I mean, you can show up, not show up. You can get a copy of the transcript.

I just didn't want you to incur more fees in this process. You may end up as a player. You may end up not as a player. Obviously, if I rule in favor of the bank, then the property goes back to you, and there you are. If I rule in favor of the -- in favor of the plaintiffs, then you are discharged. I mean, finally discharged subject to an appeal.

So you know, being realistic I don't think there is anything for me to do about you.

**MR. JACKSON:** So you would prefer that we hold off --

**THE COURT:** Why not? As they say in Brooklyn: What's the diff? You're not going anywhere. Nothing is happening. The money is here. You'll be there. You're not going out of business, right?

**MR. JACKSON:** Correct.

**THE COURT:** Good. Okay. Well, always glad to hear that. And I would anticipate -- I mean, this is my big project. So I can't tell you when it's going to be done, but I think I try to do things fairly quickly because these things

never get better over time. You just have a tendency to forget the arguments, not remember them.

So I will endeavor to get something out soon. Sorry I can't be more precise because I don't know the answer as to when. Thank you. Thanks for coming out.

**MR. JACKSON:** One last point.

**THE COURT:** Sure.

**MR. JACKSON:** Are you anticipating that whatever order you will issue --

**THE COURT:** It will be appealed. That's what I'm anticipating.

**MR. JACKSON:** Will it address the Visa and Franklin situation?

**THE COURT:** Yes, it will. It will address it, you know, in light of the Court's opinion and "X" should happen with respect to Visa and Franklin. I'll put something in there or issue a separate order with respect to that.

The whole thing is going to be appealed, I think. I mean, look, if you can settle it, but you're not going to settle it. So, I, mean -- maybe you'll settle it. I don't know.

Do you want me to send you somewhere to see if you can settle it? I'm delighted to do that.

**MR. LAMKEN:** Your Honor, typically these things are very difficult to settle because there are so many claimants

and if we settle with a few, some will come after it that's not before the Court. So typically given the size of the judgments that are outstanding, it's not feasible.

**THE COURT:** The judgments are very high, but the assets are -- you know, you've got, what, hundreds of millions of dollars?

**MR. MECHLING:** Yes.

**THE COURT:** Over how much?

**MR. LAMKEN:** Twenty --

**THE COURT:** What's in the race?

**MR. MECHLING:** It's about 18 million now.

**THE COURT:** About 18 million now. I mean, yeah. They have got hundreds of millions of dollars. They are not going to settle for five cents on the dollar. I mean, maybe they would, but I mean marginally it's not going to make that much difference to them anyway.

Look, I'm not -- any plaintiff out there wants to settle, terrific. Fine. I don't think you need me. There's nothing I can do more than -- I'm going to decide the case and everybody knows that regardless of how I decide it, it goes up and then something happens to it, and then maybe something happens to it or not. So this is a -- you know, this is just a stop, a stop along the way.

**MR. LAMKEN:** An important one nonetheless.

**THE COURT:** Oh, very important. It's important. I

mean, it's a very interesting issue, obviously. And it's not one where I can just say, well, clearly the answer is this or that. The advocacy has been terrific on both sides. Thank you so much.

(Proceedings adjourned.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, March 15, 2013